A. Barry Cappello (CSB No. 037835)
Leila J. Noël (CSB No. 114307)
Lawrence J. Conlan (CSB No. 221350)
**CAPPELLO & NOËL LLP**
831 State Street
Santa Barbara, CA 93101-3227
Telephone: (805)564-2444
Facsimile: (805)965-5950

Robert L. Lieff (CSB No. 037568)
Elizabeth J. Cabraser (CSB No. 083151)
Robert J. Nelson (CSB No. 132797)
Wilson M. Dunlavey (CSB No. 307719)
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Lynn Lincoln Sarko
*(Admitted Pro Hac Vice)*
Gretchen Freeman Cappio
*(Admitted Pro Hac Vice)*
Daniel Mensher
*(Admitted Pro Hac Vice)*
**KELLER ROHRBACK L.L.P.**
1201 Third Ave., Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384

Juli Farris (CSB No. 141716)
Matthew J. Preusch (CSB No. 298144)
**KELLER ROHRBACK L.L.P.**
1129 State Street, Suite 8
Santa Barbara, CA 93101
Telephone: (805) 456-1496
Facsimile: (805) 456-1497

*Attorneys for Individual and
Representative Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREY FOX, LLC, a California limited liability company; MAZ PROPERTIES, INC., a California corporation; BEAN BLOSSOM, LLC, a California limited liability company; WINTER HAWK, LLC, a California limited liability company, individually and on behalf of others similarly situated,<br>　　　　　Plaintiffs,<br>v.<br><br>PLAINS ALL AMERICAN PIPELINE, L.P., a Delaware limited partnership, PLAINS PIPELINE L.P., a Texas limited partnership,<br>　　　　　Defendants. | Case No.  2:16-cv-03157<br><br>**PLAINTIFFS' CLASS ACTION AND INDIVIDUAL COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

## I.  INTRODUCTION

Plaintiffs Grey Fox, LLC ("Grey Fox"), MAZ Properties, Inc. ("MAZ"), Bean Blossom, LLC ("Bean Blossom"), and Winter Hawk, LLC ("Winter Hawk") (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following against Plains All American Pipeline, L.P. ("Plains All American") and Plains Pipeline, L.P. ("Plains Pipeline") (collectively "Defendants" or "Plains"), based where applicable on personal knowledge, information and belief, and the investigation and research of counsel.

## II.  NATURE OF THE ACTION

1.      Defendants own and operate pipelines that transport crude oil and other liquids from the California coast to inland refinery markets in California. There are two pipelines. Line 901 is a 24-inch diameter pipeline that runs essentially east to west for approximately 10.7 miles along the Santa Barbara County coastline, from the Las Flores Canyon Oil & Gas Processing Facility to the Gaviota Pump Station.  Line 903 is a 30-inch diameter pipeline that runs south to north and then east for approximately 128 miles from the Gaviota Pump Station to the Emidio Station near Bakersfield, in Kern County.

2.      Line 901 delivers all of its crude oil to Line 903 at the Gaviota Pumping Station, where the two meet.  Line 903 then carries the crude from both Lines to Kern County.  Defendants control both Line 901 and Line 903 (together, the "Pipeline") from their control room in Midland, Texas.

3.      Defendants' Pipeline is shown in the map below published by the Santa Barbara County Energy Division.

///

///

///

///

///

CLASS ACTION COMPLAINT

15004.001 - 251238.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16   4.   The Pipeline runs through the real properties of Plaintiffs and putative

17   class members pursuant to written easement contracts (also known as Right-Of-

18   Way Grants).

19   5.   On the morning of May 19, 2015, the Pipeline ruptured on Plaintiff

20   Grey Fox's real property (Lot X). Before Defendants managed to shut it off, the

21   Pipeline had discharged crude oil on Lot X in an amount initially estimated by

22   Plains to be over 100,000 gallons, and then recalculated to be more than 140,000

23   gallons. Oil made its way beyond Grey Fox's property to other properties, public

24   recreation areas, coastal bluffs, beaches, and the Pacific Ocean.

25   6.   Line 901 was severely corroded prior to the spill, and in fact the steel

26   walls of the pipeline were severely eroded and had thinned to just 1/16 of an inch

27   in places. This was known to Defendants based upon third party anomaly testing.

28   Additionally, Defendants had repaired three parts of Line 901 adjacent to the

rupture, indicating that they were aware of corrosion, knew how to address it, but simply failed to do so.  Defendants also failed to maintain Line 903.

7.    The U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration ("PHMSA") shut down the Pipeline, finding that continued operation of the Pipeline without corrective measures would be hazardous to life, property, and the environment. The corrective measures include replacement of the Pipeline.

8.    The easement contracts all provide access to maintain, repair and/or restore the Pipeline to ensure its safe operation for a reasonable length of time. The easements do not, however, allow the scope of access needed by Plains to make the necessary repairs to and/or restoration of the Pipeline.

9.    Defendants failed to properly maintain the Pipeline, however, and they failed to properly monitor the Pipeline's corrosion levels or to timely make the repairs needed to sustain the reasonably-expected lifespan of the Pipeline.  Given Defendants' failures, the damage that now needs to be repaired and/or restored is far greater than what would have been required if timely maintenance had been performed. Moreover, the intrusion on Plaintiffs' real properties is commensurately greater than if Defendants had routinely and timely performed maintenance.

10.    The parties know additional access is needed because (1) the easements provided a temporary increase in the scope of access to originally install the Pipeline, which then reverted to a smaller, permanent scope after installation, and (2) when Defendants attempted to remediate the damage caused by the spill and replace the recently ruptured section on Grey Fox's property, they discovered they needed access to significantly more of Grey Fox's property than prescribed in the easement.

11.    This class action lawsuit is brought on behalf of all persons and entities who currently own real property subject to an easement for the Pipeline.

CLASS ACTION COMPLAINT

15004.001 - 251238.1

Each property owner has a written easement contract that contains similar material terms which provide limited, narrow access in order for Plains to repair and/or restore the Pipeline and protect Plaintiffs' rights to continue using and enjoying their land.

12.    Plaintiffs seek reformation of the easement contracts to allow Defendants' the necessary access to repair and/or restore the Pipeline consistent with PHMSA's findings, recommendations, and orders, and to pay Plaintiffs consideration for the additional access needed to work on the Pipeline and the additional burden that such access will place on their properties.

13.    Plaintiffs also seek specific performance of the reformed easement contracts, including maintenance, repair and/or restoration of the Pipeline as necessary to operate it safely and with minimal risk of future rupture, including the installation of necessary safety equipment, and payment for the additional access necessary for these repairs and/or restorations.

14.    Plaintiffs further seek appropriate equitable relief to prevent future disasters like the May 2015 rupture, and prohibit Defendants from reopening or restarting the Pipeline without first restoring it to a sound condition with minimal risk of future rupture and compensate Plaintiffs for the additional access necessary for the Defendants to fulfill their on-going obligations to maintain the Pipeline within the parameters of the easements and all applicable safety standards.

15.    Plaintiffs also seek all damages that flow from Defendants' breach of the easement contracts, failure to maintain the Pipeline, interference with Plaintiffs use and enjoyment of their properties, and from the pervasive threat that the Pipeline will cause future spills unless it is restored to a sound operating condition. These damages include but are not limited to lost proceeds from the sale of real property, diminished property values, costs of containment and cleanup, losses from injury to property, and loss of use and enjoyment of property.

CLASS ACTION COMPLAINT

15004.001 - 251238.1

16.     Additionally, Plaintiffs Grey Fox, MAZ, Bean Blossom, and Winter Hawk bring this action on their own behalf to recover the significant economic losses they have incurred and will continue to incur because of Defendants' oil spill.  Before Defendants' oil spill, Plaintiffs' properties and the natural environment surrounding their properties were pristine, and the properties' values reflected their location, natural beauty, and quietude.

17.     While Defendants repaired the rupture and cleaned up the petroleum-based material from the surface and soils on and around the spill area on Grey Fox's Lot X, permanent and continuing contamination in the area is likely.  The ability to use the properties has been severely impaired, and their marketability has vanished.  These Plaintiffs not only suffer present injury, but also suffer the concrete risk of imminent, additional injury.

18.     Given the rupture, spill, and condition of the Pipeline, Plaintiffs Grey Fox's,  MAZ's, Bean Blossom's, and Winter Hawk's properties are currently unsaleable, and they must continue funding costs for new residential improvement projects being built for resale that they would not have otherwise had to pay for had they been able to sell the properties in a timely manner.  Until the entire Pipeline is brought to a sound and operable condition, Plaintiffs must continue carrying the additional risks of future rupture and resulting loss of use and unanticipated costs.

19.     Plaintiffs Grey Fox, MAZ, Bean Blossom, and Winter Hawk also have incurred fees, costs, and expenses related to the spill, suffered continuing physical damages to the property despite remediation efforts, suffered damage to their ongoing efforts to commercially market their properties, and suffered stigma and reputational damages that have been and will continue to negatively impact the value, marketability, desirability, and ultimate sale price of their properties.

20.     This complaint does not supplant the currently pending Plaintiffs' Corrected Consolidated Second Amended Complaint in *Andrews* (formerly,

CLASS ACTION COMPLAINT

*Cheverez*) *v. Plains All American Pipeline, L.P.*, Case No. 2:15-CV-04113-PSG-JEM, which asserts tort and statutory claims on behalf of all persons or businesses in the United States that claim economic losses, or damages to their occupations, businesses, and/or property as a result of Defendants' May 19, 2015 oil spill from Line 901.  Rather, this case asserts (1) claims arising out of easement agreements on behalf of all persons and entities who own real property through which the Pipeline crosses, and (2) individual claims on behalf of Plaintiffs Grey Fox, Bean Blossom, MAZ, and Winter Hawk.

## III.   PARTIES

21.   Plaintiff Grey Fox, LLC is a California limited liability company with its principal place of business in Goleta, California.  It owns real property located in Santa Barbara County, California sometimes referred to as Lot X of El Rancho Tajiguas.  Lot X is burdened with an easement for the Pipeline. The May 2015 rupture of the Pipeline occurred on Lot X.

22.   Plaintiff MAZ Properties, Inc. is a California corporation with its principal place of business in Goleta, California.  It owns real property located in Santa Barbara County, California portions of which are sometimes referred to as Lot J and Lot B of El Rancho Tajiguas.  Lot J and Lot B are burdened with easements for the Pipeline.

23.   Bean Blossom, LLC is a California limited liability company with its principal place of business in Goleta, California.  It owns real property located in Santa Barbara County, California sometimes referred to as Lot H of El Rancho Tajiguas.  Lot H is burdened with an easement for the Pipeline.

24.   Winter Hawk, LLC is a California limited liability company with its principal place of business in Goleta, California.  It owns real property located in Santa Barbara County, California portions of which are sometimes referred to as Lot C of El Rancho Tajiguas.  Lot C is burdened with an easement for the Pipeline.

CLASS ACTION COMPLAINT

15004.001 - 251238.1

25. MAZ originally acquired what is commonly known as El Rancho Tajiguas. After the acquisition, MAZ executed a Right-Of-Way Grant and then an Amendment to the Right-Of-Way Grant. (See Ex. 1 [Right-Of-Way Grant] and Ex. 2 [Amendment] attached hereto and incorporated herein by reference and hereby made a part of the record hereof.) This private contract easement allows the Pipeline to run through the southern section of El Rancho Tajiguas, along the Pacific Coast.

26. El Rancho Tajiguas was and is comprised of approximately 24 legal parcels of land, or Lots, and MAZ subsequently transferred some of the Lots to limited liability companies. MAZ kept its interest in Lot B and Lot J and transferred Lot X to Grey Fox, Lot H to Bean Blossom, and Lot C to Winter Hawk. MAZ's original Right-Of-Way Grant and Amendment for El Rancho Tajiguas currently applies to Lots B, J, X, H, and C. The easements that apply to the properties of the other members of the Class are materially similar to the relevant provisions contained in the El Rancho Tajiguas easement.

27. Defendant Plains All American Pipeline, L.P. is a limited partnership formed in Delaware with its headquarters and principal place of business in Houston, Texas. Under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(10), Defendant Plains All American, an unincorporated association, is therefore a citizen of Delaware and Texas.

28. Defendant Plains All American operates through or on behalf of PAA GP LLC, a limited liability company formed in Delaware with its headquarters and principal place of business in Houston, Texas; Plains AAP, L.P. ("AAP"), a limited partnership formed in Delaware with its headquarters and principal place of business in Houston, Texas, that is the sole member of PAA GP LLC; Plains All American GP LLC ("GP LLC"), a limited liability company formed in Delaware with its headquarters and principal place of business in Houston, Texas; Plains GP Holdings, L.P. ("PAGP"), a limited partnership formed in Delaware with its

CLASS ACTION COMPLAINT

headquarters and principal place of business in Houston, Texas, that is the sole member of GP LLC; and PAA GP Holdings LLC, a limited liability company formed in Delaware with its headquarters in Houston, Texas, that is the general partner of PAGP.  As each of these entities are unincorporated associations, pursuant to CAFA, 28 U.S.C. § 1332(d)(10), they are each a citizen of Delaware and Texas.

29.    Defendant Plains Pipeline, L.P. is a limited partnership formed in Texas with its headquarters and principal place of business in Houston, Texas. Defendant Plains Pipeline is a subsidiary of Defendant Plains All American. Pursuant to CAFA, 28 U.S.C. § 1332(d)(10), Defendant Plains Pipeline, an unincorporated association, is therefore a citizen of Texas.  Plains Pipeline, L.P. is operated by its general partner, Plains GP, LLC, and its limited partner, Plains Marketing, L.P.  Plains GP, LLC is a Texas LLC with its headquarters and principal place of business in Texas.  Plains Marketing, L.P. is a Texas Limited Partnership with its headquarters and principal place of business in Texas.

30.    Defendants have common proprietary interests, ownership interests, or joint ventures with each other, are directly related to or are affiliated with each other, and are involved with the ownership, operation, and maintenance of the Pipeline.

## IV.    JURISDICTION AND VENUE

31.    This Court has jurisdiction over this class action pursuant to CAFA, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one defendant; there are more than 100 class members; and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

32.    This Court also has jurisdiction over this individual action pursuant to 28 U.S.C. § 1332(a) and (c), because the matter in controversy between Plaintiff Grey Fox and Defendants exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

33.     This Court has personal jurisdiction over Defendants because they are registered to conduct business in California, have property interests in California, and have sufficient minimum contacts with California.

34.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred and/or emanated from this District, because a substantial part of the property involved is situated in this District, and because Defendants have caused harm to Class members residing in this District.

## V.     BACKGROUND FACTS

**A.     <u>Easement Contracts Require Defendants To Maintain The Pipeline And Not Interfere With Plaintiffs' Use And Enjoyment Of Their Land</u>**

35.     The Pipeline was constructed in the late 1980s and went into crude oil service in 1991. Prior to installation, Defendants' predecessor, Celeron Pipeline Company of California, drafted easement contracts (or Right-Of-Way Grants) for each of the properties through which the Pipeline would travel.  Celeron and the property owners executed the easement contracts, and Celeron paid each property owner certain cash consideration.  Plains later acquired Celeron.

36.     In each easement contract, the grantor property owners granted the grantee oil company a non-exclusive right-of-way and easement, with the right of ingress and egress incidental thereto, "to survey, lay, maintain, operate, repair, replace, and remove one underground pipeline and appurtenances thereto for the transportation of oil, gas, water and other substances", on, over, through, under and across a portion of the grantor's land. (See Ex. 1, El Rancho Tajiguas Right-Of-Way, at p. 1.)

37.     In each easement contract, the grantor property owners also reserved the right to use and enjoy the land. (See Ex. 1, El Rancho Tajiguas Right-Of-Way Grant, at p. 2.)

CLASS ACTION COMPLAINT

**B.     Defendants Are Also Contractually Required To Indemnify And Hold Plaintiffs Harmless For Any Claims Arising From The Spill Or The Subsequent Remediation**

38.     The spill also triggered certain contractual indemnity obligations under the easement contracts.  In each easement contract, the grantee oil company assumed all risks of and agreed to indemnify and hold the grantor property owner harmless from and against all claims and losses relating to the Pipeline, unless those claims or losses were a direct result of the grantor property owner's negligence. (See Ex. 1, El Rancho Tajiguas Right-Of-Way Grant, at p. 2.)

39.     Additionally, after the spill, Plaintiff Grey Fox and Plains entered into a Temporary Property Access and Remediation Agreement, in which Plains further agreed to protect, indemnify, defend, and hold Grey Fox harmless from and against any and all damages, demands, claims, losses, liabilities, injuries, penalties, fines, liens, judgments, suits, actions, investigations, proceedings, costs or expenses whatsoever (including, without limitation, reasonable attorneys' and experts' fees) arising out of or relating to any physical harm, physical or property damage or personal injury or death caused by Plains' remediation work or the rupture and release of crude oil from the Pipeline on Lot X. (See Ex. 3, Temporary Property Access and Remediation Agreement, at § 8.)

**C.     The May 2015 Rupture of Defendants' Pipeline Spilled Toxic Crude Oil Onto Grey Fox's Lot X, Onto The Beach, And Into The Pacific Ocean**

40.     On the morning of May 19, 2015, at approximately 10:55 a.m., the Pipeline ruptured on Grey Fox's private property (Lot X) near Refugio State Beach, spilling toxic oil onto the property, onto the coastal bluffs, onto the beach, and into the Pacific Ocean.

41.     As the crude oil poured out of the ruptured pipe, motorists on U.S. 101, neighbors and beachgoers became overwhelmed by the stench of oil.  At approximately 11:30 a.m. the Santa Barbara County Fire Department responded to reports of the noxious odors, and arrived to find oil flowing freely from the

CLASS ACTION COMPLAINT

15004.001 - 251238.1

Pipeline, through a storm drain under the transportation corridor containing U.S. 101 and railroad tracks operated by Union Pacific, across the beach, and into the Pacific Ocean.  Oil continued to spill from the Pipeline until approximately 3 p.m.

42.   While the precise timeline of events is still unknown, it appears that Defendants did not promptly act to respond to signs of the Pipeline's failure or notify relevant government agencies.  As the two United States Senators from California stated in a letter to Defendants, "we are concerned that Plains Pipeline may not have detected this spill or reported it to federal officials as quickly as possible, and that these delays could have exacerbated the extent of the damage to the environment."  The senators called Defendants' response "insufficient."

43.   Indeed, as reported by the Los Angeles Times, it appears that "chaos and delay marked the initial hours after [the] pipeline burst."  According to Defendants' response to the senators' letter, Plains personnel were unable to timely notify federal spill response officials or communicate with other Plains representatives due to in part "distractions" at the spill site.  Defendants' on-site employee dispatched to respond to the emergency was reduced to using a shovel to try to build a berm to contain the spill.

44.   According to federal investigators, one of Plains' representatives told officials who first responded to reports of an oil spill that he did not think it came from Line 901, which is on the opposite side of the interstate transportation corridor from the ocean.  In fact, it was several hours before Defendants officially notified local, state, or federal spill response officials, even though Defendants' representatives were conducting a spill response drill nearby that very morning.

45.   Witnesses who visited Refugio State Beach on the night of the spill reported little or no response.  Even the next day, as professional clean-up crews began responding to the oil contaminating Refugio State Beach, the response efforts at other nearby beaches were left to volunteers with little or no training or

15004.001 - 251238.1

protective equipment, some using nothing but shovels and five-gallon buckets in attempts to remove thousands of gallons of crude oil from the sand and sea.

46.    That apparently delayed and inadequate response runs contrary to Defendants' oil spill response plan, which assured state regulators that a spill from Line 901 was "extremely unlikely."  Defendants also assured regulators that it would take no longer than 15 minutes to discover and shut off the source of any spill.  In fact, Defendants continued to operate Line 901 for more than 30 minutes after it initially ruptured, and waited hours more before officially notifying federal responders of the rupture.

47.    The spill polluted Grey Fox's Lot X and impaired the ability of all property owners along the length of the Pipeline to use and enjoy their land.  The oil spill also presented a serious risk to human life.  The Santa Barbara County Health Department recommended that residents avoid all areas affected by the spill, but U.S. Route 101, a major interstate highway, runs through and adjacent to the spill area.  The County called Refugio Beach a "Hazmat area."  The County also warned that direct contact with oil, inhalation of fumes, or ingestion of contaminated fish or shellfish can cause skin irritation, nausea, vomiting, and other illnesses.

48.    Following the spill, the group Water Defense collected oil and water samples to test for chemicals that could be harmful to the public.  Although the Pipeline had been approved to transport crude oil, the testing revealed that the Pipeline also carried – and Line 901 spilled – toxic chemicals known to pose severe threats to human health and marine life, including but not limited to, Ethylbenzene, Toluene, Xylene, and Naphthalene.  Those tests also confirmed the presence of Glutaraldehyde, a biocide used in drilling, fracking, and acidizing injections.

49.    Long term, the extent of the impact that occurred may be as-yet-unknown, but they are no less certain.  Even with the best spill response, toxic oil

will remain in the environment for a long time, continuing to harm the environment.  Recently, five years after the Deepwater Horizon oil spill in the Gulf of Mexico, officials assessing the damage to that ecosystem said "the environmental effects of this spill is likely to last for generations."  This spill, too, may cause long-lasting environmental and economic impacts.

50.    The Santa Barbara News-Press reported that, as of late June, 2015 the "most tedious" portions of the clean-up area still remained uncleaned, and cleanup costs had exceeded $92 million.    By January of this year, only a small fraction of the oil – 14,267 gallons of an oil/water mix – had been recovered, and over 430 oiled birds and mammals had been observed.

**D.** **The May 2015 Rupture Exposed The Dangerous Conditions Of The Entire Pipeline**

**1.** **The Root Cause Of The Rupture Was External Corrosion**

51.    On February 17, 2016, PHMSA issued a Preliminary Factual Findings Report and identified external corrosion as the root cause of the Pipeline rupture.

52.    The Pipeline is coated with coal tar urethane and covered with foam insulation and a tape wrap over the insulation.  Shrink wrap sleeves, which provide a barrier between the steel pipeline and soil, are present at all of the pipe joints on Line 901 and multiple locations on Line 903.  Both Lines carry low API gravity crude oil at a temperature of approximately 135 degrees Fahrenheit.

53.    After the rupture, a third party performed a metallurgical analysis and concluded that the rupture "occurred at an area of external corrosion that ultimately failed in ductile overload under the imposed operating pressure.  The morphology of the external corrosion observed on the pipe section is consistent with corrosion under insulation facilitated by wet-dry cycling."  In other words, moisture is getting between the pipe and insulation, the insulation does not allow the moisture to evaporate fast enough, the pipe does not dry properly, the pipe

corrodes from the outside, and the corrosion materially compromises the integrity of the structure of the pipe, allowing for a rupture.

54.    Because of the external components of the Pipeline, Defendants should have known that exterior corrosion was a risk and should have more competently monitored and maintained it.  Instead, Defendants have created a dangerous situation that can be made safe only by replacing the entire Pipeline.  Unlike internal corrosion, external corrosion cannot be repaired from the inside. An externally corroded pipe must by dug up and replaced.

### 2.    The Entire Pipeline Is Riddled With Additional Anomalies

55.    The point-of-rupture is not the only corroded portion of the Pipeline. The entire Pipeline is riddled with additional anomalies known to Plains, further threatening another disaster comparable to or worse than the May 19, 2015 spill.

56.    Plains' existing corrosion control system is not preventing external corrosion of the pipe under the insulation, and the frequency and extent of corrosion anomalies are only increasing.

57.    PHMSA's Preliminary Findings show that data from Plains' "in-line inspections" of Line 901 "show a growing number of corrosion anomalies on Line 901," increasing from 12 areas of metal loss of 40 to 59 percent, to 80 such areas by the month of the spill in May 2015.  Based on that and other data, the agency concluded that "Plains' existing corrosion system is not preventing external corrosion of the pipe under insulation."   Line 903 was likewise found to have corrosion characteristics consistent with the failure point of Line 901.

58.    While these numbers are disturbing, they are also understated.  The May 2015 survey, for instance, did not accurately report the full extent of external corrosion in the area of the spill, and it did not accurately report the full extent of external corrosion anomalies consistently compared to field measurements of all anomalies investigated after the spill.

59.    Defendants also failed to monitor and maintain the Pipeline's cathodic protection system.  Though the system is supposed to prevent or reduce corrosion even when moisture makes it through to the Pipeline, it is not functioning correctly.

60.    In 2003 PHMSA alerted pipeline owners and operators, including Defendants, of stress corrosion cracking (SCC) as a potential risk and the assessment and remediation measures that should be performed.

61.    SCC or environmentally-assisted cracking can be induced on a pipeline from the combined influence of tensile stress and a corrosive medium.  SCC is commonly associated with disbonded coatings.  Disbonded coatings may prevent the cathodic protection currently used for corrosion control from reaching the pipe surface and allow an SCC-susceptible environment to form between the pipe and coating.  Tape coatings and shrink wrap sleeves are both susceptible to disbondment, which reduces the efficacy of the cathodic protection system and may lead to corrosion and possibly environmentally assisted cracking or SCC.

62.    Although these types of coatings and sleeves are present on the Pipeline, PHMSA's Preliminary Findings indicates that Plains did not factor in the insulation of the Pipeline when determining the protection level supplied by its cathodic protection system.  Cathodic protection is required by Federal pipeline safety regulations to prevent external corrosion of the Pipeline.  Historical records, however, reveal that Defendants supplied a cathodic protection level sufficient to protect non-insulated, coated steel pipe, but insufficient to protect the Pipeline, which is insulated.

63.    The May 2015 rupture and the resulting environmental disaster exposed the dangerous condition of the entire Pipeline running through Plaintiffs' properties.  It also exposed Defendants' systemic failure to properly monitor and maintain the Pipeline.

64.     The Pipeline, which transports crude with toxins (including unauthorized toxins) under high pressure through private property and in close proximity to residential areas and drinking water resources, is an immediate and ultrahazardous risk and serious danger to Plaintiffs and putative class members. This hazardous activity has created and continues to create a zone of danger to Plaintiffs.

65.     The Pipeline was, and is, in an unsafe condition, and its continued use would only put further stress on it.  It must be restored and brought to a safe and sound operating condition, including the installation of additional safety devices, and properly maintained going forward to ensure the safe transport of crude oil through the entire route of the Pipeline.

**E.    Defendants Cannot Repair and/or Restore The Pipeline Within The Parameters Of The Easements**

66.     After the May 2015 rupture, Defendants removed and replaced the ruptured section of the Pipeline on Grey Fox's Lot X, but did not repair and/or restore any of the other sections on Lot X or the other Plaintiffs' properties.  As a result, the rest of the Pipeline remains unsafe and riddled with corrosion and other anomalies.

67.     The current easements, however, do not allow sufficient access for the necessary repair and/or restoration of the Pipeline.  When Defendants attempted to restore the ruptured section on Lot X, they discovered that they needed access to more of Grey Fox's property than is prescribed in the easement. Plains and Grey Fox then had to negotiate a Temporary Property Access and Remediation Agreement to allow Plains greater access than prescribed in the easement. (See Ex. 3, Temporary Property Access and Remediation Agreement.)

68.     Each easement contract limits Defendants' access along the entire Pipeline.  As the easement owner, Defendants have no right to use any more than the prescribed amount of land to repair and/or restore the Pipeline.

15004.001 - 251238.1

69.   Any additional access creates a new burden on Plaintiffs' servient tenement or materially increases the existing burden.  Neither is allowed without Plaintiffs' consent.  Should Defendants be allowed to expand the easements without Plaintiffs' consent, Defendants would obstruct Plaintiffs' free use and enjoyment of their land, and such action, if continued, would eventually ripen into a new easement for Defendants' benefit.

70.   Therefore, while Defendants have a right to maintain a safe Pipeline, they have no right to maintain it beyond the extent of their existing easements without additional compensation, and render it a nuisance to or destructive of Plaintiffs' land.  Since the easements have been finally established, Defendants cannot access more of Plaintiffs' land without compensation for the burden, risks and harm of their doing so.

**F.   Defendants Have A Long History Of Recklessly Avoiding Safety**

71.   Threats to the Gaviota Coast and Santa Barbara's environment and economy from oil development, production and operations are not new.  In 1969, a blowout at Union Oil's off-shore drill rig sent millions of gallons of oil into the waters and onto the beaches of Santa Barbara County.  The blowout killed thousands of birds, dolphins, fish, and other marine life.  The litigation that followed effectively led to the birth of the environmental movement and legislation to protect the environment, the public and private property owners from oil and gas operations on and off shore.

72.   Despite that disaster, the oil industry has only continued to grow in and around Santa Barbara County.  Today, however, governments and some companies have taken significant steps to make the production and transportation of crude oil safer and more reliable.  Defendants, on the other hand, are notable for their track record of doing otherwise.

73.   Automatic shut-off valves are one such safety feature others have adopted but Defendants have refused to install.  This refusal by Defendants to

follow standard safety protocols directly contradicts their own published pipeline safety protocol, which provides "that Plains All American Pipeline is committed to designing, constructing, operating, and maintaining its pipelines in a safe and reliable manner that will meet or exceed minimum safety standards. …"

74.   Consequently, the Pipeline is likely the only pipeline system that is still capable of failing and discharging hundreds of thousands of gallons of oil without warning.

**G.   The May 2015 Rupture Could Have Been Averted Had Defendants Adequately Installed And Maintained The Pipeline, Making It Less Susceptible To Corrosion And Rupture**

75.   Regular monitoring and maintenance of pipelines is a crucial step that owners of pipelines must take in order to avoid exactly the disaster that occurred. Regular monitoring and maintenance is also what the property owners expected when they entered into the easement contracts.

76.   Defendants failed to provide regular maintenance and failed to detect and repair the corrosion that was eating away at the steel walls of the Pipeline. Defendants, instead, wantonly disregarded the health and safety of the public and environment by operating the Pipeline when they knew it was corroded and did not have proper safety systems in place.

77.   Even though they should know that they still do not have the proper safety systems in place to avoid another disaster, Defendants indicated they have no intention of implementing them.

**H.   Defendants' Lax Safety Standards On The Pipeline Are Not Isolated Incidents**

78.   The lax safety standards on the Pipeline are not isolated incidents for Defendants. Since 2006 Plains has been cited for more than 175 violations of safety requirements, causing nearly $24 million in property damage. Eleven of those incidents were in California.  Plains is one of the top four most-cited pipeline operators in the country.

79.    Even more alarming is that, according to federal statistics analyzed by the website The Smart Pig Blog, the "number of incidents on crude oil pipelines operated by [Plains] . . . is increasing faster than the national average," by about 14%.  The rapidly rising increase in incidents for pipelines operated by Plains is as shown in this chart:



80.    In 2014, for example, a pipeline owned and operated by Defendants ruptured in a Los Angeles neighborhood, covering streets, cars, houses, and businesses in oil.  The cause: a poorly maintained pipeline.  A few years ago, another poorly maintained Plains pipeline ruptured and sent oil into a drinking water reservoir for the residents of Los Angeles.

81.    In 2010, pursuant to a Consent Decree filed by the U.S. EPA following numerous alleged violations of the Clean Water Act by Defendants in several states, Defendants represented that they would update their procedures such that "[i]f there is an unexplained increase in delivery flow-rate with corresponding decrease in pressure – [Plains would] SHUTDOWN the affected line segment."

82.    As part of the settlement of the EPA actions, Defendants paid a $3.25 million penalty for 10 spills between June 2004 and September 2007 that discharged a total of roughly 273,420 gallons of crude oil into navigable waters or adjoining shorelines in Texas, Louisiana, Oklahoma, and Kansas.

15004.001 - 251238.1

83.     Plains itself recently acknowledged in a disclosure report to the U.S. Securities and Exchange Commission that it has "experienced (*and likely will experience future*) releases of hydrocarbon products into the environment from our pipeline . . . operations" that "may reach surface water bodies." (Emphasis added).

84.     Indeed, less than two months after the rupture of Line 901, more than 4,000 gallons of oil spilled from a pump station on Defendants' Capwood Pipeline in Illinois, contaminating a nearby creek.

**I.     Defendants Are On Formal Notice By PHMSA For Probable Violations Of Federal Regulations, And Have Been Issued A Compliance Order**

85.     On August 19-22, 2013, September 16-19, 2013, and September 30-October 4, 2013, a PHMSA representative inspected Lines 901 and Line 903. Following those field inspections, PHMSA requested additional documentation and information pertaining to the Pipeline.  This information was provided through June 2014.

86.     On September 11, 2015 PHMSA issued a formal notice of probable violation and compliance order (the "Notice") against Defendants in light of its long-standing investigation.

87.     In its Notice to Defendants, PHMSA stated that "as a result of the inspection, it appears that you have committed probable violations of the Pipeline Safety Regulations, Title 49, Code of Federal Regulations . . . . These findings and probable violations were determined prior to the May 19, 2015 crude oil spill in Santa Barbara County, California."

88.     The Notice identifies six probable violations:

    i. Failure to maintain adequate documentation of pressure tests as part of its baseline assessment plan for its seven breakout tanks at Pentland Station in Kern County, California and failure to present any evidence of past pressure tests performed on the breakout tanks to inspection teams.  While some evidence of testing from 1995 was ultimately

presented, these did not confirm that the tests were performed in compliance with regulations;

ii.  Failure to maintain adequate documentation of its preventative and mitigative evaluations prior to the 2013 calendar year for at least two different pipeline segments, and later stating that these records could not be found;

iii. Failure to adequately document consideration of preventive and mitigative measures nor explain why implementation of said measures were not executed in "High Consequence Areas";

iv. Failure to present adequate documentation of its annual review of Plains' emergency response training program, resulting in an inability to demonstrate an adequate review of training program objectives or the decision-making process for changes made to emergency response programs;

v. Failure to present adequate documentation to demonstrate that supervisors maintained a thorough knowledge of the portions of the emergency response procedure for which they are responsible and for which it is their job to ensure compliance; and

vi. Failure to maintain sufficient records to demonstrate that contractors met the required qualifications.

89.      In addition to the above probable violations, PHMSA also cited three additional areas of safety concern:

i.  Failure to fully discuss or document how tool tolerance was addressed or how measured anomalies that deviated significantly from the size predicted by the tool were addressed;

ii.  Incomplete documentation of Management of Change for pressure reduction; and

CLASS ACTION COMPLAINT

iii. Failure to comply with its responsibility to educate emergency response officials as part of its Public Awareness Program.

90.     As a result of these findings, PHMSA issued a Proposed Compliance Order demanding that Defendants take action to remediate the above probable violations and safety concerns.[1]

91.     Later that same day, the Associated Press reported on the Notice and Proposed Compliance Order, quoting Robert Bea, a civil engineering professor at University of California, Berkeley. Professor Bea, a former oil executive who has studied numerous spills, stated that, "In all the documentation I have reviewed concerning the pipeline, I have never seen evidence of any advanced risk assessment and management processes being used by Plains."

92.     The Associated Press further reported that Professor Bea said the latest action by regulators speak to a weak corporate culture of safety and inadequate efforts to assess risk and prevent spills.

93.     In short, Plains operates pipelines that routinely and foreseeably fail. The communities through which it transports oil suffer the consequences.

94.     More recently, and as set forth above, on February 17, 2016, PHMSA issued Preliminary Findings on the May 19, 2015 Pipeline rupture.  The agency found that:

i.  The Pipeline failed at an approximate pressure of 750 psig (pounds per square inch gauge) which is only 56% of the Maximum Operating Pressure;

ii.  The May 6, 2015 In Line Inspection survey did not accurately size the amount of external corrosion in the area of the release;

---

[1] On November 12, 2015, PHMSA issued an amendment to the corrective action order. *See In the Matter of Plains Pipeline, LP, Respondent*, CPF No. 5-2015-5011H, Amendment No. 2 To the Corrective Action Order, *available at* http://www.phmsa.dot.gov/pv_obj_cache/pv_obj_id_B5EF5CF4C40AED2ACB35EE030BDB5CFAD5B60400/filename/52015_5011H_Amendment_No2_Corrective_Action_Order.pdf. That order explains that, contrary to common practice in the pipeline industry, Plains did not provide data from its field surveys of Line 901 to its in-line inspection vendor, and that based on PHMSA's investigation of Line 903 "it does not appear that Plains has an effective corrosion control program[.]"

CLASS ACTION COMPLAINT

iii.  The In Line Inspection survey did not size corrosion anomalies consistently compared to field measurements of all anomalies investigated after the May 19th spill;

iv.   Plains' existing corrosion control system is not preventing external corrosion of the pipe under insulation.

95.     The PHMSA investigation is continuing, with particular focus on metallurgical report review; the third-party root cause failure analysis; third-party analysis of the In Line Investigation surveys; complete analysis of the Plains control room including Controller actions; complete review and analysis of Plains Integrity Management Program; review of the adequacy of the placement and closure requirements of valves; need for additional pressure/flow monitoring devices; and investigation of the Plains Facility Response Plan.

96.     Defendants have profited and continue to profit from their blatant negligence and failure to comply with local, state, and federal safety requirements and guidelines, and their decision not to maintain and replace the Pipeline demonstrates Defendants' willingness to prioritize profits of over public safety.

97.     Defendants knew of the extremely high risk of catastrophic injury inherent in the transportation of oil through the Pipeline, and they know of the extremely high risk of reopening and restarting the Pipeline.  Notwithstanding, Defendants took insufficient steps to engage in necessary monitoring and maintenance activities so as to prevent the rupture and protect Plaintiffs.  Indeed, Defendants have actively avoided taking action to protect Plaintiffs from known risks the Pipeline presented before and after the rupture.  Defendants have demonstrated a callous and reckless disregard for human life, health, and safety by operating the Pipeline without proper monitoring, maintenance and without proper safety equipment.

98.     This disregard for human life and safety is part of a pattern and practice that Defendants have demonstrated across the country.  Defendants have

1    acted with such indifference to the consequences of their misconduct, with such

2    recklessness, and as part of a well-established pattern, as to be willful, malicious,

3    and oppressive, and in disregard of the rights of the Plaintiffs, thereby meriting an

4    award of punitive or exemplary damages against Defendants.

## VI.    CLASS ACTION ALLEGATIONS

6        99.    Plaintiffs bring claims pursuant to Federal Rule of Civil Procedure 23

7    on behalf of classes of similarly situated persons, which they initially propose be

8    defined as follows:

9                *All persons and entities who currently own real*

10               *property subject to an easement for the Pipeline.*

11   Plaintiffs reserve the right to propose subclasses of Plaintiffs in connection with

12   their Motion for Class Certification, and as determined by the Court in its

13   discretion.

14       100.  **Numerosity**: The members of the Class are so numerous that joinder

15   of all members is impractical. The exact number of class members is unknown at

16   this time by Plaintiffs, but the approximate size of the class is in the hundreds and

17   is known by Plains.

18       101.  **Commonality**: There are common questions of law and fact that

19   predominate over any questions affecting only individual members of the Class.

20   The members of the Class own real property subject to easements allowing Plains

21   to operate, maintain, repair, remove, and replace the Pipeline.  Defendants failed to

22   maintain the Pipeline, leaving it in an unsafe condition, which is hazardous to life,

23   property, and the environment.

24       102.  No reasonable property owner would have entered the contracts if they

25   had known the truth. Rather than meet its obligations, Plains failed to properly

26   maintain the Pipeline, failed to timely act on independent third party monitoring of

27   the Pipeline's corrosion levels, and failed to timely make the repairs and/or

28

-24-                                    CLASS ACTION COMPLAINT

1    restoration needed to sustain the reasonably expected lifespan of the Pipeline,

2    rendering it increasingly unsafe and more hazardous.

3          103.   The claims of the Plaintiffs and class members arise from common

4    facts relevant to each class member, and each member of the designated class sues

5    under common legal theories.  Common issues of law or fact or the class include,

6    but are not limited to:

7          i.    Whether Defendants failed to properly monitor and maintain the

8                Pipeline;

9          ii.   Whether the Defendants failed to properly monitor and maintain the

10               Pipeline in a safe condition;

11         iii.  Whether Defendants maintained and operated the Pipeline in an

12               unsafe condition;

13         iv.   Whether Defendants breached their duties and obligations pursuant

14               to the Pipeline easements;

15         v.    Whether Defendants breached their obligation to properly monitor

16               and maintain the Pipeline in a safe condition;

17         vi.   Whether the easement contracts should be reformed to reflect the

18               access needed to repair and/or restore the Pipeline;

19         vii.  Whether the easement contracts should be reformed to provide

20               consideration to Plaintiffs for the additional access needed to repair

21               and/or restore the Pipeline;

22         viii. Whether the parties were mistaken that the access provided in the

23               easement contracts was adequate to repair and/or restore the Pipeline;

24         ix.   Whether there was a mutual mistake of fact regarding the amount of

25               access needed to repair and/or restore the Pipeline;

26         x.    Whether Defendants negligently represented to Plaintiffs that the

27               Pipeline would be properly maintained and could be repaired and/or

28               restored within the parameters of the easements;

-25-                          CLASS ACTION COMPLAINT

xi.   Whether Defendants should be required to specifically perform the easement contracts by restoring the Pipeline;

xii.   Whether Defendants' operation and maintenance of the Pipeline unreasonably affects Plaintiffs and the Class Members;

xiii.   Whether Defendants used the easements unreasonably;

xiv.   Whether the Pipeline is causing damage to Plaintiffs' and Class Members' properties;

xv.   Whether the improperly maintained Pipeline is a nuisance;

xvi.  Whether attempts to repair and/or restore the Pipeline will be a nuisance;

xvii.   Whether Defendants should be required to pay class-wide damages for nuisance; and

xviii.   Whether Defendants should be required to pay class-wide damages for breach of the private easement contracts.

104.  Each of the Plaintiffs and Class Members have the same, uniform contractual and implied right to fully use and enjoy their property.  The Pipeline operates as one unit along each easement holders' lands.  The use of the easement is uniform to all Plaintiffs and Class Members because the Pipeline is one pipeline. The pipeline functions and is operated by Defendants as one continuous unit along Plaintiffs' properties.  The Pipeline operates as a whole for a single purpose and is one petroleum transmission system, pumping crude oil throughout and physically touching Plaintiffs' real properties.

105.  Plaintiffs' property rights are fundamental and specifically articulated in the language of a written easement.  This written easement language is consistent with the common law duties in California, directing that the holder of the easement rights cannot unreasonably interfere with the servient easement holder's property, preventing the servient easement holder from the right to fully use and enjoy his or her property.

CLASS ACTION COMPLAINT

106.  **Typicality**: The representative Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and all the members of the Class have been injured by the same wrongful acts and omissions of Defendants. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the members of the Class and are based on the same legal theories. There is common liability and a common wrongful conduct by the Defendants applicable to all class members.  Further, the defenses interposed by the Defendants are expected to be common toward the class members.

107.  **Adequacy of Representation**: Plaintiffs are representatives who will fully and adequately assert and protect the interests of the Class, and have retained class counsel who are experienced and qualified in prosecuting class actions. Neither Plaintiffs nor their attorneys have any interests contrary to or in conflict with the Class.

108.  The proposed class representatives will fairly and adequately represent the interests of the class members because the class members have similar easements allowing for reasonable use and operation of the Pipeline.  Plains has operated and maintained the Pipeline in a defective, unsafe manner and pursuant to a common course of corporate policy, pattern, practice, and conduct.  The class representatives bring this lawsuit for the benefit of affected class members.

109.  Moreover, the class representatives have retained counsel to represent themselves and class members who have extensive experience representing parties and class actions involving, mass torts and property claims, and who have knowledge and experience of the law and claims presented in this lawsuit and the nature of Rule 23, as a procedural mechanism to bring a lawsuit to decide a common liability for and bring relief for a group of affected persons.

110.  **Ascertainability**: The number and identity of class members can be easily ascertained.  Every property owner with an easement for the Pipeline is aware of the easement, and is correspondingly aware of the heightened threat of

additional harm to them as a result of Plains' conduct.  Moreover, since Plains presumably maintains files of its easement contracts with each member of the Class, Plains will have the exact number of class members and will be able to identify each class member.  In addition, each easement is recorded in the records of Santa Barbara County, Kern County or San Luis Obispo County.

111.  **Rule 23(b)(1)(A)**. This lawsuit should be certified as a class action because individually affected members who prosecute separate actions would cause multiplicity of litigation, there could be risk of inconsistent findings on the same set of operative facts of liability, there could be inconsistent and varying adjudications with respect to individual class members that could establish incompatible standards of conduct for the Defendants, and individual adjudications would as a practical matter affect the interests and rights of individual persons not made a party to this lawsuit.

112.  **Rule 23(b)(2)**. Defendants have acted or refused to act on grounds that apply generally to the proposed Class, making final declaratory or injunctive relief appropriate with respect to the proposed Class as a whole.

113.  **Rule 23(b)(3)**. Common questions of law and fact predominate over any questions affecting only individual Class members and a class action is superior to individual litigation.  The amount of damages available to individual plaintiffs are insufficient to make litigation addressing Defendants' conduct economically feasible in the absence of the class action procedure.  Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case.  By contrast, the class action device presents far fewer case management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

CLASS ACTION COMPLAINT

114.  **Rule 23(c)(4)**. The claims of Class members are composed of particular issues that are common to all Class members and capable of class wide resolution that will significantly advance the litigation.

## First Claim for Relief

### Breach of Written Easement Contract

### *All Plaintiffs and Class Members against All Defendants*

115.  Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

116.  As alleged herein, Plaintiffs and Defendants have written contracts under which Plaintiffs granted Defendants an easement over Plaintiffs' land for Defendants to "maintain, operate, repair, replace, and remove" the Pipeline.

117.  The easement contracts for all Plaintiffs and putative class members contain similar material language regarding the purpose of the easement.

118.  The easement contracts create duties on the part of Defendants to install, repair, monitor, maintain, operate, remove, or replace the Pipeline so as not to unreasonably interfere with the property owners' right to fully use and enjoy their properties.

119.  Defendants have not adequately installed, repaired, maintained, operated, removed, or replaced the Pipeline, but rather Defendants have left the Pipeline in disrepair, unmaintained, unsafe, and in need of repair and/or restoration.

120.  Defendants permanently suppressed and concealed from Plaintiffs and putative class members that the Pipeline was in disrepair, unmaintained, unsafe, and in need of repair and/or restoration.  Despite having knowledge that the Pipeline was in disrepair, unmaintained, unsafe, and in need of repair and/or restoration, Defendants knowingly transported hazardous materials (including unauthorized toxins) at a high volume through the Pipeline.

CLASS ACTION COMPLAINT

121.  Defendants' Pipeline interfered with and continues to interfere with Plaintiffs' rights to fully use and enjoy their properties.

122.  The entire Pipeline is unsound, in disrepair, unmaintained, unsafe, and poorly maintained.  The breach of the easement contracts resulted from a predominating course of corporate policy, pattern, practice, and conduct involving pipeline inspection, maintenance, operation, evaluation, and analysis by Defendants.

123.  Defendants' failure to install, repair, maintain, operate, remove, and replace the Pipeline is a material breach of the contractual easement for the Plaintiffs and the putative class members located along the Pipeline.

124.  Defendants' material breach of the contractual easements hasdeprived Plaintiffs and class members of their benefit of the bargain and their rights under the easements to fully use and enjoy their real properties..

125.  Plaintiffs have performed all conditions, covenants, and promises required by them on their part to be performed in accordance with the terms and conditions of the contracts, except for those they were prevented from performing or which were waived or excused by Defendants' misconduct.

126.  As a proximate result of Defendants' breach of contract, Plaintiffs are entitled to require repair and/or restoration of the unsafe and unsound Pipeline, to require safe and continuous maintenance and to receive adequate compensation for the additional burden on their land needed to restore the Pipeline and ensure its ongoing safe operation, and damages for Defendants' breach of contract, in an amount to be proved at trial.

///

///

///

///

///

CLASS ACTION COMPLAINT

**Second Claim for Relief**

**Reformation of Easement Contracts**

**(Mutual Mistake of Fact)**

*All Plaintiffs and Class Members against All Defendants*

127.   Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

128.  As alleged herein, Plaintiffs and Defendants have written contracts for easements (Right-Of-Way Grants), under which Plaintiffs have granted Defendants easements over Plaintiffs' real properties for Defendants to maintain the Pipeline in exchange for certain consideration.

129.  The parties to the easement contracts believed that after the initial installation of the Pipeline, the rights-of-way provided in the easements would be sufficient for Defendants to repair, maintain, operate, remove, and replace the Pipeline.

130.  The parties were mistaken.  The true fact was that the rights-of-way provided in the easement contracts were insufficient, particularly in light of Defendants' failure to consistently maintain the Pipeline.  Defendants instead need additional access and land within which to complete the extensive repair and/or restoration and additional safety features required to safely operate and maintain the Pipeline, particularly given the more hazardous substances Plains now typically transports through the Pipeline.

131.  The parties' mistaken belief was an essential part of the inducement for the easement contracts.  The parties would not have entered into the easement contracts had the true facts been known.

132.  Plaintiffs discovered the error in the written easement contracts when they learned that Defendants required additional access to repair and/or restore the Pipeline on Plaintiff Grey Fox's Lot X following the May 2015 rupture.

CLASS ACTION COMPLAINT

15004.001 - 251238.1

133.  As a result, the easement contracts as written do not accurately set forth the intentions of the parties and should be reformed to accurately reflect the parties' intentions.  The easement contracts should provide for additional easement land area as required for repair and/or restoration of the Pipeline and payment of consideration to Plaintiffs for the increased access and burden on their properties.

**Third Claim for Relief**

**Reformation of Easement Contracts**

**(Unilateral Mistake of Fact)**

*All Plaintiffs and Class Members against All Defendants*

134.  Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

135.  As alleged herein, Plaintiffs and Defendants have written contracts for easements (Right-Of-Way Grants), under which Plaintiffs have granted Defendants easements over Plaintiffs' real properties for Defendants to maintain the Pipeline in exchange for certain consideration.

136.  Plaintiffs believed that after the initial installation of the Pipeline, the rights-of-way provided in the easements would be sufficient for Defendants to repair, maintain, operate, remove, and replace the Pipeline.

137.  Plaintiffs were mistaken.  The true fact was that the rights-of-way provided in the easement contracts were insufficient.  Defendants instead need additional land area within which to repair and/or restore the Pipeline.

138.  The failure of the written easement contracts to reflect the true intent of the parties resulted from a unilateral mistake on the part of Plaintiffs, in that Plaintiffs mistakenly believed that the easement contracts correctly expressed the terms intended by the parties.

139.  Defendants knew of or suspected the mistake at the time of execution of the written easement contracts.

15004.001 - 251238.1

140.  Plaintiffs discovered the error in the written easement contracts when they learned that Defendants required additional access to repair and/or restore the Pipeline on Plaintiff Grey Fox's Lot X following the May 2015 rupture.

141.  As a result, the easement contracts as written do not accurately set forth the true intentions of the parties and should be reformed to accurately reflect the parties' intentions.  The easement contracts should provide an easement increase for repair and/or restoration of the Pipeline and payment of consideration to Plaintiffs for the increased access and burden on their properties.

## **Fourth Claim for Relief**

### **Negligent Misrepresentation**

#### ***All Plaintiffs and Class Members against All Defendants***

142.  Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

143.  As alleged herein, Defendants' predecessors-in-interest represented to Plaintiffs predecessors-in-interest that once installed, the Pipeline would be properly monitored and maintained, and could be repaired, maintained, operated, removed, and replaced within the parameters of the rights-of-way provided in the easements.

144.  When Defendants made these representations, they had no reasonable ground for believing them to be true.

145.  Defendants made these representations with the intention of inducing Plaintiffs to act in reliance on these representations and grant Defendants the easements over their properties.

146.  The representations made by Defendants were in fact false.  The true facts were that Defendants were not going to properly maintain the Pipeline and Defendants could not maintain, repair, remove, or replace the Pipeline within the parameters of the easements.

CLASS ACTION COMPLAINT

15004.001 - 251238.1

147.  Plaintiffs, at the time these representations were made by Defendants and at the time Plaintiffs granted Defendants the easements over their properties, were ignorant of the falsity of Defendants' representations and believed them to be true. In reliance on these representations, Plaintiffs were induced to and did grant Defendants the easements over their properties.  Had Plaintiffs known the actual facts, they would not have taken such action. Plaintiffs' reliance on Defendants' representations was reasonable and justified.

148.  As a proximate result of Defendants' conduct, Plaintiffs granted Defendants easements over Plaintiffs' properties for Defendants to repair, maintain, operate, remove, and replace the Pipeline, Defendants failed to properly monitor and maintain the Pipeline, the Pipeline has become a dangerous hazard to health and the environment, and Defendants cannot repair, maintain, operate, remove, or replace the Pipeline within the parameters of the easements.  Plaintiffs have been damaged in an amount to be proved at trial.

## **Fifth Claim for Relief**

### **Negligence**

### ***All Plaintiffs and Class Members against All Defendants***

149.  Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

150.  Defendants owed a duty to Plaintiffs to exercise reasonable and ordinary care.  That duty arose under the easement contracts and property law generally, as well as from, among other things, federal, state, and local laws, ordinances, and regulations that require Defendants to comply with all applicable safety standards, including without limitation, the Pipeline Safety Act ("PSA") (49 U.S.C. § 60101, et seq.), the Lempert-Keene Act, Government Code Section 8670, *et seq*., the Porter-Cologne Act, Water Code Sections 13000, *et seq*., Cal. Fish & Game Code Section 5650, *et seq*., the Federal Clean Water Act, 33 U.S.C. § 1251

*et seq.*, Santa Barbara County Code, Chapter 25, §§ 25-7(g) and 25-37, and state and federal spill response and notification laws.

151.   A special relationship exists between Defendants and Plaintiffs as a result of Defendants' transportation of hazardous materials through Plaintiffs' properties, and Defendants' responsibility to properly maintain the Pipeline through which those hazardous materials move.  Defendants had a duty to maintain, repair and/or restore the Pipeline that would have avoided unnecessary injury to Plaintiffs' property values.  The construction of the Pipeline was intended to, and did, affect Plaintiffs.  Failure to maintain, repair and/or restore the Pipeline was a clearly foreseeable harm to Plaintiffs' property.  Plaintiffs have suffered physical injury to and interference with their properties, as well as economic harm as a result of Defendants' failure to maintain the Pipeline.  Defendants' conduct is a direct and proximate cause of the injury suffered.  Given the toxic nature of the substances in the Pipeline, Defendants' track record of repeated violations of pipeline safety regulation, and the clear warning signs that the Pipeline required repair and/or restoration, there is a sound policy and moral reasons for holding Defendants accountable for their failure to maintain, repair and/or restore the Pipeline.

152.  As set forth herein, Defendants breached their duty to Plaintiffs by, among other things, failing to detect and repair the corrosion, anomalies, leaks, and potential rupture points along the entire length of the Pipeline and failing to install, operate, monitor, maintain, repair and/or restore the Pipeline in a reasonable manner consistent with all applicable safety standards.

153.   Defendants, in the exercise of reasonable care, should have known that the Pipeline could corrode and degrade and that it could leak, fail, rupture, and spill significant amounts of hazardous materials.  Defendants have acknowledged that spills have occurred on their pipelines in the past and will occur, and have in fact occurred, again.  Yet, Defendants have a history of failing to take reasonable,

commonsense steps to monitor, detect and repair the corrosion and other anomalies known to exist in its Pipeline facilities.  Defendants' conduct, or lack thereof, increases the risk of ruptures and catastrophic spills and unnecessarily threatens lives and property.

154.   In addition, Defendants' violations of the statutes, ordinances, and regulations cited herein resulted in precisely the harm to Plaintiffs that the laws were designed to prevent, and Plaintiffs are members of the class of persons for whose protection those laws were adopted.

155.   At all times herein mentioned, Defendants negligently, wantonly, carelessly and/or recklessly maintained and operated the Pipeline.

156.   As a direct and proximate result of Defendants' negligence, Plaintiffs have suffered and will continue to suffer physical injury to and interference with their properties, as well as economic harm and other damages, including but not limited to the loss of use and enjoyment of Plaintiffs' properties; the loss of profits due to failed real property marketing and sales to buyers who, but for the Pipeline, would have purchased Plaintiffs' properties; and the diminished value of Plaintiffs' properties and future lost profits due to the taboo associated with the Pipeline and the May 2015 rupture, which has and will continue to drive down the value and desirability of Plaintiffs' properties.

157.   As described herein, the acts and omissions of Defendants were done with oppression, fraud, and/or malice, thereby justifying an award of punitive damages in accordance with proof at trial.

### Sixth Claim for Relief

**Violations of California's Unfair Competition Law**

**(Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

***All Plaintiffs and Class Members against All Defendants***

158.  Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

CLASS ACTION COMPLAINT

15004.001 - 251238.1

159.  Defendants have engaged in and continue to engage in unfair competition in violation of California's Unfair Competition Law ("UCL").

160.  In the easement contracts, Defendants represented that (1) they would install, operate, repair, and maintain the Pipeline in a manner that would meet all applicable safety standards and (2) they would have the capability, whenever necessary, to operate, maintain, repair and/or restore the Pipeline within the parameters of the easement.

161.  No Plaintiff, and no reasonable property owner, would have granted an easement knowing the Pipeline was not going to be maintained in a reasonable manner consistent with all applicable safety standards and/or that the operator of the Pipeline lacked the capability to do so within the parameters of the easement.

162.  Moreover, it is axiomatic that in order to maintain and operate the Pipeline, Defendants must comply with all applicable safety standards, including the Pipeline Safety Act ("PSA").  These standards are mandatory, and a pipeline may be legally operated only if the standards' express terms have been met. Accordingly, an easement which grants the right to operate a pipeline must, if the easement is not to be wholly illusory, imply the right to operate the pipeline in a reasonable manner and in accordance with applicable laws and regulations.

163.  As set forth herein, Defendants have failed to install, operate, monitor, maintain, repair and/or restore the Pipeline in a reasonable manner that meets all applicable safety standards, and they have admitted, in the Temporary Property Access and Remediation Agreement with Grey Fox, that they do not have the capability to install, operate, repair, maintain, remove and replace the Pipeline within the parameters of the easements.

164.  Each Plaintiff relied on Plains' representations in deciding to grant the easements.  Each Plaintiff was induced to grant and did grant the easement due to the false and misleading representation, and would not have granted Defendants an easement absent Defendants' representations, which were reasonably relied upon.

165.   In granting the easements to Defendants, each Plaintiff gave up certain rights in their properties in exchange for certain amounts of consideration.

166.   Defendants' conduct constitutes "fraudulent" business practices within the meaning of UCL in that Defendants have all but ignored the maintenance of the Pipeline as evidenced by the degradation and failure of the Pipeline. Defendants' conduct amounts to "unfair" business practices because of the negative consequences of Defendants' failure to maintain the Pipeline far exceed the cost of actual compliance. Defendants' conduct is "unlawful" because it violated laws including but not limited to the PSA (which includes the Natural Gas Pipeline Safety Act of 1968, the Federal Pipeline Safety Act of 1979, the Pipeline Inspection, Protection, Enforcement and Safety Act of 2006, and the Pipeline Safety, Regulatory Certainty, and Job Creation Act of 2011), and all related regulations that set minimum safety standards for the design, installation, inspection, emergency plans and procedures, testing, extension, construction, operation, replacement and maintenance of pipeline facilities.

167.   Plaintiffs' right to have their properties free from unlawful encroachments must be protected.  In order to continue to operate the Pipeline, Defendants must operate, maintain, repair and/or restore the Pipeline as the easement contemplates, and comply with all safety regulations.

168.   Defendants presently cannot legally operate the Pipeline in compliance with all regulations.  Defendants also cannot adequately repair and/or restore the Pipeline within the parameters of the easements and without encroaching unlawfully on Plaintiffs' properties beyond the scope of the existing easements. The easements will have to be reformed to provide additional access for Defendants to work and compensation to Plaintiffs for the access and the additional burden imposed on their properties.

///

///

CLASS ACTION COMPLAINT

169.  As a proximate result of Defendants' unfair, fraudulent, and unlawful methods of competition, Plaintiffs have been harmed.  Injunctive relief is necessary to require Plains to meet modern safety standards.

170.  As a further proximate result of Defendants' unfair, fraudulent, and unlawful methods of competition, Plaintiffs suffered a loss of property when they granted Defendants the easements.  Defendants should be required to make appropriate restitution payments to Plaintiffs.

### Seventh Claim for Relief

### Breach of Implied Covenant of Good Faith and Fair Dealing

#### *All Plaintiffs and Class Members against All Defendants*

171.  Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

172.  As alleged herein, Plaintiffs have private easement contracts with Defendants.

173.  There is implied in all of the agreements between Plaintiffs and Defendants a covenant of good faith and fair dealing whereby Defendants impliedly covenanted that they would act in good faith and in the exercise of fair dealing, deal with Plaintiffs fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiffs' rights.

174.  As alleged herein, Defendants breached the covenant and frustrated Plaintiffs' enjoyment of their contractual rights.  Defendants' acts include but are not limited to:

  i.  Disregarding their duty under the private easement contracts to adequately monitor, repair, maintain, operate, remove, and replace the Pipeline;

  ii.  Operating an unsafe Pipeline through Plaintiffs' properties;

  iii.  Impairing, interfering with, hindering, and injuring Plaintiffs' rights;

iv.  Promoting a predominating course of corporate policy, pattern, practice, and conduct involving grossly negligent pipeline inspection, maintenance, operation, evaluation, and analysis;

v.  Exposing Plaintiffs and class members to the unsafe Pipeline;

vi.  Depriving Plaintiffs and class members of their reasonable right to fully use and enjoy their real property;

vii.  Using the Pipeline to carry toxic chemicals, other than crude oil, known to pose severe threats to human health;

viii.  Using the Pipeline to carry toxic chemicals that are associated with fracking – which is a procedure not known to exist at the time the property owners agreed to the easements, was not an intended risk assumed by the property owners, was not accounted for as part of the consideration exchanged, and was beyond the scope of the easements.

ix.  Failing to comply with industry rules and policies pertaining to the maintenance, inspection, and integrity management of hazardous liquid pipelines;

x.  Evading the spirit of the bargain made with Plaintiffs; and

xi.  Otherwise failing to do everything the easement contracts presupposed the Defendants would do to accomplish their purpose.

175.  Plaintiffs have performed all conditions, covenants and promises required by them on their part to be performed in accordance with the terms and conditions of the easement contracts, except for those they were prevented from performing or which were waived or excused by Defendants' misconduct.

176.  As a proximate result of Defendants' acts, Plaintiffs and class members are entitled to repair and/or restoration of the unsafe Pipeline, adequate compensation for the additional burden on their land needed to repair and/or restore the Pipeline, and damages for Defendants' material breach of contract, in an amount to be proved at trial.

**Eighth Claim for Relief**

**Permanent Nuisance**

***All Plaintiffs and Class Members against All Defendants***

177. Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

178. Defendants' Pipeline, because of the hazards it has created, is a nuisance. At all times herein mentioned, Defendants have failed to properly install, maintain, repair and/or restore the Pipeline, creating an unsafe, ultrahazardous Pipeline that is extremely dangerous to Plaintiffs' health, indecent and offensive to Plaintiffs' senses, an obstruction to the reasonable use of Plaintiffs' property, and interferes with the comfortable enjoyment of Plaintiffs' life and property.

179. Defendants' conduct has caused the Pipeline to corrode, rupture, damage the environment, and threaten the people and properties near it. The hazardous conditions are not limited to the area immediately surrounding the May 2015 rupture on El Rancho Tajiguas Lot X. The Pipeline, along its entire length, is riddled with corrosion, other known anomalies, leaks, and potential rupture points, all of which are harmful to both human health and the environment and interfere with Plaintiffs' comfortable use and enjoyment of their real properties.

180. Property owners with land subject to easements along the Pipeline have suffered real damage because the unsafe Pipeline runs through and under their properties. The corroded Pipeline, its defective insulation, and the residual hazardous materials left behind on Plaintiffs' properties have resulted in physical injury to the properties, and have damaged and unreasonably interfered with the properties of all Plaintiffs along the entire length of the Pipeline.

181. Defendants were, at all relevant times, in sufficient control of the Pipeline to have known of the hazards. Defendants knew or should have known that their operation of the Pipeline would have, and did, cause the hazards,

15004.001 - 251238.1

including catastrophic failures due to corrosion, anomalies, leaks, and releases of hazardous materials.

182.  Despite knowledge and forewarning, Defendants failed to take reasonable steps to prevent the catastrophic failure of the Pipeline due to corrosion, anomalies, leaks, and releases of hazardous materials.

183.  Plaintiffs did not consent to the ongoing damage to the use and enjoyment of their properties as a result of Defendants' actions and inactions.

184.  As a direct and proximate cause, Defendants' acts and omissions have caused substantial actual damage and immediate and ongoing diminution of the value of Plaintiffs' real properties, as well as the loss of use and enjoyment of their properties, in amounts to be determined at trial.

185.  The nuisance caused by Defendants' conduct is permanent, and the health, well-being, and comfortable enjoyment of life and property of Plaintiffs, Plaintiffs' families and the surrounding community have suffered irreparable damage.

186.  Plaintiffs have no plain, speedy, or adequate remedy at law, and injunctive relief is warranted.  A preliminary and permanent injunction should therefore be issued, ordering Defendants to repair and/or restore and improve the Pipeline and associated hazards; to take all steps necessary to ensure that the Pipeline operates within the parameters of all applicable safety standards, including without limitation installing automatic shutoff valves, before transporting any hazardous materials over or through Plaintiffs' properties; and to provide appropriate compensation to Plaintiffs for the additional risk of continued use of the pipeline and the burden and access needed to complete the restoration process.

///
///
///

### Ninth Claim for Relief

### Threatened Nuisance

### *All Plaintiffs and Class Members against All Defendants*

187.  Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

188.  Defendants plan to reopen the Pipeline and continue operating it. However, the continued operation of the Pipeline in its current state will create a probable and imminent danger to life, property, and the environment.

189.  In order to continue to safely transport crude oil through Plaintiffs' properties, Defendants will have to restore the Pipeline to its original condition and install modern safety features.  Yet, as explained herein, the easement does not provide sufficient access to complete the necessary work, and any such work will necessarily burden Plaintiffs' properties unreasonably beyond the parameters of the existing easements and create an additional nuisance and trespass.

190.  The necessary work will also cause noise, vibration, dust and the release of noxious and malodorous gases, fumes, and other contaminants to further pollute the land and air in the vicinity of and over Plaintiffs' properties.

191.  The continued use of the Pipeline and any attempt to repair and/or restore it will result in interference with Plaintiffs' comfortable enjoyment of life and property and injury to the health of Plaintiffs and their families.

192.  Plaintiffs have no adequate remedy at law for the threatened nuisances in that the threatened contamination and pollution will cause significant health hazards to Plaintiffs and their families, and the threatened interference with their property rights will cause additional burdens to be placed on their properties beyond the scope of their current easements.  It will be impossible for Plaintiffs to determine the precise amount of damage which they will suffer if Defendants' threatened conduct is not restrained.

193.  Unless Defendants are enjoined, Plaintiffs will suffer irreparable injury in that their health will be compromised, the usefulness and economic value of their properties will be substantially diminished, and they will be deprived of the reasonable and comfortable enjoyment of their properties.

194.  An injunction should therefore be issued, ordering Defendants to repair and/or restore the Pipeline and bring it within the parameters of all applicable safety standards, including without limitation installing automatic shutoff valves, and provide appropriate compensation to Plaintiffs for the additional ongoing risk, burden and access needed to complete the process and consistently maintain the Pipeline in a sound matter.

### **Tenth Claim for Relief**

**Permanent Injunction**

*All Plaintiffs and Class Members against All Defendants*

195.  Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

196.   Defendants have wrongfully and unlawfully failed to maintain the Pipeline and failed to safely, and within the parameters of the easements, monitor, maintain, repair and/or restore the Pipeline.

197.   In the absence of an injunction, Defendants will continue to violate the rights of Plaintiffs.  Defendants, and each of them, have refused and still refuse to refrain from their wrongful conduct.

198.   Defendants' wrongful conduct, unless and until enjoined and restrained by order of this court, will cause great and irreparable injury to Plaintiffs.

199.  Plaintiffs have no adequate remedy at law for the injuries that will result from failure of the Defendants to repair and/or restore and maintain the Pipeline, in that *inter alia*, Plaintiffs will suffer ongoing nuisance and be forced to bring a multiplicity of suits, and it could be impossible for Plaintiffs to determine

the precise amount of damages they will suffer if Defendants' conduct is not restrained.

200.   Plaintiffs have no plain, speedy or adequate remedy at law, and injunctive relief is warranted. A preliminary and permanent injunction should therefore be issued, ordering Defendants to repair and/or restore and improve the Pipeline and associated hazards; to take all steps necessary to ensure that the Pipeline operates within the parameters of all applicable safety standards, including without limitation installing automatic shutoff valves, before transporting any hazardous materials over or through Plaintiffs' properties; and to provide appropriate compensation to Plaintiffs for the additional risk of continued use of the Pipeline and the burden and access needed to complete the restoration process.

## Eleventh Claim for Relief

### Declaratory Relief

### *All Plaintiffs and Class Members against All Defendants*

201.  Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

202.  As alleged herein, Plaintiffs and Defendants have written contracts for easements (Right-of-Way Grants).

203.  Plaintiffs contend that Defendants acknowledge the need to repair and/or restore the Pipeline running through their properties.

204.  Plaintiffs furthermore contend that Defendants have breached the contracts by their failure to maintain, repair and/or restore the Pipeline.

205.  Plaintiffs moreover contend that Defendants cannot adequately repair and/or restore the Pipeline within the terms of the contract.

206.  Plaintiffs additionally contend that the easements do not permit Defendants access to the Plaintiffs' properties beyond the terms of the easement.

207.   Plaintiffs desire and seek a judicial determination of the validity and extent of the easement contracts between the parties.  An actual and justiciable controversy exists between Plaintiffs and Plains concerning the status and extent of the contracts, given Defendants' stated plans to repair and/or restore the Pipeline.

## Twelfth Claim for Relief

### Trespass

### *Plaintiff Grey Fox against All Defendants*

208.   Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

209.   Plaintiff Grey Fox has a real property interest in Lot X. Defendants discharged a polluting matter which invaded Lot X and caused harm. Plaintiff Grey Fox seeks its damages for which it was not compensated pursuant to the Temporary Property Access and Remediation Agreement.

210.   By discharging polluting matter, Defendants entered, invaded, and intruded on the real property of Plaintiff Grey Fox without privilege, permission, invitation, or justification.

211.   Defendants had a duty to use reasonable care not to enter, intrude on, or invade Plaintiff's real property.  Defendants also owed a duty to Plaintiff Grey Fox to exercise reasonable care in the manufacture, installation, maintenance, and operation of the Pipeline.

212.   Defendants had a heightened duty of care to Plaintiff Grey Fox because of the great danger associated with transporting oil through Plaintiff's property and so near to pristine coastal areas.

213.   Defendants breached the duty they owed to Plaintiff Grey Fox when they failed to exercise reasonable care in the construction, installation, monitoring, maintenance, and operation of the Pipeline, which conduct resulted in entry, intrusion or invasion on Plaintiff's real property.

214.   Defendants knew or should have known that their conduct would foreseeably result in a disastrous oil spill, causing damage to Plaintiff's property.

215.   As a direct and proximate result of Defendants' trespass, Plaintiff Grey Fox has suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, property damage, diminution of value of real estate, loss of income, and other economic loss.

216.   As described herein, the acts and omissions of Defendants were done with oppression, fraud, and/or malice, thereby justifying an award of punitive damages in accordance with proof at trial.

## Thirteenth Claim for Relief

### Strict Liability for Ultrahazardous Activities

#### *Plaintiff Grey Fox against All Defendants*

217.   Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

218.   At all times herein, Defendants owned and operated the Pipeline.

219.   At all times relevant to this action, Defendants had supervision, custody, and control of the Pipeline.

220.   At all times herein, Defendants were under a continuing duty to protect Plaintiff Grey Fox from the harm caused by the Pipeline.

221.   Defendants were engaged in ultrahazardous activities by transporting flammable, hazardous, and toxic oil through the Pipeline.

222.   Plaintiff Grey Fox has suffered harm from the discharge of toxic oil and other hazardous materials from the Pipeline.

223.   The injuries sustained by Plaintiff Grey Fox as a result of the oil spill were the direct and proximate result of Defendants' activities and/or inactions.

224.   The harm to Plaintiff Grey Fox was and is the kind of harm that would be reasonably anticipated as a result of the risks created by transporting

CLASS ACTION COMPLAINT

flammable, hazardous, and toxic oil and other hazardous materials in the Pipeline and not properly maintaining the Pipeline.

225.   Defendants' operation of the Pipeline and its failure was a substantial factor in causing the harms suffered by Plaintiff Grey Fox.

226.   Due to Defendants' strict liability, Plaintiff Grey Fox is entitled to recover actual damages.

227.   As described herein, the acts and omissions of Defendants were done with oppression, fraud, and/or malice, thereby justifying an award of punitive damages in accordance with proof at trial.

## Fourteenth Claim for Relief

### Negligence

***Plaintiffs Grey Fox, MAZ Properties, Bean Blossom and Winter Hawk against All Defendants***

228.   Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

229.  Defendants owed a duty to Plaintiffs to exercise reasonable and ordinary care.  That duty arose under the easement contracts and property law generally, as well as from, among other things, federal, state, and local laws, ordinances, and regulations that require Defendants to comply with all applicable safety standards, including without limitation, the Pipeline Safety Act ("PSA") (49 U.S.C. § 60101, et seq.), the Lempert-Keene Act, Government Code Section 8670, *et seq*., the Porter-Cologne Act, Water Code Sections 13000, *et seq*., Cal. Fish & Game Code Section 5650, *et seq*., the Federal Clean Water Act, 33 U.S.C. § 1251 *et seq*., Santa Barbara County Code, Chapter 25, §§ 25-7(g) and 25-37, and state and federal spill response and notification laws.

230.   A special relationship exists between Defendants and these Plaintiffs as a result of the failure of Defendants' Pipeline in the immediate vicinity of their properties.  Defendants had a duty to operate the Pipeline in a manner that would

CLASS ACTION COMPLAINT

15004.001 - 251238.1

have avoided unnecessary injury to Plaintiffs' property values from the spill of oil and other toxic chemicals on and near their properties, as well as the resulting noise, vibration, dust and the release of noxious and malodorous gases, fumes, and other contaminants that further polluted the land and air in the vicinity of, under and over Plaintiffs' properties following the spill.  Failure to maintain, repair and/or restore the Pipeline was a clearly foreseeable harm to these Plaintiffs' properties.  Plaintiffs have suffered physical injury to and interference with their properties, as well as economic harm as a result of Defendants' failure to maintain the Pipeline and prevent the spill.  Defendants' conduct is a direct and proximate cause of the injury suffered.  Given the toxic nature of the substances in the Pipeline, Defendants' track record of repeated violations of pipeline safety regulation, and the clear warning signs that the Pipeline required repair and/or restoration, there is a sound policy and moral reasons for holding Defendants accountable for their failure to maintain, repair and/or restore the Pipeline.

231.  As set forth herein, Defendants breached their duty to Plaintiffs by, among other things, failing to detect and repair the corrosion, anomalies, leaks, and potential rupture points, by failing to install, operate, monitor, maintain, repair and/or restore the Pipeline in a reasonable manner consistent with all applicable safety standards, and by failing to respond adequately and promptly to the spill.

232.   Defendants, in the exercise of reasonable care, should have known that the Pipeline could corrode and degrade and that it could leak, fail, rupture, and spill significant amounts of hazardous materials.  Defendants have acknowledged that spills have occurred on their pipelines in the past and will occur, and have in fact occurred, again.  Yet, Defendants have a history of failing to take reasonable, commonsense steps to monitor, detect and repair the corrosion and other anomalies known to exist in its Pipeline facilities.  Defendants' conduct, or lack thereof, increases the risk of ruptures and catastrophic spills and unnecessarily threatens lives and property.

233.   In addition, Defendants' violations of the statutes, ordinances, and regulations cited herein resulted in precisely the harm to Plaintiffs that the laws were designed to prevent, and Plaintiffs are members of the class of persons for whose protection those laws were adopted.

234.   At all times herein mentioned, Defendants negligently, wantonly, carelessly and/or recklessly maintained and operated the Pipeline.

235.   As a direct and proximate result of Defendants' negligence, Plaintiffs have suffered and will continue to suffer physical injury to and interference with their properties, economic harm and other damages, including but not limited to the loss of use and enjoyment of Plaintiffs' properties; the loss of profits due to failed real property marketing and sales to buyers who, but for the Pipeline, would have purchased Plaintiffs' properties; and the diminished value of Plaintiffs' properties and future lost profits due to the taboo associated with the Pipeline and the May, 2015 rupture, which has and will continue to drive down the value and desirability of Plaintiffs' properties.

236.   As described herein, the acts and omissions of Defendants were done with oppression, fraud, and/or malice, thereby justifying an award of punitive damages in accordance with proof at trial.

### Fifteenth Claim for Relief

### Breach of Contract

***Plaintiff Grey Fox against Defendant Plains Pipeline, LP***

237.  Plaintiff incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

238.  Plaintiff Grey Fox and Defendant Plains Pipeline, LP are parties to a contract entered into after the spill, the Temporary Property Access and Remediation Agreement, which obligates Plains to pay a Use Fee in the amount of $5,500 per day for use of the Grey Fox property, and separately to protect Grey Fox against, among other things any and all damages, losses, costs or expenses

-50-

whatsoever, including attorneys' fees and experts' fees arising out of any physical or property damage.

239.  Plaintiff Grey Fox has performed all conditions, covenants, and promises required by it on its part to be performed in accordance with the terms and conditions of the contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct..

240.  Defendant Plains materially breached the contract by refusing to pay for Use Fees owed and refusing to pay fees and costs owed arising out of damage to the property.

241.  As a result of Defendant's breach, Plaintiff has incurred damages in the amount of $137,500 in unpaid Use Fees, and $221,666.74 in fees and costs incurred as a result of damage to the property.  Plaintiff Grey Fox believes there are and will be additional fees and expenses owed in an amount to be proved at trial.

## VII.   REQUEST FOR RELIEF

Plaintiffs, individually and on behalf of all others similarly situated, request judgment against Defendants, and each of them, as follows:

A.      For an order certifying the Class, appointing Plaintiffs as representatives of the Class, and appointing the lawyers and law firms representing Plaintiffs as counsel for the Class;

B.      For reformation of the easements;

C.      For specific performance of the reformed easements;

D.      For injunctive relief;

E.      For compensatory damages sustained by Plaintiffs and the Class;

F.      For treble damages insofar as they are allowed by applicable laws;

G.      For appropriate individual relief;

H.      For costs and expenses;

15004.001 - 251238.1

1    I.    For both pre-judgment and post-judgment interest on any amounts

2  awarded;

3    J.    For payment of attorney fees and expert fees as may be allowable

4  under applicable law;

5    K.    For exemplary and punitive damages;

6    L.    For such other and further relief, including declaratory relief, as the

7  Court may deem just and proper.

## VIII.  DEMAND FOR JURY TRIAL

9    Plaintiffs hereby demand a trial by jury on all issues so triable.

10

11

12  Dated:  May 6, 2016           Respectfully submitted,

13                               CAPPELLO & NOËL LLP

14

                                 By:  _/s/ A. Barry Cappello_____
15                                     A. Barry Cappello

16                               A. Barry Cappello (CSB No. 037835)
                                 Leila J. Noël (CSB No. 114307)
17                               Lawrence J. Conlan (CSB No. 221350)
                                 CAPPELLO & NOËL LLP
18                               831 State Street
                                 Santa Barbara, CA 93101-3227
19                               Telephone:  (805)564-2444
                                 Facsimile:   (805)965-5950
20

21                               Robert L. Lieff (CSB No. 037568)
                                 Elizabeth J. Cabraser (CSB No. 083151)
22                               Robert J. Nelson (CSB No. 132797)
                                 Wilson M. Dunlavey (CSB No. 307719)
23                               LIEFF CABRASER HEIMANN &
                                 BERNSTEIN, LLP
24                               275 Battery Street, 29th Floor
                                 San Francisco, CA  94111-3339
25                               Telephone:  (415) 956-1000
                                 Facsimile:  (415) 956-1008
26

27

28

CLASS ACTION COMPLAINT

15004.001 - 251238.1

Juli Farris (CSB No. 141716)
Matthew J. Preusch (CSB No. 298144)
KELLER ROHRBACK L.L.P.
1129 State Street, Suite 8
Santa Barbara, CA 93101
Telephone: (805) 456-1496
Facsimile: (805) 456-1497

Lynn Lincoln Sarko
*(Admitted Pro Hac Vice)*
Gretchen Freeman Cappio
*(Admitted Pro Hac Vice)*
Daniel Mensher
*(Admitted Pro Hac Vice)*
KELLER ROHRBACK L.L.P.
1201 Third Ave, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Facsimile:  (206) 623-3384


*Attorneys for Individual and
Representative Plaintiffs*

CLASS ACTION COMPLAINT

15004.001 - 251238.1