A. Barry Cappello (CSB No. 037835)
Leila J. Noël (CSB No. 114307)
Lawrence J. Conlan (CSB No. 221350)
David L. Cousineau (CSB No. 298801)
**CAPPELLO & NOËL LLP**
831 State Street
Santa Barbara, CA 93101-3227
Telephone:  (805)564-2444
Facsimile:   (805)965-5950

Lynn Lincoln Sarko
*(Admitted Pro Hac Vice)*
**KELLER ROHRBACK L.L.P**.
1201 Third Ave. , Suite 3200
Seattle, WA 98101
Telephone:  (206) 623-1900
Facsimile:   (206) 623-3384

Robert L. Lieff (CSB No. 037568)
Elizabeth J. Cabraser (CSB No. 083151)
Robert J. Nelson (CSB No. 132797)
Wilson M. Dunlavey (CSB No. 307719)
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956. 1000
Facsimile:   (415) 956. 1008

Juli Farris (CSB No. 141716)
Matthew J. Preusch (CSB No. 298144)
**KELLER ROHRBACK L.L.P.**
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Telephone:  (805) 456-1496
Facsimile:   (805) 456-1497

*Attorneys for Individual and Representative Plaintiffs*

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| GREY FOX, LLC a California limited liability company; MAZ PROPERTIES, INC. , a California Corporation; BEAN BLOSSOM, LLC, a California limited liability company; WINTER HAWK, LLC, a California limited liability company, MARK W. TAUTRIM, individually and o/b/o the MARK W. TAUTRIM REVOCABLE TRUST, LIVE OAK BAZZI RANCH, L. P. , a California limited partnership, JTMT LLC, MIKE and DENISE MCNUTT, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>PLAINS ALL AMERICAN PIPELINE, L.P. , a Delaware limited partnership, PLAINS PIPELINE, L.P. , a Texas limited partnership, and JOHN DOES 1 through 10,<br><br>Defendants. | Case No. **2:16-cv-03157-PSG-JEM**<br><br>**PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

1

# I.   INTRODUCTION

Plaintiffs Grey Fox, LLC ("Grey Fox"), MAZ Properties, Inc. ("MAZ"), Bean Blossom, LLC ("Bean Blossom"), Winter Hawk, LLC ("Winter Hawk"), Mark W. Tautrim, Trustee of the Mark W. Tautrim Revocable Trust ("Tautrim Trust"), Live Oak Bazzi Ranch L. P. ("Live Oak"), JTMT, LLC, a California Limited Partnership ("JTMT"), and Mike and Denise McNutt, a marital community ("McNutt"), (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following against Plains All American Pipeline, L.P. ("Plains All American") and Plains Pipeline, L.P. ("Plains Pipeline") (collectively "Defendants" or "Plains"), based where applicable on personal knowledge, information and belief, and the investigation and research of counsel.

## II.   NATURE OF THE ACTION

1.   This class action lawsuit is brought on behalf of all persons and entities who currently own real property subject to an easement for the Pipeline (Lines 901 and 903) ("Easements"). Each property owner has a written easement contract that contains similar material terms which provide Plains with limited, narrow access to the properties to take certain specified actions related to "one pipeline," i. e. the existing Lines 901 and 903. Plains installed that one pipeline almost 30 years ago but then failed to maintain it, leading the pipeline to fail catastrophically and Plains to recognize that the Pipeline was beyond repair. Plains now claims that its failure to maintain the Pipeline gives it the right to install a brand-new pipeline in the easements despite (1) the easements' explicit limitation to one pipeline and (2) that subjecting the Plaintiffs' to the construction required to install the new pipeline would overburden the easements. Plaintiffs bring this suit to protect the property rights to which they are legally entitled and to preclude Plains' from imposing additional burdens on their properties unless and until Plains secures the easements that are adequate to cover the new burden it seeks to impose.

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

2.      Defendants own and operate pipelines that transport crude oil and other liquids from the California coast to inland refinery markets in California. There are two pipelines. Line 901 is a 24-inch diameter pipeline that runs essentially east to west for approximately 10. 7 miles along the Santa Barbara County coastline, from the Las Flores Canyon Oil & Gas Processing Facility to the Gaviota Pump Station. Line 903 is a 30-inch diameter pipeline that runs south to north and then east for approximately 128 miles from the Gaviota Pump Station to the Emidio Station near Bakersfield, in Kern County.

3.      Line 901 delivers all of its crude oil to Line 903 at the Gaviota Pumping Station, where the two meet. Line 903 then carries the crude from both Lines to Kern County. Defendants control both the Pipeline from their control room in Midland, Texas.

4.      Defendants' Pipeline is shown in the map below published by the Santa Barbara County Energy Division.



PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

5.      The Pipeline runs through the real properties of Plaintiffs and putative class members pursuant to written easement contracts (also known as Right-Of-Way Grants).

6.      The Pipeline was constructed in the late 1980's by Celeron Pipeline Company of California and operated through its subsidiary All American Pipeline Company ("AAPC"). The Pipeline went into crude oil service in 1991. Prior to installation, Celeron drafted and executed easement contracts with the owners of approximately 120 properties through which the existing Pipeline travels. As the original properties were further subdivided, the easements now cover approximately 165 properties.

7.      At the time the contracts were negotiated, Celeron and AAPC were owned by Wingfoot, a wholly-owned subsidiary of Goodyear. In 1998, Plains Resources, Inc. purchased all outstanding capital stock of AAPC and Celeron from Wingfoot, including all assets, liabilities and results of operations. Plains Resources then created several subsidiaries and partnerships to operate its new assets. Plains Pipeline, LP now owns and operates Lines 901 and 903. Thus, Plains is the successor-in-interest of Celeron.

8.      The Easements, negotiated by Plain's predecessor Celeron and still in effect today, are virtually identical in all respects that are material to this Complaint. Each of the agreements at issue in this Class Action states that it is for the use of "one pipeline," and expressly allows that Plains shall use the easement for the "maintenance, repair, removal or replacement" of that one Pipeline, or words to that effect.[1] The contracts provided a temporary construction easement of up to 100 feet, each of which terminated when construction was completed. The permanent easements then reverted to a width

---

[1] To the best of Plaintiffs' knowledge, there are only four existing easement contracts related to Lines 901 and 903 that do not specify "one pipeline." Two of these relate to permission to install block valves, one is granted by Mobil Oil and one is an amendment that specifically allows for "one additional backup pipeline," only "at the time of initial construction of the main pipeline at the crossing of the Cuyama River." These easements are not at issue in this Complaint.

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
                                COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

between 25 and 50 feet, but none are wider than that. Twelve of the easement contracts, relating to twelve of the properties, granted limited right of access along and adjacent to the permanent easement during temporary periods and only as reasonably necessary for maintenance, repair, removal, or replacement of the facilities (described as accessory structures used during construction). In addition, contracts for approximately 130 of the existing subordinated parcels give property owners the right to require removal of the Pipeline at the end of its natural life.

9.     Although the Pipeline was approved to transport crude oil, subsequent testing revealed that Plains used it to transport other toxic chemicals known to pose threats to human health and marine life, including but not limited to Ethylbenzene, Toluene, Xylene and Naphthalene. The pipeline also transported Glutaraldehyde, a biocide used for drilling, fracking and acidizing operations.

10.     A properly maintained pipeline will operate for well over 50 years, and each of the Easements provided that Plains would maintain, operate and repair the Pipeline as needed. Plains failed to do so. Defendants also failed to properly monitor the Pipeline's corrosion levels or to timely make the repairs needed to sustain the reasonably-expected lifespan of the Pipeline. As a result, over the course of its useful life, the Pipeline became severely corroded, thinning from an original thickness of more than 1/3rd of an inch to just 1/16th of an inch in some areas—a five-fold decrease. Third party anomaly testing put Plains on notice of these defects, as did prior repairs to areas adjacent to the eventual rupture location.

11.     As a result of Plains' failures, on the morning of May 19, 2015, the Pipeline ruptured on Plaintiff Grey Fox's real property (Lot X). Before Defendants managed to shut it off, the Pipeline had discharged more than 140,000 gallons of crude oil on Lot X, even by Plains' own estimates, although Plaintiffs believe that actual amount discharged was exponentially higher. Oil made its way beyond Grey Fox's property to other properties, public recreation areas, coastal bluffs, beaches, and the Pacific Ocean.

12.     Within three days of the Pipeline rupture, on May 21, 2015, the U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration ("PHMSA") shut down the Pipeline, finding that continued operation of the Pipeline without corrective measures would be hazardous to life, property, and the environment.

13.     After a one-year investigation, in May 2016, PHMSA issued its Failure Investigation Report ("FIR"), which concluded that this external corrosion—compounded by ineffective corrosion protection, failure by Plains to detect or mitigate the corrosion, and Plains' failure to timely detect and respond to the pipeline rupture—was the direct or proximate cause of the Refugio Oil Spill.

14.     The corrective measures ultimately required as a result of PHMSA's investigation include replacement of the Pipeline, improvements to Plains' Integrity Management Plan ("IMP"), enhancements to leak detection and alarm systems, installation of safety valves and pressure sensors.

15.     Plains was also charged and convicted of nine counts of criminal wrongdoing, related to its operation of the Pipeline and the resulting oil spill, including an unprecedented felony conviction for: 1. Knowingly [sic] or reasonably should have known that its actions would cause the discharge of oil into the waters of the state; 2. Knowingly failing to follow a material provision of an applicable oil contingency plan, and; 3. Unlawfully discharging oil or waste to the surface or subsurface waters or land by oil field operations. *State of California v. Plains All American Pipeline, L.P*, No. 1495091 (Santa Barbara Cty. Super. Ct. Sept. 7, 2018).

16.     In light of the Pipeline failure, Plains applied for and received approval to convert its Pipeline from an interstate system, regulated by the U.S. Department of Transportation, to an intra-state system, governed by the California Office of the State Fire Marshal (OSFM).

17.     Recognizing that its failure to maintain the one pipeline allowed under the easements caused that pipeline to deteriorate beyond reasonable repair or replacement,

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

Plains sought regulatory approval for an entirely new pipeline system. The permit application for this new system, describes its plan to "abandon the existing pipelines known as Line 901 and Line 903 in-place and construct a replacement pipeline known as Line 901 R" and Line 903 R." This proposed replacement pipeline, of 123. 4 miles, is intended to follow the same corridor as the existing pipeline, along the same properties.[2] *See* Detailed Construction Description for L901R & L903R Pipelines.[3]

18.     The Construction Plan contemplates construction of an entirely new pipeline system, using three separate crews or "spreads," each utilizing 87 vehicles and more than 200 employees, 13-24 hours per day, six days per week. A fourth crew of 27 employees and 27 vehicles will be utilized to flush, clean and stabilize the existing system before abandoning it in place. Moreover, to the extent any of the property owners who have the right insist on removal, rather than abandonment of the existing pipeline -- yet another crew of 48 vehicles and 66 employees is intended to safely excavate and remove up to 77.8 miles of the existing system.[4] Even by Plains' own overly optimistic estimates, this construction process will take 15-21 months with more than 336 vehicles, transporting up to 740 employees, with more than 350 round trips to and from the job site each day.

19.     The work to be conducted by the construction crews is ambitious and extensive, to include bulldozers, backhoes, "jack and boring" (i. e. tunneling beneath roads and highways), horizontal directional drilling (tunneling under rivers or other large obstructions), welding, pressure testing, and backfill of resulting trenches.

---

[2] One section of the new pipeline, near the city of Buellton, will follow a different route than its predecessor.

[3] *See* http://sbcountyplanning. org/energy/documents/projects/PlainsPipeline/ Att%20B. 9%20Line%20901903%20Pipeline%20Replacement_Construction%20Description_R1. pdf

[4] Plains' makes no provision to remove any part of the existing Pipeline, unless required to do so. Its plan is to "abandon in place" the entire Line 901/903 system.

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

20.     The heaviest equipment would remain on site continuously during that period, requiring thirteen or more primary staging areas, and a construction corridor of between 100 and 200 feet or more, to accommodate construction, additional "secondary" staging areas, and to route around existing natural barriers, such as large oak trees. The permit also seeks a "Permanent Maintenance Corridor" of at least 50 feet, nearly twice the width of most of the easements along Line 901.

21.     The rights Plains seeks in its permits far exceed those granted through the Easements. Most notably, every one of the relevant contracts are expressly limited to "one pipeline." These Easements do not allow for the construction of an entirely new Pipeline, and certainly do not allow the prolonged and disruptive construction program required for a new pipeline. Moreover, the Permanent Maintenance Corridor Plains describes is larger than the existing easements on many of the properties, including the majority of Line 901 properties, and the Temporary Construction Easement planned extends at least 75 to 175 feet beyond all of the current Easements.

22.     The requirements for permitted operation of the replacement Pipeline could not be met through repair and continued operation of the existing line, nor does Plains contemplate doing so. But the easement contracts expressly limit Plains to the operation of *one* pipeline—the pipeline that Celeron installed more than thirty years ago.

23.     It is also abundantly clear that Lines 901R and 903R represent an entirely new pipeline system, requiring new permitting, through a new regulatory system. The terms of the Easements and applicable law do not allow Plains to install this new pipeline system.

24.     The limitation to *one* pipeline also reflects that the Easements were only intended to cover a single construction event, which was completed in the early 1990s. The scope of the Easements certainly does not allow, or even contemplate, the overwhelming breadth of the burdens required to install and operate a new pipeline.

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

25.     The parties know additional access is needed because: 1. Plains' construction description in its application requires permanent easements of at least 50 feet and construction easements of 100 to 190 feet or more, that far exceed the scope of its existing Easements; 2. the existing Easements provided a temporary increase in the scope of access to originally install the Pipeline, which then reverted to a smaller, permanent scope after installation, and; 3. when Defendants attempted to remediate the damage caused by the spill and replace the recently ruptured section on Grey Fox's property, as described above, they discovered they needed access to significantly more of Grey Fox's property than prescribed in that easement. Moreover, a second massive construction project in fewer than 30 years vastly exceeds any burden the parties to the easement could have reasonably contemplated.

26.     As the original property owners, or bona fide purchasers thereof, Plaintiffs are entitled to receive the benefit of their bargain under their existing contracts, each of which entitled Plains to install, and impose the associated burdens of, only *one* pipeline.

27.     Plaintiffs do not contest the desirability of retiring Lines 901 and 903 and installing a new system with better safety mechanisms, routine maintenance and other features.[5] Indeed, the events of May 19, 2015 make clear that such changes are long overdue. The ongoing operation of the improperly maintained and severely corroded Pipeline posed a real and grave risk to the Plaintiffs and their property. But desirability does not give Plains the right to exceed the scope of the Easements to the detriment of Plaintiffs' property rights, simply because Plains feloniously failed to maintain the *one* pipeline it was entitled to install. Plaintiffs are entitled to clarify their existing property rights.

---

[5] Plaintiffs take no position in this litigation as to whether the system proposed by Plains is adequate or meets regulatory guidelines. This question will be addressed by the relevant regulatory entities.

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

28.   For these reasons, Plaintiffs seek a declaratory ruling, and associated injunctive relief, that under the Easements: 1. Plains' proposed Line 901R and 903R would be an impermissible second pipeline, and; 2. Plains lacks the necessary rights to perform the construction necessary to install Line 901R and 903R. Plains can only impose these additional burdens by obtaining easements adequate to cover the additional property rights they seek for appropriate consideration.

29.   Plaintiffs also seek specific damages for the harm resulting from Plains' bad actions. Given Defendants' failures, the damage that now needs to be repaired and/or restored is far greater than what would have been required if timely maintenance had been performed. Moreover, the intrusion on Plaintiffs' real properties is commensurately greater than if Defendants had routinely and timely performed maintenance. For these reasons, Plaintiffs also seek all damages that flow from Defendants' breach of the easement contracts, failure to maintain the original Pipeline, and interference with Plaintiffs use and enjoyment of their properties. These damages include but are not limited to lost proceeds from the sale of real property, diminished property values, costs of containment and cleanup, losses from injury to property, and loss of use and enjoyment of property.

30.   Additionally, Plaintiffs Grey Fox and Bean Blossom bring additional claims on their own behalf to recover the significant economic losses they have incurred and will continue to incur because of Defendants' oil spill. Before Defendants' oil spill, the natural environment surrounding these properties was pristine, and the property values reflected their location, natural beauty, and quietude.

31.   Before Defendants' oil spill, Plaintiff Grey Fox's property and the natural environment surrounding the property was pristine, and the property value reflected its location, natural beauty, and quietude. While Defendants repaired the rupture and cleaned up the petroleum-based material from the surface and soils on and around the spill area on Grey Fox's Lot X, permanent and continuing contamination in the area is likely. The

10

ability to use the property has been severely impaired. Plaintiff Grey Fox suffered continuing physical damages to the property despite remediation efforts. Moreover, Plaintiff Grey Fox suffers not only present injury, but continuing harm, given the on-going uncertainty regarding the installation of the new Pipeline, and the nearly three-year construction and installation process.

32.    Plaintiffs Grey Fox and Bean Blossom have both made all reasonable efforts to market and sell their properties since the spill occurred, without success. The reduction in market value and complete loss of marketability is the direct result of Defendants' actions. Given the rupture, spill, and condition of the Pipeline, Plaintiffs Grey Fox and Bean Blossom's, properties are currently unsaleable. As a result, both plaintiffs have been forced to continue funding costs that they would not have otherwise had to pay, had they been able to sell the properties in a timely manner. Both Plaintiffs must continue carrying the additional risks of future rupture and resulting loss of use and unanticipated costs.

33.    Plaintiffs Grey Fox and Bean Blossom have incurred fees, costs, and expenses related to the spill, suffered damage to their ongoing efforts to commercially market its property, and suffered stigma and reputational damages that have been and will continue to negatively impact the value, marketability, desirability, and ultimate sale price of their properties.

34.    This Complaint does not supplant the currently pending Plaintiffs' Corrected Consolidated Second Amended Complaint in *Andrews* (formerly, *Cheverez*) *v. Plains All American Pipeline, L.P.*, No. 2:15-CV-04113 (C. D. Cal. ), which asserts tort and statutory claims on behalf of all persons or businesses in the United States that claim economic losses, or damages to their occupations, businesses, and/or property as a result of Defendants' May 19, 2015 oil spill from Line 901. Rather, this case asserts (1) claims arising out of easement agreements on behalf of all persons and entities who own real property through which the Pipeline crosses, and (2) individual claims on behalf of Plaintiffs Grey Fox, Bean Blossom, MAZ, and Winter Hawk.

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

## III.   PARTIES

35.     Plaintiffs are owners of property that is subject to an easement for Plains' existing Pipeline (Lines 901 and 903). Each of these Plaintiffs is an original owner, who negotiated its easement directly with Plains or its predecessor-in-interest, Celeron, or a bona fide purchaser of properties that were subject to existing easements at the time of purchase. Each of the easement contracts specified that they allowed only "one pipeline." A bona fide purchaser for value, who acquires his interest in real property without notice of another's asserted rights in the property, takes the property free of such unknown rights.

**Plaintiffs Grey Fox LLC, MAZ Properties, Inc, Bean Blossom, LLC, and Winter Hawk LLC**

36.     Plaintiff Grey Fox, LLC is a California limited liability company with its principal place of business in Goleta, California. It owns real property located in Santa Barbara County, California sometimes referred to as Lot X of El Rancho Tajiguas. Lot X is burdened with an easement for the Pipeline. The May 2015 rupture of the Pipeline occurred on Lot X. Lot X has been continuously listed and marketed for sale for more than a year, but remains unsold.

37.     Plaintiff MAZ Properties, Inc. is a California corporation with its principal place of business in Goleta, California. It owns real property located in Santa Barbara County, California portions of which are sometimes referred to as Lot J and Lot B of El Rancho Tajiguas. Lot J and Lot B are burdened with easements for the Pipeline.

38.     Bean Blossom, LLC is a California limited liability company with its principal place of business in Goleta, California. It owns real property located in Santa Barbara County, California sometimes referred to as Lot H of El Rancho Tajiguas. Lot H is burdened with an easement for the Pipeline. Lot H has been listed and marketed for sale continuously since the Oil Spill occurred, but remains unsold.

39.     Winter Hawk, LLC is a California limited liability company with its principal place of business in Goleta, California. It owns real property located in Santa

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

Barbara County, California portions of which are sometimes referred to as Lot C of El Rancho Tajiguas. Lot C is burdened with an easement for the Pipeline.

40.     MAZ originally acquired what is commonly known as El Rancho Tajiguas. After the acquisition, MAZ executed a Right-Of-Way Grant and then an Amendment to the Right-Of-Way Grant. (*See* Ex. 1 [Right-Of-Way Grant] and Ex. 2 [Amendment] attached hereto and incorporated herein by reference and hereby made a part of the record hereof). This private contract easement allows the Pipeline to run through the southern section of El Rancho Tajiguas, along the Pacific Coast.

41.     El Rancho Tajiguas was and is comprised of approximately 24 legal parcels of land, or Lots, and MAZ subsequently transferred some of the Lots to limited liability companies. MAZ kept its interest in Lot B and Lot J and transferred Lot X to Grey Fox, Lot H to Bean Blossom, and Lot C to Winter Hawk. MAZ's original Right-Of-Way Grant and Amendment for El Rancho Tajiguas currently applies to Lots B, J, X, H, and C. The Right of Way Grant and Amendment executed by MAZ, applies to all of the properties conveyed to Plaintiffs Grey Fox, Bean Blossom and Winter Hawk (collectively, "MAZ Properties"). The easements that apply to the properties of the other members of the Class (collectively, "Easements") are similar in all material respects to the relevant provisions contained in the El Rancho Tajiguas easement.

42.     Plaintiff MAZ is an original owner, who negotiated its easement directly with Plains or its predecessor-in-interest, Celeron. The easement contract specified that it allowed only "one pipeline," and Plaintiff MAZ relied on this language when negotiating the contract.

**Plaintiff Mark W. Tautrim, Trustee of the Mark W. Tautrim Revocable Trust**

43.     Plaintiff Mark W. Tautrim, Trustee of the Mark W. Tautrim Revocable Trust is a citizen of California and owner of the property known as Orella Ranch, 12750 Calle Real, Goleta, California ("the Tautrim Property"). The Tautrim Property is burdened with an easement for the Pipeline.

44.     The Tautrim Property has been owned and managed by members of the Tautrim family for multiple generations. In 1988, joint-owners Karl W. Tautrim, Luzena E. Tautrim, Martin Tautrim, Marion F. Tautrim, Deborah D. Tautrim and Plaintiff Mark W. Tautrim executed a Right-of-Way Grant. (*See* Ex. 3 [Right-of-Way Grant No. 88-050104], attached hereto and incorporated herein by reference and hereby made a part of the record hereof). This private contract easement allows the Pipeline to run alongside the eastern boundary and then through the southern section of the Tautrim Property.

45.     Subsequently in 1994, then joint-owners Karl W. Tautrim, Trustee of the Tautrim Trust dated March 2, 1990, Martin Tautrim and Marion F. Tautrim, and Plaintiff Mark W. Tautrim executed an Amendment to the Right-of-Way Grant clarifying minor deviations in the location of the Pipeline on the property. (*See* Ex. 4 [Amendment No. 1 to ROW 94-026564] attached hereto and incorporated herein by reference and hereby made a part of the record hereof). Following a series of intra-family transfers, the property came to be solely owned by Plaintiff Mark W. Tautrim as Trustee of the Mark W. Tautrim Revocable Trust.

46.     Plaintiff Mark W. Tautrim was an original joint owner of the Tautrim Property, who negotiated the easement directly with Plains or its predecessor-in-interest, Celeron. The easement contract specified that they allowed only "one pipeline."

### Plaintiff Live Oak Bazzi Ranch, L.P.

47.     Live Oak Bazzi Ranch, L.P. ("Live Oak") is a California domestic limited partnership and owner of the property known as Live Oak Bazzi Ranch ("the Bazzi Property"). The Bazzi Property is burdened with an easement for the Pipeline.

48.     The Bazzi Property has been owned by members of the Bazzi family for approximately sixty years, during which it has been used for farming, cattle ranching and the operation of a shale quarry. In 1986, then-owners Maria Bazzi and her twin daughters, Angelina Bazzi Daniels and Martha Bazzi Marsango, individually and as Trustees under the Last Will and Testament of Abbondio Bazzi, executed a Right-of-Way Grant. (*See*

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

1   Ex. 5 [Right-of-Way Grant No. 87-005709] attached hereto and incorporated herein by
2   reference and hereby made a part of the record hereof). This private contract easement
3   allows the Pipeline to run through the eastern section of the Bazzi Property.

4        49.    In 2002, the property was conveyed to Live Oak Ranch, a California general
5   partnership between the four grandchildren of Abbondio and Maria Bazzi. In 2015, the
6   property was conveyed from the general partnership to its present owner, Live Oak Bazzi
7   Ranch, L. P., a limited partnership whose membership interests are held by the four
8   surviving grandchildren of Abbondio and Maria Bazzi.

9                                **Plaintiff JTMT LLC**

10       50.    Plaintiff JTMT LLC is a California limited liability corporation and current
11   owner of the property known as J T Ranch at 9660 Foxen Canyon Road, Santa Maria,
12   California. The J T Ranch property is burdened by an easement for the Pipeline.

13       51.    In 1987, then-owners of the property, Josephine Giorgi, individually and as
14   Trustee of the Natele Giorgi Trust and Albert V. Giorgi, as Trustee of the Natale Giorgi
15   Trust executed a Right-of-Way Grant. (*See* Ex. 6 [ROW Grant 87-005710] attached
16   hereto and incorporated herein by reference and hereby made a part of the record hereof).
17   Approximately one year later, a Correction Right-of-Way Grant was executed between
18   the same parties. (*See* Ex. 7 [Correction ROW Grant 88-013274] attached hereto and
19   incorporated herein by reference and hereby made a part of the record hereof). These
20   private contract easements allow the Pipeline to run through the south-west section of the
21   property.

22       52.    In 1991, the property was purchased by Marvin and Paulette Teixeira for the
23   sum of $1,300,000. 00. In 2003, the property was conveyed to J T Ranch L.P., a California
24   limited partnership, the general partner of which is MPT Enterprises, LLC, a California
25   limited liability corporation established and managed by Marvin and Paulette Teixiera.
26   Two years later, the property was conveyed from J T Ranch L.P. to its current owner,

27
28
                              15

1   JTMT, LLC, a California limited liability corporation established and managed by Marvin

2   and Paulette Teixeira for the purpose of ownership and management of the property.

3       53.     Plaintiff JTMT LLC is a bona fide purchaser of a property that was subject

4   to an existing easement at the time of its purchase. The easement contract to which its

5   property was subjected specified that it allowed only "one pipeline", and Plaintiff JTMT

6   LLC took the property for value without notice of any claim that the easement allowed

7   the installation of a second pipeline.

8                           **Plaintiffs Mike and Denise McNutt**

9       54.     Plaintiffs Mike and Denise McNutt are citizens of California and owners of

10  the property known as 50 Pine Canyon Rd, Santa Maria, California ("McNutt Property").

11  The McNutt Property is burdened by an easement for the Pipeline.

12      55.     In 1984, then-owners D. M. Wilson and Eleanor Wilson executed a Right-

13  of-Way Grant (*See* Ex. 8 [ROW Grant 84-062027] attached hereto and incorporated

14  herein by reference and hereby made a part of the record hereof). The private contract

15  easement allows the Pipeline to run through the north-west section of the property.

16      56.     Twelve years later, Plaintiffs Mike and Denise McNutt purchased the

17  property for $160,000. 00. Plaintiffs Mike and Denise McNutt are bona fide purchasers

18  of a property that was subject to an existing easement at the time of its purchase. The

19  easement contract to which their property is subjected specified that it allowed only "one

20  pipeline" and Plaintiffs Mike and Denise McNutt purchased their property for value

21  without notice of any claim that the easement allowed the installation of a second pipeline.

22                                  **Defendants**

23      57.     Defendant Plains All American Pipeline, L.P. is a limited partnership formed

24  in Delaware with its headquarters and principal place of business in Houston, Texas.

25  Under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(10),

26  Defendant Plains All American, an unincorporated association, is therefore a citizen of

27  Delaware and Texas.

28

16          PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
            COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

58.     Defendant Plains All American operates through or on behalf of: PAA GP LLC, a limited liability company formed in Delaware with its headquarters and principal place of business in Houston, Texas; Plains AAP, L.P. ("AAP"), a limited partnership formed in Delaware with its headquarters and principal place of business in Houston, Texas, that is the sole member of PAA GP LLC; Plains All American GP LLC ("GP LLC"), a limited liability company formed in Delaware with its headquarters and principal place of business in Houston, Texas; Plains GP Holdings, L.P. ("PAGP"), a limited partnership formed in Delaware with its headquarters and principal place of business in Houston, Texas, that is the sole member of GP LLC; and PAA GP Holdings LLC, a limited liability company formed in Delaware with its headquarters in Houston, Texas, that is the general partner of PAGP. As each of these entities are unincorporated associations, pursuant to CAFA, 28 U.S.C. §1332(d)(10), they are each a citizen of Delaware and Texas.

59.     Defendant Plains Pipeline, L. P. is a limited partnership formed in Texas with its headquarters and principal place of business in Houston, Texas. Defendant Plains Pipeline is a subsidiary of Defendant Plains All American. Pursuant to CAFA, 28 U.S.C. §1332(d)(10), Defendant Plains Pipeline, an unincorporated association, is therefore a citizen of Texas. Plains Pipeline, L.P. is operated by its general partner, Plains GP, LLC, and its limited partner, Plains Marketing, L. P. Plains GP, LLC is a Texas LLC with its headquarters and principal place of business in Texas. Plains Marketing, L.P. is a Texas Limited Partnership with its headquarters and principal place of business in Texas.

60.     Defendants John Does 1 through 10, are Plains-related corporations or partnerships, the names and addresses of which are currently unknown.

61.     Defendants (collectively, "Plains"), have common proprietary interests, ownership interests, or joint ventures with each other, are directly related to or are affiliated with each other, and are involved with the ownership, operation, and maintenance of the Pipeline.

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

## IV.   JURISDICTION AND VENUE

62.    This Court has jurisdiction over this class action pursuant to CAFA, 28 U.S.C. §1332(d), because at least one class member is of diverse citizenship from one defendant; there are more than 100 class members; and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

63.    This Court also has jurisdiction over this individual action pursuant to 28 U.S.C. §1332(a) and (c), because the matter in controversy between Plaintiff Grey Fox and Defendants exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

64.    This Court has personal jurisdiction over Defendants because they are registered to conduct business in California, have property interests in California, and have sufficient minimum contacts with California.

65.    Venue is proper in this District under 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred and/or emanated from this District, because a substantial part of the property involved is situated in this District, and because Defendants have caused harm to Class members residing in this District.

## V.   BACKGROUND FACTS

### A.   Easement Contracts Require Defendants To Maintain The Pipeline And Not Interfere With Plaintiffs' Use And Enjoyment Of Their Land

66.    The Pipeline was constructed in the late 1980s and went into crude oil service in 1991. Prior to installation, Defendants' predecessor, Celeron Pipeline Company of California, drafted easement contracts (or Right-Of-Way Grants) for each of the properties through which the Pipeline would travel. Celeron and the property owners executed the easement contracts (collectively, "Easements").

67.    At the time the contracts were negotiated, Celeron and AAPC were owned by Wingfoot, a wholly-owned subsidiary of Goodyear. In 1998, Plains Resources, Inc. purchased all outstanding capital stock of AAPC and Celeron from Wingfoot, including

all assets, liabilities and results of operations. Plains Resources then created several subsidiaries and partnerships to operate its new assets. Plains Pipeline, LP now owns and operates Lines 901 and 903. Thus, Plains is the successor-in-interest of Celeron.

68.     The Easements negotiated by Plains' predecessor Celeron, still in effect today, are virtually identical in all respects that are material to this Complaint. Each of the agreements states that it is for the use of "one pipeline," and expressly allows that Plains shall use the easement for the "maintenance, repair, removal or replacement" of that one Pipeline, or words to that effect.

69.     In each easement contract, the grantor property owners granted the grantee oil company a non-exclusive right-of-way and easement, with the right of ingress and egress incidental thereto, to take certain actions related to *one* pipeline (e. g. , "to survey, lay, maintain, operate, repair, replace, and remove one underground pipeline and appurtenances thereto for the transportation of oil, gas, water and other substances"), on, over, through, under and across a portion of the grantor's land. (*See* Ex. __, El Rancho Tajiguas Right-Of-Way, at p. 1. )

70.     The grantor property owners did not convey any rights not contained in the easements

71.     In the approximately thirty years since the Easements were negotiated, many of the properties changed ownership. In each instance, the purchasers acquired the parcels subject to the Easements and without knowledge of Plains' claims that the Easements allowed it to install a new pipeline that would subject each parcel to well over a year of destruction, and other disruptions. Thus, the purchasing plaintiffs were each bona fide purchasers of the subject properties.

72.     Similarly, Defendants, who purchased all assets and liabilities of Celeron and its All American Pipeline, are successors-in-interest to Celeron and thus subject to the same obligations and responsibilities that existed when Celeron negotiated the

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

contracts, including the obligation to adequately maintain the Pipeline, and the limitation to install and maintain only "one pipeline," i. e. the existing Line 901 and 903.

73.     The easement contracts provided a temporary construction easement of up to 100 feet, each of which terminated when construction was completed. The permanent easements then reverted to a width of just 25 feet, like the easement applicable to the MAZ Properties. *Id*. Some of the contracts, including those held by Plaintiffs Mike and Denise McNutt, provide permanent easements of up to 50 feet, but none are wider than that. Twelve of the easement contracts, include temporary right of access along and adjacent to the permanent easement as may be reasonable necessary for maintenance, repair, removal, or replacement of the facilities (described as accessory structures used during construction), like Plaintiff Tautrim. In addition, approximately 130 of the existing subordinated parcels, including Plaintiff Live Oak Bazzi Ranch L.P., give owners the right to require removal of the Pipeline at the end of its natural life.

74.     Notably, however, not one of these agreements contemplates or allows the construction of an entirely new separate Pipeline system, subject to jurisdiction of a separate regulatory body. And not one of these agreements contemplates or allows the extensive and intrusive construction Plan that, as Plains' acknowledges in its permitting application, is necessary in order to comply with current safety measures and standards the government now requires in order to open the pipeline. Plaintiffs seek declaratory and injunctive relief to clarify just that.

**B.     Defendants Are Also Contractually Required To Indemnify And Hold Plaintiffs Harmless For Any Claims Arising From The Spill Or The Subsequent Remediation**

75.     The spill also triggered certain contractual indemnity obligations under the Easements. In each easement contract, the grantee oil company assumed all risks of and agreed to indemnify and hold the grantor property owner harmless from and against all claims and losses relating to the Pipeline, unless those claims or losses were a direct result of the grantor property owner's negligence. *Id*. at p. 2. )

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

76.     Additionally, after the spill, Plaintiff Grey Fox and Plains entered into a Temporary Property Access and Remediation Agreement, in which Plains further agreed to protect, indemnify, defend, and hold Grey Fox harmless from and against any and all damages, demands, claims, losses, liabilities, injuries, penalties, fines, liens, judgments, suits, actions, investigations, proceedings, costs or expenses whatsoever (including, without limitation, reasonable attorneys' and experts' fees) arising out of or relating to any physical harm, physical or property damage or personal injury or death caused by Plains' remediation work or the rupture and release of crude oil from the Pipeline on Lot X. (*See* Ex. 9, Temporary Property Access and Remediation Agreement, at ¶ 8. )

**C.   The May 2015 Rupture of Defendants' Pipeline Spilled Toxic Crude Oil Onto Grey Fox's Lot X, Onto The Beach, And Into The Pacific Ocean**

77.     On the morning of May 19, 2015, at approximately 10:55 a. m. , the Pipeline ruptured on Grey Fox's private property (Lot X) near Refugio State Beach, spilling toxic oil onto the property, onto the coastal bluffs, onto the beach, and into the Pacific Ocean.

78.     As the crude oil poured out of the ruptured pipe, motorists on U.S. 101, neighbors and beachgoers became overwhelmed by the stench of oil. At approximately 11:30 a. m. the Santa Barbara County Fire Department responded to reports of the noxious odors and arrived to find oil flowing freely from the Pipeline, through a storm drain under the transportation corridor containing U.S. 101 and railroad tracks operated by Union Pacific, across the beach, and into the Pacific Ocean. Oil continued to spill from the Pipeline until approximately 3 p. m.

79.     Defendants did not promptly act to respond to signs of the Pipeline's failure or notify relevant government agencies. As the two United States Senators from California stated in a letter to Defendants, "we are concerned that Plains Pipeline may not have detected this spill or reported it to federal officials as quickly as possible, and that these delays could have exacerbated the extent of the damage to the environment." The senators called Defendants' response "insufficient."

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

80.     Indeed, as reported by the Los Angeles Times, it appears that "chaos and delay marked the initial hours after [the] pipeline burst." According to Defendants' response to the senators' letter, Plains personnel were unable to timely notify federal spill response officials or communicate with other Plains representatives due to in part "distractions" at the spill site. Defendants' on-site employee dispatched to respond to the emergency was reduced to using a shovel to try to build a berm to contain the spill.

81.     According to federal investigators, one of Plains' representatives told officials who first responded to reports of an oil spill that he did not think it came from Line 901, which is on the opposite side of the interstate transportation corridor from the ocean. In fact, it was several hours before Defendants officially notified local, state, or federal spill response officials, even though Defendants' representatives were conducting a spill response drill nearby that very morning.

82.     Witnesses who visited Refugio State Beach on the night of the spill reported little or no response. Even the next day, as professional clean-up crews began responding to the oil contaminating Refugio State Beach, the response efforts at other nearby beaches were left to volunteers with little or no training or protective equipment, some using nothing but shovels and five-gallon buckets in attempts to remove thousands of gallons of crude oil from the sand and sea.

83.     The delayed and inadequate response runs contrary to Defendants' oil spill response plan, which assured state regulators that a spill from Line 901 was "extremely unlikely." Defendants also assured regulators that it would take no longer than 15 minutes to discover and shut off the source of any spill. In fact, Defendants continued to operate Line 901 for more than 30 minutes after it initially ruptured and waited hours more before officially notifying federal responders of the rupture.

84.     Indeed, a California jury unanimously found Plains guilty because it "knowingly [sic] or reasonably should have known that its actions would cause the discharge of oil into the waters of the State" a felony crime. Plains was also convicted of

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
                                           COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

eight criminal misdemeanors, including knowingly failing to follow a material provision of an applicable oil contingency plan, and unlawfully discharging oil or waste to the surface or subsurface waters or land by oil field operations, as well as several counts for resulting death of marine life. *State of California v. Plains All American Pipeline, L. P.*, No. 1495091 (Cal. Super. Ct. Sept. 7, 2018).

85.     The spill polluted Grey Fox's Lot X and impaired the ability of all property owners along the length of the Pipeline to use and enjoy their land. The oil spill also presented a serious risk to human life. The Santa Barbara County Health Department recommended that residents avoid all areas affected by the spill, but U.S. Route 101, a major interstate highway, runs through and adjacent to the spill area. The County called Refugio Beach a "Hazmat area." The County also warned that direct contact with oil, inhalation of fumes, or ingestion of contaminated fish or shellfish can cause skin irritation, nausea, vomiting, and other illnesses.

86.     Following the spill, the group Water Defense collected oil and water samples to test for chemicals that could be harmful to the public. Although the Pipeline had been approved to transport crude oil, the testing revealed that the Pipeline also carried – and Line 901 spilled – toxic chemicals known to pose severe threats to human health and marine life, including but not limited to, Ethylbenzene, Toluene, Xylene, and Naphthalene. Those tests also confirmed the presence of Glutaraldehyde, a biocide used in drilling, fracking, and acidizing injections.

87.     Long term, the extent of the impact that occurred may be as-yet-unknown, but it is no less certain. Even with the best spill response, toxic oil will remain in the environment for a long time, continuing to harm the environment. Recently, five years after the Deepwater Horizon oil spill in the Gulf of Mexico, officials assessing the damage to that ecosystem said, "the environmental effects of this spill is likely to last for generations." This spill, too, may cause long-lasting environmental and economic impacts.

88.    The Santa Barbara News-Press reported that, as of late June 2015, the "most tedious" portions of the clean-up area remained uncleaned, and cleanup costs had exceeded $92 million. By January 2016, only a small fraction of the oil – 14,267 gallons of an oil/water mix – had been recovered, and more than 430 oiled birds and mammals had been observed.

**D.    The May 2015 Rupture Exposed The Dangerous Conditions Of The Entire Pipeline**

**1.    The Root Cause Of The Rupture Was External Corrosion**

89.    On May 19, 2016, PHMSA issued its FIR regarding the Refugio Oil Spill that identified external corrosion as the root cause of the Pipeline rupture.

90.    The Pipeline is coated with coal tar urethane and covered with foam insulation and a tape wrap over the insulation. Shrink wrap sleeves, which provide a barrier between the steel pipeline and soil, are present at all of the pipe joints on Line 901 and multiple locations on Line 903. Both Lines carry low API gravity crude oil at a temperature of approximately 135 degrees Fahrenheit.

91.    After the rupture, a third party performed a metallurgical analysis and concluded that the rupture "occurred at an area of external corrosion that ultimately failed in ductile overload under the imposed operating pressure. The morphology of the external corrosion observed on the pipe section is consistent with corrosion under insulation facilitated by wet-dry cycling." In other words, moisture is getting between the pipe and insulation, the insulation does not allow the moisture to evaporate fast enough, the pipe does not dry properly, the pipe corrodes from the outside, and the corrosion materially compromises the integrity of the structure of the pipe, allowing for a rupture.

92.    Because of the external components of the Pipeline, Defendants should have known that exterior corrosion was a risk and should have more competently monitored and maintained it. Instead, Defendants created a dangerous situation that can be made safe

24                        PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
                                COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

only by replacing the entire Pipeline. Unlike internal corrosion, external corrosion cannot be repaired from the inside. An externally corroded pipe must by dug up and replaced.

### 2.    The Entire Pipeline Is Riddled With Additional Anomalies

93.    The point-of-rupture is not the only corroded portion of the Pipeline. The entire Pipeline is riddled with additional anomalies known to Plains, further threatening another disaster comparable to or worse than the May 19, 2015 spill.

94.    Plains' existing corrosion control system is not preventing external corrosion of the pipe under the insulation, and the frequency and extent of corrosion anomalies are only increasing.

95.    In May 2016, the U.S. Department of Transportation Pipeline Hazardous Materials Safety Administration issued its FIR ("Report") on the Pipeline. It found that the proximate or direct cause of the Spill was external corrosion that this the Pipeline to an unsustainable level.[6] The Report details how the Pipeline (consisting of both Line 901 and Line 903) was severely corroded. PHMSA's Report shows that data from Plains' "in-line inspections" of Line 901 "show a growing number of corrosion anomalies on Line 901," increasing from 12 areas of metal loss of 40 to 59 percent to 80 such areas, 2 areas of metal loss of 60 to 79% to 12 such areas, and 0 areas of metal loss greater than 80% to two such areas from 2007 to May 2015. *Id.* at 13. Because Line 903 has "similar corrosion characteristics," PHMSA shut down both lines.[7]

96.    While these numbers are disturbing, they are also understated. The May 2015 survey, for instance, did not accurately report the full extent of external corrosion in the area of the spill, and it did not accurately report the full extent of external corrosion

---

[6] *See* Report at p. 3; *available at* https://www. phmsa. dot. gov/sites/phmsa. dot. gov/files/docs/PHMSA_Failure_Investigation_Report_Plains_Pipeline_LP_Line_901_Public. pdf.

[7] *See* https://www. reuters. com/article/plains-all-amer-pipeline-california-idUSL1N1382UV20151113.

anomalies consistently compared to field measurements of all anomalies investigated after the spill.

97.   Defendants also failed to monitor and maintain the Pipeline's cathodic protection system. Though the system is supposed to prevent or reduce corrosion even when moisture makes it through to the Pipeline, it did not function correctly.

98.   In 2003 PHMSA alerted pipeline owners and operators, including Defendants, of stress corrosion cracking (SCC) as a potential risk and the assessment and remediation measures that should be performed.

99.   SCC or environmentally-assisted cracking can be induced on a pipeline from the combined influence of tensile stress and a corrosive medium. SCC is commonly associated with disbonded coatings. Disbonded coatings may prevent the cathodic protection currently used for corrosion control from reaching the pipe surface and allow an SCC-susceptible environment to form between the pipe and coating. Tape coatings and shrink wrap sleeves are both susceptible to disbondment, which reduces the efficacy of the cathodic protection system and may lead to corrosion and possibly environmentally assisted cracking or SCC.

100.   Although these types of coatings and sleeves are present on the Pipeline, PHMSA's findings indicate that Plains did not factor in the insulation of the Pipeline when determining the protection level supplied by its cathodic protection system. Cathodic protection is required by Federal pipeline safety regulations to prevent external corrosion of the Pipeline. Historical records, however, reveal that Defendants supplied a cathodic protection level sufficient to protect non-insulated, coated steel pipe, but insufficient to protect the Pipeline, which is insulated.

101.   The May 2015 rupture and the resulting environmental disaster exposed the dangerous condition of the entire Pipeline running through Plaintiffs' properties. It also exposed Defendants' systemic failure to properly monitor and maintain the Pipeline.

102.   The Pipeline, which transports crude with toxins (including unauthorized toxins) under high pressure through private property and in close proximity to residential areas and drinking water resources, was an immediate and ultrahazardous risk and serious danger to Plaintiffs and putative class members. This hazardous activity created a zone of danger to Plaintiffs.

103.   The Pipeline was, and is, in an unsafe condition, as regulators have held.

104.   After a one-year investigation, in May 2016, PHMSA issued its Failure Investigation Report ("FIR"), which concluded that this external corrosion was the direct or proximate cause of the Line 901, coupled with ineffective corrosion protection, failure by Plains to detect or mitigate the corrosion, and Plains' failure to timely detect and respond to the oil spill.

105.   The corrective measures ultimately required as a result of PHMSA's investigation include replacement of the Pipeline, improvements to Plains' IMP, enhancements to leak detection and alarm systems, installation of safety valves and pressure sensors. These features are unachievable with the existing Pipeline, and Plains has acknowledged as much in its permitting proposal to abandon the existing interstate Pipeline and construct an entirely new intrastate pipeline system, to be known as Line 901R and 903R.

**E.    Defendants Cannot Repair and/or Restore The Pipeline Within The Parameters Of The Easements**

106.   The Easements held by Plains, do not allow, or even contemplate, the installation of a second separate and brand-new pipeline system along the existing easement corridor. The existing permanent easements do not provide the 100 to 190 feet (or more) that Plains requires during construction and related primary and secondary staging areas. Indeed, many of the easements do not even offer the 50 ft corridor that Plains wishes to maintain.

107.    For example, when Defendants attempted to restore the ruptured section on Lot X, they discovered that they needed access to more of Grey Fox's property than is prescribed in the easement. Plains and Grey Fox then had to negotiate a Temporary Property Access and Remediation Agreement to allow Plains greater access than prescribed in the easement. (*See* Ex. 9, Temporary Property Access and Remediation Agreement. )

108.    The Easements limit Defendants' access along the entire Pipeline. As the easement owner, Defendants have no right to use any more than the prescribed amount of land to repair and/or restore the Pipeline.

109.    Any additional access creates a new burden on Plaintiffs' servient tenement or materially increases the existing burden. Neither is allowed without Plaintiffs' consent or an easement acquired through eminent domain. If Defendants were allowed to expand the Easements' scope unilaterally, Defendants would be impermissibly taking Plaintiffs' property without compensation.

110.    Moreover, *none* of the easements provide for the installation of a second pipeline system in the existing easement. Rather, this new system requires an entirely new set of easement contracts or amendments, to reflect the new burden placed on the existing pipeline corridor and the impact on the remainder of each parcel of Property.

111.    Nor do the Easements contemplate or allow the additional burden of the three-year, 6 to 7 days per week, 13-24 hour per day, multi-phase construction project necessary to install a second pipeline. Plaintiffs, and the class whom they seek to represent, are entitled to control activities that impact their properties, and to receive adequate compensation for the violent disruption to their ownership rights Plains seeks to impose.

112.    Therefore, while Defendants have a right to maintain a safe Pipeline within the scope of the existing Easements, they have no right to use their original decision to negotiate, and pay for, a limited easement or their failure to maintain the Pipeline as an

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

excuse to exceed that scope without proper compensation. Nor can Plains render the Easements a nuisance to or destructive of Plaintiffs' land. Since the Easements have been finally established, Defendants cannot exceed the scope of the Easements without compensation for the burden, risks and harm of doing so.

## F.    Defendants Have A Long History Of Recklessly Avoiding Safety

113.    Threats to the Gaviota Coast and Santa Barbara's environment and economy from oil development, production and operations are not new. In 1969, a blowout at Union Oil's off-shore drill rig sent millions of gallons of oil into the waters and onto the beaches of Santa Barbara County. The blowout killed thousands of birds, dolphins, fish, and other marine life. The litigation that followed effectively led to the birth of the environmental movement and legislation to protect the environment, the public and private property owners from oil and gas operations on and off shore.

114.    Despite that disaster, the oil industry has only continued to grow in and around Santa Barbara County. Today, however, governments and some companies have taken significant steps to make the production and transportation of crude oil safer and more reliable. Defendants, on the other hand, are notable for their track record of doing otherwise.

115.    Automatic shut-off valves are one such safety feature others have adopted but Defendants have refused to install. This refusal by Defendants to follow standard safety protocols directly contradicts their own published pipeline safety protocol, which provides "that Plains All American Pipeline is committed to designing, constructing, operating, and maintaining its pipelines in a safe and reliable manner that will meet or exceed minimum safety standards. …"

116.    Consequently, the existing Pipeline is likely the only pipeline system in the area that was capable of failing and discharging hundreds of thousands of gallons of oil without warning.

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

**G.    The May 2015 Rupture Could Have Been Averted Had Defendants Adequately Installed And Maintained The Pipeline, Making It Less Susceptible To Corrosion And Rupture**

117.    Regular monitoring and maintenance of pipelines is a crucial step that owners of pipelines must take in order to avoid exactly the disaster that occurred. Regular monitoring and maintenance is also what the property owners expected when they entered into the Easements, or purchased properties subject to the Easements.

118.    Defendants failed to provide regular maintenance and failed to detect and repair the corrosion that was eating away at the steel walls of the Pipeline. Defendants, instead, wantonly disregarded the health and safety of the public and environment by operating the Pipeline when they knew it was corroded and did not have proper safety systems in place.

**H.    Defendants' Lax Safety Standards On The Pipeline Are Not Isolated Incidents**

119.    The lax safety standards on the Pipeline were not isolated incidents for Defendants. Since 2006 Plains has been cited for more than 175 violations of safety requirements, causing nearly $24 million in property damage. Eleven of those incidents were in California. Plains is one of the top four most-cited pipeline operators in the country.

120.    Even more alarming is that, according to federal statistics analyzed by the website The Smart Pig Blog, the "number of incidents on crude oil pipelines operated by [Plains] . . . is increasing faster than the national average," by about 14%. The rapidly rising increase in incidents for pipelines operated by Plains is as shown in this chart:

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



121.   In 2014, for example, a pipeline owned and operated by Defendants ruptured in a Los Angeles neighborhood, covering streets, cars, houses, and businesses in oil. The cause: a poorly maintained pipeline. A few years ago, another poorly maintained Plains pipeline ruptured and sent oil into a drinking water reservoir for the residents of Los Angeles.

122.   In 2010, pursuant to a Consent Decree filed by the U.S. EPA following numerous alleged violations of the Clean Water Act by Defendants in several states, Defendants represented that they would update their procedures such that "[i]f there is an unexplained increase in delivery flow-rate with corresponding decrease in pressure – [Plains would] SHUTDOWN the affected line segment."

123.   As part of the settlement of the EPA actions, Defendants paid a $3. 25 million penalty for 10 spills between June 2004 and September 2007 that discharged a total of roughly 273,420 gallons of crude oil into navigable waters or adjoining shorelines in Texas, Louisiana, Oklahoma, and Kansas.

124.   Plains itself recently acknowledged in a disclosure report to the U.S. Securities and Exchange Commission that it has "experienced (*and likely will experience future*) releases of hydrocarbon products into the environment from our pipeline . . . operations" that "may reach surface water bodies." (Emphasis added).

31

125.    Indeed, less than two months after the rupture of Line 901, more than 4,000 gallons of oil spilled from a pump station on Defendants' Capwood Pipeline in Illinois, contaminating a nearby creek.

126.    Nor has Plains' safety record improved since the Refugio Oil Spill. Just last year, Plains admitted responsibility for another large oil spill from one of its lines. Nearly 19,000 gallons of crude oil cascaded out of one of Plains' pipeline in Oklahoma, with internal corrosion listed as the likely cause.[8] In Oklahoma alone, Plains has experienced more than 25 pipeline incidents since 2006, with 14 leaks attributed to corrosion. [9]

## I.    Defendants Are On Formal Notice By PHMSA For Probable Violations Of Federal Regulations, And Have Been Issued A Compliance Order

127.    On August 19-22, 2013, September 16-19, 2013, and September 30-October 4, 2013, a PHMSA representative inspected Lines 901 and Line 903. Following those field inspections, PHMSA requested additional documentation and information pertaining to the Pipeline. This information was provided through June 2014.

128.    On September 11, 2015 PHMSA issued a formal notice of probable violation and compliance order (the "Notice") against Defendants in light of its long-standing investigation.

129.    In its Notice to Defendants, PHMSA stated that "as a result of the inspection, it appears that you have committed probable violations of the Pipeline Safety Regulations, Title 49, Code of Federal Regulations . . . . These findings and probable violations were determined prior to the May 19, 2015 crude oil spill in Santa Barbara County, California."

130.    The Notice identifies six probable violations:

i.    Failure to maintain adequate documentation of pressure tests as part of its baseline assessment plan for its seven breakout tanks at Pentland Station in

---

[8] *See* https://kfor. com/2017/04/24/pipeline-leaks-18000-gallons-of-crude-oil-onto-kingfisher-co-farmland/.

[9] *See* http://www. okenergytoday. com/2017/04/plains-american-pipeline-continues-oil-spill-cleanup-kingfisher-county/.

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

Kern County, California and failure to present any evidence of past pressure tests performed on the breakout tanks to inspection teams. While some evidence of testing from 1995 was ultimately presented, these did not confirm that the tests were performed in compliance with regulations;

ii.    Failure to maintain adequate documentation of its preventative and mitigative evaluations prior to the 2013 calendar year for at least two different pipeline segments, and later stating that these records could not be found;

iii.    Failure to adequately document consideration of preventive and mitigative measures nor explain why implementation of said measures were not executed in "High Consequence Areas";

iv.    Failure to present adequate documentation of its annual review of Plains' emergency response training program, resulting in an inability to demonstrate an adequate review of training program objectives or the decision-making process for changes made to emergency response programs;

v.    Failure to present adequate documentation to demonstrate that supervisors maintained a thorough knowledge of the portions of the emergency response procedure for which they are responsible and for which it is their job to ensure compliance;

vi.    Failure to maintain sufficient records to demonstrate that contractors met the required qualifications.

131.   In addition to the above probable violations, PHMSA also cited three additional areas of safety concern:

i.    Failure to fully discuss or document how tool tolerance was addressed or how measured anomalies that deviated significantly from the size predicted by the tool were addressed;

ii.    Incomplete documentation of Management of Change for pressure reduction;

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

iii.    Failure to comply with its responsibility to educate emergency response officials as part of its Public Awareness Program.

132.    As a result of these findings, PHMSA issued a Proposed Compliance Order demanding that Defendants take action to remediate the above probable violations and safety concerns.[10]

133.    Later that same day, the Associated Press reported on the Notice and Proposed Compliance Order, quoting Robert Bea, a civil engineering professor at University of California, Berkeley. Professor Bea, a former oil executive who has studied numerous spills, stated that, "In all the documentation I have reviewed concerning the pipeline, I have never seen evidence of any advanced risk assessment and management processes being used by Plains."

134.    The Associated Press further reported that Professor Bea said the latest action by regulators speak to a weak corporate culture of safety and inadequate efforts to assess risk and prevent spills.

135.    In short, Plains operates pipelines that routinely and foreseeably fail. The communities through which it transports oil suffer the consequences.

136.    More recently, and as set forth above, on February 17, 2016, PHMSA issued Preliminary Findings on the May 19, 2015 Pipeline rupture. The agency found that:

i.    The Pipeline failed at an approximate pressure of 750 psig (pounds per square inch gauge) which is only 56% of the Maximum Operating Pressure;

---

[10] On November 12, 2015, PHMSA issued an amendment to the corrective action order. *See In the Matter of Plains Pipeline, LP, Respondent*, CPF No. 5-2015-5011H, Amendment No. 2 To the Corrective Action Order, *available at* https://primis. phmsa. dot. gov/comm/reports/enforce/documents/520155011H/520155011H_Amendment%20No. %202%20Corrective%20Action%20Order_11122015_text. pdf. That order explains that, contrary to common practice in the pipeline industry, Plains did not provide data from its field surveys of Line 901 to its in-line inspection vendor, and that based on PHMSA's investigation of Line 903 "it does not appear that Plains has an effective corrosion control program[. ]"

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

ii.    The May 6, 2015 In Line Inspection survey did not accurately size the amount of external corrosion in the area of the release;

iii.    The In Line Inspection survey did not size corrosion anomalies consistently compared to field measurements of all anomalies investigated after the May 19th spill;

iv.    Plains' existing corrosion control system is not preventing external corrosion of the pipe under insulation.

137.    The PHMSA investigation is continuing, with particular focus on metallurgical report review; the third-party root cause failure analysis; third-party analysis of the In Line Investigation surveys; complete analysis of the Plains control room including Controller actions; complete review and analysis of Plains' IMP; review of the adequacy of the placement and closure requirements of valves; need for additional pressure/flow monitoring devices; and investigation of the Plains Facility Response Plan.

138.    Defendants have profited from their blatant negligence and failure to comply with local, state, and federal safety requirements and guidelines, and their decision not to maintain and replace the Pipeline demonstrates Defendants' willingness to prioritize profits of over public safety.

139.    Defendants knew of the extremely high risk of catastrophic injury inherent in the transportation of oil through the Pipeline. Notwithstanding, Defendants took insufficient steps to engage in necessary monitoring and maintenance activities so as to prevent the rupture and protect Plaintiffs. Indeed, Defendants actively avoided taking action to protect Plaintiffs from known risks the Pipeline presented before the rupture. Defendants demonstrated a callous and reckless disregard for human life, health, and safety by operating the Pipeline without proper monitoring, maintenance and without proper safety equipment.

140.    This disregard for human life and safety is part of a pattern and practice that Defendants have demonstrated across the country. Defendants have acted with such

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

indifference to the consequences of their misconduct, with such recklessness, and as part of a well-established pattern, as to be willful, malicious, and oppressive, and in disregard of the rights of the Plaintiffs, thereby meriting an award of punitive or exemplary damages against Defendants.

## VI.   CLASS ACTION ALLEGATIONS

141.   Plaintiffs bring claims pursuant to Federal Rule of Civil Procedure 23 on behalf of classes of similarly situated persons, which they initially propose be defined as follows:

> All persons and entities who currently own real property subject to an easement, specifying "one pipeline," for the pipeline known as Plains All American Pipeline, Lines 901 and 903.

Plaintiffs reserve the right to propose subclasses of Plaintiffs in connection with their Motion for Class Certification, and as determined by the Court in its discretion.

142.   **Numerosity:** The members of the Class are so numerous that joinder of all members is impractical. The exact number of class members is unknown at this time by Plaintiffs, but the approximate size of the class is more than one hundred and is known by Plains.

143.   **Commonality:** All members of the Class own real property subject to easements related to the existing Pipeline, Lines 901 and 903 ("Easements"). Each of them will be impacted by the construction of the new Pipeline, Lines 901R and Line 903R. None of the Easements can be used for the construction and permanent maintenance of the new Pipeline. Nor can the Easements be used to accommodate the intrusive and extensive construction necessary to install and maintain any Pipeline that would meet the existing safety and regulatory requirements. Thus, common questions of law and fact predominate over any questions affecting only individual members of the Class.

144.   Plains violated its obligations to each of the property owners. Rather than meet its obligations, Plains failed to properly maintain the Pipeline, failed to timely act

on independent third-party monitoring of the Pipeline's corrosion levels, and failed to timely make the repairs and/or restoration needed to sustain the reasonably expected lifespan of the Pipeline, rendering it increasingly unsafe and more hazardous. Had Plains not violated its obligations, it would not be trying to install a second pipeline in the easement.

145.    The claims of the Plaintiffs and class members arise from common facts relevant to each class member, and each member of the designated class sues under common legal theories. Common issues of law or fact or the class include, but are not limited to:

i.      Whether the existing Easements, referring to "one pipeline," allow the construction of a new intrastate Pipeline;

ii.     Whether the construction of a new intrastate Pipeline constitutes a new "taking," that is not included in the rights bestowed by the existing Easements to "survey, lay, maintain, operate, repair, replace and remove" "one pipeline," i. e. the Pipeline already installed in the existing Right of Way;

iii.    Whether Defendants are barred from utilizing the existing permanent Easements for the construction and maintenance of their new intrastate Pipeline, Line 901R and 903R;

iv.     Whether Defendants are required to obtain new permanent easements, and provide adequate compensation for the new intrastate Pipeline, Line 901R and 903R;

v.      Whether the construction necessary to install the proposed pipeline constitutes an overburdening of the Easements;

vi.     Whether Defendants failed to properly monitor and maintain the Pipeline;

vii.    Whether the Defendants failed to properly monitor and maintain the Pipeline in a safe condition;

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

viii.    Whether Defendants maintained and operated the Pipeline in an unsafe condition;

ix.    Whether Defendants breached their duties and obligations pursuant to the Pipeline easements;

x.    Whether Defendants breached their obligation to properly monitor and maintain the Pipeline in a safe condition;

xi.    Whether Defendants' failure to operate and maintain the Pipeline unreasonably affected Plaintiffs and the Class Members;

xii.    Whether Defendants used the Easements unreasonably;

xiii.    Whether the improperly maintained Pipeline caused damage to Plaintiffs' and Class Members' properties;

xiv.    Whether the improperly maintained Pipeline was a nuisance;

xv.    Whether attempts to replace the Pipeline will be a nuisance or otherwise exceeds the permissible use of the easements;

xvi.    Whether Defendants should be required to pay class-wide damages for nuisance;

xvii.    Whether Defendants should be required to pay class-wide damages for breach of the Easement contracts.

146.    Each of the Plaintiffs and Class Members have the same, uniform contractual and implied right to fully use and enjoy their property. The Pipeline operates as one unit along each easement holders' land. The use of the Easements is uniform to all Plaintiffs and Class Members because the Pipeline is one pipeline. The pipeline functions and is operated by Defendants as one continuous unit along Plaintiffs' properties. The Pipeline operates as a whole, for a single purpose, and is one petroleum transmission system, pumping crude oil throughout and physically touching Plaintiffs' real properties.

147.    Plaintiffs' property rights are fundamental and specifically articulated in the language of a written easement. This Easements' language is consistent with the common

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

law duties in California, directing that the holder of the easement rights cannot unreasonably interfere with the servient easement holder's property, preventing the servient easement holder from the right to fully use and enjoy his or her property.

148. **Typicality:** The representative Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all the members of the Class have been injured by the same wrongful acts and omissions of Defendants. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the members of the Class and are based on the same legal theories. There is common liability and a common wrongful conduct by the Defendants applicable to all class members. Further, the defenses interposed by the Defendants are expected to be common toward the class members.

149. **Adequacy of Representation:** Plaintiffs are representatives who will fully and adequately assert and protect the interests of the Class and have retained class counsel who are experienced and qualified in prosecuting class actions. Neither Plaintiffs nor their attorneys have any interests contrary to or in conflict with the Class.

150. The proposed class representatives will fairly and adequately represent the interests of the class members because the class members have similar easements allowing for reasonable use and operation of the Pipeline. Plains has operated and maintained the Pipeline in a defective, unsafe manner and pursuant to a common course of corporate policy, pattern, practice, and conduct. The class representatives bring this lawsuit for the benefit of affected class members.

151. Moreover, the class representatives have retained counsel to represent themselves and class members who have extensive experience representing parties and class actions involving, mass torts and property claims, and who have knowledge and experience of the law and claims presented in this lawsuit and the nature of Rule 23, as a procedural mechanism to bring a lawsuit to decide a common liability for and bring relief for a group of affected persons.

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

152.   **Ascertainability:** The number and identity of class members can be easily ascertained. Every property owner with an easement for the Pipeline is aware of the easement and is correspondingly aware of the heightened threat of additional harm to them as a result of Plains' conduct. Moreover, since Plains presumably maintains files of its easement contracts with each member of the Class, Plains will have the exact number of class members and will be able to identify each class member. In addition, each easement is recorded in the records of Santa Barbara County, Kern County or San Luis Obispo County.

153.   **Rule 23(b)(1)(A).** This lawsuit should be certified as a class action because individually affected members who prosecute separate actions would cause multiplicity of litigation, there could be risk of inconsistent findings on the same set of operative facts of liability, there could be inconsistent and varying adjudications with respect to individual class members that could establish incompatible standards of conduct for the Defendants, and individual adjudications would as a practical matter affect the interests and rights of individual persons not made a party to this lawsuit.

154.   **Rule 23(b)(2).** Defendants have acted or refused to act on grounds that apply generally to the proposed Class, making final declaratory or injunctive relief appropriate with respect to the proposed Class as a whole.

155.   **Rule 23(b)(3).** Common questions of law and fact predominate over any questions affecting only individual Class members and a class action is superior to individual litigation. The amount of damages available to individual plaintiffs are insufficient to make litigation addressing Defendants' conduct economically feasible in the absence of the class action procedure. Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, the class action device presents far fewer case management difficulties and

provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

156.   **Rule 23(c)(4).** The claims of Class members are composed of particular issues that are common to all Class members and capable of class wide resolution that will significantly advance the litigation.

## VII.   CAUSES OF ACTION

**First Claim for Relief: Declaratory Relief Limiting Easement to "One Pipeline"**
*All Plaintiffs and Class Members against All Defendants*

157.   Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

158.   As alleged herein, Plaintiffs and Defendants have written contracts for easements (Right-of-Way Grants) related to "one pipeline" (the "Easements").

159.   Plaintiffs contend that the Easements' terms, properly interpreted, only allow Plains' to put into the easement one pipeline and that one pipeline, the existing Line 901 and 903, was installed more than thirty years ago, and that Plains cannot install its contemplated pipeline without an adequate easement acquired either through consensual negotiations or, if Plains is so entitled, eminent domain.

160.   Plaintiffs further contend that nothing in the easements provided notice of Plains' claim that those agreements entitled it to install another pipeline in the easement or to impose on the landowners the significant burdens associated with constructing and installing a new pipeline, and that Plaintiffs who are bona fide purchasers purchased without notice of those claims.

161.   Defendants, as confirmed through their application for a new permit, contend that their ability under the Easements to "repair" or "replace" the one pipeline entitles them to install an entirely new pipeline system.

162.   Defendants are currently pursuing the regulatory process to get the necessary approvals to perform this work, thereby demonstrating their present intent to install a

second pipeline in the Easements. The regulatory approval process does not consider whether Defendants have any rights to perform this work under the existing Easements.

163.   Plaintiffs further contend, and Defendants implicitly acknowledge, the existing Pipeline is now beyond the end of its useful life and cannot be utilized to safely transport oil or meet the safety and other regulatory guidelines currently required;

164.   Plaintiffs furthermore contend that Defendants have breached the contracts by their failure to maintain, repair and/or restore the Pipeline.

165.   Plaintiffs moreover contend that Defendants cannot replace, or adequately repair and/or restore the Pipeline within the terms of the existing Easements.

166.   Plaintiffs additionally contend that the easements do not permit Defendants access to the Plaintiffs' properties beyond the terms of the Easements.

167.   Plaintiffs desire and seek a judicial determination of the scope of Defendants' permissible rights under the easement contracts as related to Defendants intention to install the new pipeline system. An actual and justiciable controversy exists between Plaintiffs and Plains concerning the status and scope of the contracts, given Defendants' stated plans to replace the Pipeline.

168.   Plaintiffs desire and seek a judicial determination of their rights and duties and a declaration that use of the Easement is limited to one pipeline and that the easement's scope does not allow Defendants to install their new pipeline system.

169.   A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiffs and Defendants may ascertain their rights and duties under the Easements. As between the Plaintiffs and Defendants, as well as their successors-in-interest, a judicial declaration will establish the extent to which the Easements may be used.

170.   Because Defendants have no right under the Easements to install a second pipeline, an injunction prohibiting such conduct until Plains obtains the required easements in exchange for appropriate compensation is proper ancillary relief.

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

1

**Second Claim for Relief: Declaratory Relief for Overburdening**

2

*All Plaintiffs and Class Members against All Defendants*

3       171.   Plaintiffs incorporate by reference each and every prior and subsequent

4    allegation of this Complaint as if fully restated here.

5       172.   As confirmed by their application for a new permit, Defendants contend that

6    the existing Easements entitle them to perform a second massive construction project to

7    install an entirely new pipeline.

8       173.   Defendants are currently pursuing the regulatory process to get the necessary

9    approvals to perform this work, thereby demonstrating their present intent to perform the

10   described work. The regulatory approval process does not consider whether Defendants

11   have any right to perform this work under the existing Easements.

12      174.   Plaintiffs contend that the work required to construct and install a new

13   pipeline, to the extent not otherwise prohibited, overburdens and otherwise exceeds the

14   allowed uses of the Easements and is therefore not permissible.

15      175.   A judicial declaration is necessary and appropriate at this time under the

16   circumstances in order that Plaintiffs and Defendants may ascertain their rights and duties

17   under the Easements. As between the Plaintiffs and Defendants, as well as their

18   successors-in-interest, a judicial declaration will establish the extent to which the

19   Easements may be used.

20      176.   Because Defendants have no right to overburden the Easements by

21   constructing and installing a new pipeline, an injunction prohibiting such conduct until

22   Plains obtains the required easements in exchange for appropriate compensation is proper

23   ancillary relief.

24

**Third Claim for Relief: Injunctive Relief**

25

*All Plaintiffs and Class Members against All Defendants*

26      177.   Plaintiffs incorporate by reference each and every prior and subsequent

27   allegation of this Complaint as if fully restated here.

28

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

178.   Defendants have no right under the easements to install a second pipeline or to overburden the Easements as contemplated in Defendants' permit application. Therefore, an injunction until Plains obtains the required easement in exchange for appropriate compensation is proper.

179.   Furthermore, unless and until enjoined and restrained by order of this Court, Defendants' use of the Easements as alleged above will cause great and irreparable injury to the Plaintiffs in that the material increase of the burden on their Properties, for the three year construction Defendants intend, as well as the on-going burden of the additional continued maintenance of the new intrastate Pipeline, Line 901R and 903R, will prevent the Plaintiffs from the peaceful use and enjoyment of their Properties and will further result in damage and injury to Plaintiffs and the subject Properties.

180.   Plaintiffs have no adequate remedy at law for the Defendants' actions. Monetary compensation will not abate the Defendants' conduct resulting in the material overburdening of the Easements. Additionally, absent injunctive relief, Plaintiffs would be required to commence multiple actions to abate Defendants' conduct when such conduct resulted in a material overburdening of the Easements.

## Fourth Claim for Relief: Breach of Written Easement Contract
### *All Plaintiffs and Class Members against All Defendants*

181.   Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

182.   As alleged herein, Plaintiffs and Defendants have written contracts under which Plaintiffs granted Defendants an easement over Plaintiffs' land for Defendants to "maintain, operate, repair, replace, and remove" the Pipeline.

183.   The easement contracts for all Plaintiffs and putative class members contain similar material language regarding the purpose of the easement.

184.   The easement contracts create duties on the part of Defendants to install, repair, monitor, maintain, operate, remove, or replace the Pipeline so as not to

unreasonably interfere with the property owners' right to fully use and enjoy their properties.

185.   Defendants failed to adequately install, repair, maintain, operate, remove, or replace the Pipeline, but rather Defendants left the Pipeline in disrepair, unmaintained, unsafe, and in need of repair and/or restoration.

186.   Defendants permanently suppressed and concealed from Plaintiffs and putative class members that the Pipeline was in disrepair, unmaintained, unsafe, and in need of repair and/or restoration. Despite having knowledge that the Pipeline was in disrepair, unmaintained, unsafe, and in need of repair and/or restoration, Defendants knowingly transported hazardous materials (including unauthorized toxins) at a high volume through the Pipeline.

187.   Defendants' Pipeline interfered with and continues to interfere with Plaintiffs' rights to fully use and enjoy their properties.

188.   The breach of the Easements resulted from a predominating course of corporate policy, pattern, practice, and conduct involving pipeline inspection, maintenance, operation, evaluation, and analysis by Defendants.

189.   Defendants' failure to install, repair, maintain, operate, remove, and replace the Pipeline is a material breach of the Easements, for the Plaintiffs and the putative class members located along the Pipeline.

190.   As a direct result of these failures, the existing Pipeline is inoperable and Defendants must now replace the entire Pipeline with a new separate intrastate pipeline, requiring extensive and intrusive construction that will severely impact Plaintiffs and deprive them of use and enjoyment of the subject properties for a period of three years or more.

191.   Defendants' material breach of the contractual Easements has deprived Plaintiffs and class members of their benefit of the bargain and their rights under the easements to fully use and enjoy their real properties.

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

192.   Plaintiffs have performed all conditions, covenants, and promises required by them on their part to be performed in accordance with the terms and conditions of the contracts, except for those they were prevented from performing or which were waived or excused by Defendants' misconduct.

193.   As a proximate result of Defendants' breach of contract, Plaintiffs are entitled to receive adequate compensation for the additional burden on their land as a result of the construction and on-going presence and safe operation of the second Pipeline, and damages for Defendants' breach of contract, in an amount to be proved at trial.

## Fifth Claim for Relief: Negligent Misrepresentation
### *All Plaintiffs and Class Members against All Defendants*

194.   Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

195.   As alleged herein, Defendants' predecessors-in-interest represented to Plaintiffs or their predecessors-in-interest that once installed, the Pipeline would be properly monitored and maintained, and could be repaired, maintained, operated, removed, and replaced within the parameters of the rights-of-way provided in the easements.

196.   Defendants, as successors-in-interest of the original easement holders, are responsible for these misrepresentations to the same extent as their predecessors.

197.   When Defendants, or their sucessors-in-interest made these representations, they had no reasonable ground for believing them to be true.

198.   Defendants made these representations with the intention of inducing Plaintiffs to act in reliance on these representations and grant Defendants the easements over their properties.

199.   The representations made by Defendants were in fact false. The true facts were that Defendants were not going to properly maintain the Pipeline and Defendants

could not maintain, repair, remove, or replace the Pipeline within the parameters of the easements.

200.   Plaintiffs, at the time these representations were made by Defendants and at the time Plaintiffs granted Defendants the easements over their properties, were ignorant of the falsity of Defendants' representations and believed them to be true. In reliance on these representations, Plaintiffs were induced to and did grant Defendants the Easements over their properties. Had Plaintiffs known the actual facts, they would not have taken such action. Plaintiffs' reliance on Defendants' representations was reasonable and justified.

201.   To the extent they did not personally negotiate the Easements, each Plaintiff purchased the property as a bona fide purchaser, and was entitled to and did rely on Defendants representations that they would safely operate and maintain the Pipeline in good repair.

202.   As a proximate result of Defendants' conduct, Plaintiffs granted Defendants Easements over Plaintiffs' properties for Defendants to repair, maintain, operate, remove, and replace the Pipeline, Defendants failed to properly monitor and maintain the Pipeline, the Pipeline became a dangerous hazard to health and the environment until it was shut down, and remains inoperable. Defendants can no longer repair, maintain, operate, remove, or replace the Pipeline within the parameters of the easements. Plaintiffs have been damaged in an amount to be proved at trial.

### Sixth Claim for Relief: Negligence

#### *All Plaintiffs and Class Members against All Defendants*

203.   Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

204.   Defendants owed a duty to Plaintiffs to exercise reasonable and ordinary care. That duty arose under the easement contracts and property law generally, as well as from, among other things, federal, state, and local laws, ordinances, and regulations that

require Defendants to comply with all applicable safety standards, including without limitation, the Pipeline Safety Act ("PSA"), 49 U.S.C. §60101, *et seq.*, the Lempert-Keene Act, Government Code Section 8670, *et seq.*, the Porter-Cologne Act, Water Code Sections 13000, *et seq.*, Cal. Fish & Game Code Section 5650, *et seq.*, the Federal Clean Water Act, 33 U.S.C. §1251 *et seq.*, Santa Barbara County Code, Chapter 25, §§25-7(g) and 25-37, and state and federal spill response and notification laws.

205.   A special relationship exists between Defendants and Plaintiffs as a result of Defendants' transportation of hazardous materials through Plaintiffs' properties, and Defendants' responsibility to properly maintain the Pipeline through which those hazardous materials move. Defendants had a duty to maintain, repair and/or restore the Pipeline that would have avoided unnecessary injury to Plaintiffs' property or that would have avoided subjecting those properties to a second intrusive construction project. The construction of the Pipeline was intended to, and did, affect Plaintiffs. Failure to maintain, repair and/or restore the Pipeline was a clearly foreseeable harm to Plaintiffs' property. Plaintiffs have suffered physical injury to and interference with their properties, as well as economic harm as a result of Defendants' failure to maintain the Pipeline. Defendants' conduct is a direct and proximate cause of the injury suffered. Given the toxic nature of the substances in the Pipeline, Defendants' track record of repeated violations of pipeline safety regulation, and the clear warning signs that the Pipeline required repair and/or restoration, there is a sound policy and moral reasons for holding Defendants accountable for their failure to maintain the Pipeline in a timely manner.

206.   As set forth herein, Defendants breached their duty to Plaintiffs by, among other things, failing to detect and repair the corrosion, anomalies, leaks, and potential rupture points along the entire length of the Pipeline and failing to install, operate, monitor, maintain, repair and/or restore the Pipeline in a reasonable manner consistent with all applicable safety standards.

207.   Defendants, in the exercise of reasonable care, should have known that the Pipeline could corrode and degrade and that it could leak, fail, rupture, and spill significant amounts of hazardous materials. Defendants have acknowledged that spills have occurred on their pipelines in the past and will occur, and have in fact occurred, again. Yet, Defendants have a history of failing to take reasonable, commonsense steps to monitor, detect and repair the corrosion and other anomalies known to exist in its Pipeline facilities. Defendants' conduct, or lack thereof, increases the risk of ruptures and catastrophic spills and unnecessarily threatens lives and property.

208.   In addition, Defendants' violations of the statutes, ordinances, and regulations cited herein resulted in precisely the harm to Plaintiffs that the laws were designed to prevent, and Plaintiffs are members of the class of persons for whose protection those laws were adopted.

209.   At all times herein mentioned, Defendants negligently, wantonly, carelessly and/or recklessly maintained and operated the Pipeline.

210.   As a direct and proximate result of Defendants' negligence, Plaintiffs have suffered and will continue to suffer physical injury to and interference with their properties, as well as economic harm and other damages, including but not limited to the loss of use and enjoyment of Plaintiffs' properties; the loss of profits due to failed real property marketing and sales to buyers who, but for the Pipeline, would have purchased Plaintiffs' properties; and the diminished value of Plaintiffs' properties and future lost profits due to the Pipeline and the May 2015 rupture, which has and will continue to drive down the value and desirability of Plaintiffs' properties.

211.   As described herein, the acts and omissions of Defendants were done with oppression, fraud, and/or malice, thereby justifying an award of punitive damages in accordance with proof at trial.

**Seventh Claim for Relief: Violations of California's Unfair Competition Law
(Cal. Bus. & Prof. Code §§ 17200, et seq. )**

*All Plaintiffs and Class Members against All Defendants*

212.   Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

213.   Defendants have engaged in and continue to engage in unfair competition in violation of California's Unfair Competition Law ("UCL").

214.   In the Easements, Defendants represented that (1) they would install, operate, repair, and maintain the Pipeline in a manner that would meet all applicable safety standards and (2) they would have the capability, whenever necessary, to operate, maintain, repair and/or restore the Pipeline within the parameters of the easement.

215.   No Plaintiff, and no reasonable property owner, would have granted an easement knowing the Pipeline was not going to be maintained in a reasonable manner consistent with all applicable safety standards and/or that the operator of the Pipeline lacked the capability to do so within the parameters of the easement.

216.   Moreover, it is axiomatic that in order to maintain and operate the Pipeline, Defendants must comply with all applicable safety standards, including the Pipeline Safety Act ("PSA"). These standards are mandatory, and a pipeline may be legally operated only if the standards' express terms have been met. Accordingly, an easement which grants the right to operate a pipeline must, if the easement is not to be wholly illusory, imply the right to operate the pipeline in a reasonable manner and in accordance with applicable laws and regulations.

217.   As set forth herein, Defendants have failed to install, operate, monitor, maintain, repair and/or restore the Pipeline in a reasonable manner that meets all applicable safety standards, and they have admitted, in the Temporary Property Access and Remediation Agreement with Grey Fox, that they do not have the capability to install,

operate, repair, maintain, remove and replace the Pipeline within the parameters of the Easements.

218.   Each Plaintiff relied on Plains' representations in deciding to grant the Easements. Each Plaintiff was induced to grant and did grant the Easements due to the false and misleading representation and would not have granted Defendants an easement absent Defendants' representations, which were reasonably relied upon.

219.   To the extent they did not personally negotiate the Easements, each Plaintiff purchased the property as a bona fide purchaser, and was entitled to and did rely on Defendants representations that they would safely operate and maintain the Pipeline in good repair.

220.   In granting the Easements to Defendants, each Plaintiff gave up certain rights in their properties in exchange for certain amounts of consideration.

221.   Defendants' conduct constitutes "fraudulent" business practices within the meaning of UCL in that Defendants have all but ignored the maintenance of the Pipeline as evidenced by the degradation and failure of the Pipeline. Defendants' conduct amounts to "unfair" business practices because the negative consequences of Defendants' failure to maintain the Pipeline far exceed the cost of actual compliance. Defendants' conduct is "unlawful" because it violated laws including but not limited to the PSA (which includes the Natural Gas Pipeline Safety Act of 1968, the Federal Pipeline Safety Act of 1979, the Pipeline Inspection, Protection, Enforcement and Safety Act of 2006, and the Pipeline Safety, Regulatory Certainty, and Job Creation Act of 2011), and all related regulations that set minimum safety standards for the design, installation, inspection, emergency plans and procedures, testing, extension, construction, operation, replacement and maintenance of pipeline facilities.

222.   Plaintiffs' right to have their properties free from unlawful encroachments must be protected. In order to continue to operate the Pipeline, Defendants must operate,

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

maintain, repair and/or restore the Pipeline as the Easements contemplate, and comply with all safety regulations.

223.   Defendants presently cannot legally operate the existing Pipeline in compliance with all regulations. Defendants also cannot adequately repair and/or restore the Pipeline within the parameters of the Easements and without encroaching unlawfully on Plaintiffs' properties beyond the scope of the existing Easements. Plains must obtain easements that provide the additional access necessary and provide adequate compensation to Plaintiffs for the access and the additional burden imposed on their properties.

224.   As a proximate result of Defendants' unfair, fraudulent, and unlawful methods of competition, Plaintiffs have been harmed.

225.   As a further proximate result of Defendants' unfair, fraudulent, and unlawful methods of competition, Plaintiffs suffered a loss of property when they granted Defendants the Easements. Defendants should be required to make appropriate restitution payments to Plaintiffs.

### Eighth Claim for Relief: Breach of Implied Covenant of Good Faith & Fair Dealing

#### *All Plaintiffs and Class Members against All Defendants*

226.   Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

227.   As alleged herein, Plaintiffs have private easement contracts with Defendants.

228.   There is implied in all of the agreements between Plaintiffs and Defendants a covenant of good faith and fair dealing whereby Defendants impliedly covenanted that they would act in good faith and in the exercise of fair dealing, deal with Plaintiffs fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiffs' rights.

229.   As alleged herein, Defendants breached the covenant and frustrated Plaintiffs' enjoyment of their contractual rights. Defendants' acts include but are not limited to:

i.   Disregarding their duty under the Easements to adequately monitor, repair, maintain, operate, remove, and replace the Pipeline;

ii.   Operating an unsafe Pipeline through Plaintiffs' properties;

iii.   Impairing, interfering with, hindering, and injuring Plaintiffs' rights;

iv.   Promoting a predominating course of corporate policy, pattern, practice, and conduct involving grossly negligent pipeline inspection, maintenance, operation, evaluation, and analysis;

v.   Exposing Plaintiffs and class members to the unsafe Pipeline;

vi.   Depriving Plaintiffs and class members of their reasonable right to fully use and enjoy their real property;

vii.   Using the Pipeline to carry toxic chemicals, other than crude oil, known to pose severe threats to human health;

viii.   Using the Pipeline to carry toxic chemicals that are associated with fracking – which is a procedure not known to exist at the time the property owners agreed to the easements, was not an intended risk assumed by the property owners, was not accounted for as part of the consideration exchanged, and was beyond the scope of the Easements.

ix.   Failing to comply with industry rules and policies pertaining to the maintenance, inspection, and integrity management of hazardous liquid pipelines;

x.   Evading the spirit of the bargain made with Plaintiffs;

xi.   Otherwise failing to do everything the Easements presupposed the Defendants would do to accomplish their purpose.

230.   Plaintiffs have performed all conditions, covenants and promises required by them on their part to be performed in accordance with the terms and conditions of the

easement contracts, except for those they were prevented from performing or which were waived or excused by Defendants' misconduct.

231.   As a proximate result of Defendants' acts, Plaintiffs and class members are entitled to repair and/or restoration of the unsafe Pipeline, adequate compensation for the additional burden on their land needed to repair and/or restore the Pipeline, and damages for Defendants' material breach of contract, in an amount to be proved at trial.

## Ninth Claim for Relief: Permanent Nuisance

### *All Plaintiffs and Class Members against All Defendants*

232.   Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

233.   Defendants' Pipeline, because of the hazards it has created, is a nuisance. At all times herein mentioned, Defendants have failed to properly install, maintain, repair and/or restore the Pipeline, creating an unsafe, ultrahazardous Pipeline that is extremely dangerous to Plaintiffs' health, indecent and offensive to Plaintiffs' senses, an obstruction to the reasonable use of Plaintiffs' property, and interferes with the comfortable enjoyment of Plaintiffs' life and property.

234.   Defendants' conduct has caused the Pipeline to corrode, rupture, damage the environment, and threaten the people and properties near it. The hazardous conditions are not limited to the area immediately surrounding the May 2015 rupture on El Rancho Tajiguas Lot X. The Pipeline, along its entire length, is riddled with corrosion, other known anomalies, leaks, and potential rupture points, all of which are harmful to both human health and the environment and interfere with Plaintiffs' comfortable use and enjoyment of their real properties.

235.   Property owners with land subject to Easements along the Pipeline have suffered real damage because the unsafe Pipeline runs through and under their properties. The corroded Pipeline, its defective insulation, and the residual hazardous materials left behind on Plaintiffs' properties have resulted in physical injury to the properties and have

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

damaged and unreasonably interfered with the properties of all Plaintiffs along the entire length of the Pipeline.

236.   Defendants were, at all relevant times, in sufficient control of the Pipeline to have known of the hazards. Defendants knew or should have known that their operation of the Pipeline would have, and did, cause the hazards, including catastrophic failures due to corrosion, anomalies, leaks, and releases of hazardous materials.

237.   Despite knowledge and forewarning, Defendants failed to take reasonable steps to prevent the catastrophic failure of the Pipeline due to corrosion, anomalies, leaks, and releases of hazardous materials.

238.   Plaintiffs did not consent to the ongoing damage to the use and enjoyment of their properties as a result of Defendants' actions and inactions.

239.   As a direct and proximate cause, Defendants' acts and omissions have caused substantial actual damage and immediate and ongoing diminution of the value of Plaintiffs' real properties, as well as the loss of use and enjoyment of their properties, in amounts to be determined at trial.

240.   The nuisance caused by Defendants' conduct is permanent, and the health, well-being, and comfortable enjoyment of life and property of Plaintiffs, Plaintiffs' families and the surrounding community have suffered irreparable damage.

241.   Plaintiffs have no plain, speedy, or adequate remedy at law, and injunctive relief is warranted. A preliminary injunction should therefore be issued, to ensure that the new Pipeline operates within the parameters of all applicable safety standards required by law or regulatory authority, before transporting any hazardous materials over or through Plaintiffs' properties; and to provide appropriate compensation to Plaintiffs for the additional risk of continued use of the pipeline, as well as the burden and access needed to complete the construction and maintenance process necessary to ensure current and ongoing safety requirements are met.

## Tenth Claim for Relief: Threatened Nuisance

### *All Plaintiffs and Class Members against All Defendants*

242.   Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

243.   Although Defendants do not intend, and cannot, operate the existing Pipeline, they plan to install a second Pipeline, Lines 901R and 903R, under a new regulatory system and subject to new safety and maintenance requirements.

244.   Yet, as explained herein, the Easements do not provide sufficient access to complete the necessary work, and any such work will necessarily burden Plaintiffs' properties unreasonably beyond the parameters of the existing Easements and create an additional nuisance and trespass.

245.   The necessary work will also cause noise, vibration, dust and the release of noxious and malodorous gases, fumes, and other contaminants to further pollute the land and air in the vicinity of and over Plaintiffs' properties.

246.   The construction, maintenance and on-going presence of the second Pipeline will result in interference with Plaintiffs' comfortable enjoyment of life and property and injury to the health of Plaintiffs and their families.

247.   Plaintiffs have no adequate remedy at law for the threatened nuisances in that the threatened contamination and pollution will cause significant health hazards to Plaintiffs and their families, and the threatened interference with their property rights will cause additional burdens to be placed on their properties beyond the scope of their current Easements. It will be impossible for Plaintiffs to determine the precise amount of damage which they will suffer if Defendants' threatened conduct is not restrained.

248.   Unless Defendants are enjoined, Plaintiffs will suffer irreparable injury in that their health will be compromised, the usefulness and economic value of their properties will be substantially diminished, and they will be deprived of the reasonable and comfortable enjoyment of their properties.

249. An injunction should therefore be issued, prohibiting Defendants from attempting to utilize the existing Easements for the construction and maintenance of new Lines 901R and 903R, and requiring them to provide appropriate compensation to Plaintiffs for the additional property rights and ongoing risk, burden and access needed to complete the process and consistently maintain the Pipeline in a sound matter.

## Eleventh Claim for Relief: Trespass

### *Plaintiff Grey Fox against All Defendants*

250. Plaintiff Grey Fox incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

251. Plaintiff Grey Fox has a real property interest in Lot X. Defendants discharged a polluting matter which invaded Lot X and caused harm. Plaintiff Grey Fox seeks its damages for which it was not compensated pursuant to the Temporary Property Access and Remediation Agreement.

252. By discharging polluting matter, Defendants entered, invaded, and intruded on the real property of Plaintiff Grey Fox without privilege, permission, invitation, or justification.

253. Defendants had a duty to use reasonable care not to enter, intrude on, or invade Plaintiff's real property. Defendants also owed a duty to Plaintiff Grey Fox to exercise reasonable care in the manufacture, installation, maintenance, and operation of the Pipeline.

254. Defendants had a heightened duty of care to Plaintiff Grey Fox because of the great danger associated with transporting oil through Plaintiff's property and so near to pristine coastal areas.

255. Defendants breached the duty they owed to Plaintiff Grey Fox when they failed to exercise reasonable care in the construction, installation, monitoring, maintenance, and operation of the Pipeline, which conduct resulted in entry, intrusion or invasion on Plaintiff's real property.

256.   Defendants knew or should have known that their conduct would foreseeably result in a disastrous oil spill, causing damage to Plaintiff's property.

257.   As a direct and proximate result of Defendants' trespass, Plaintiff Grey Fox has suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, property damage, diminution of value of real estate, loss of income, and other economic loss.

258.   As described herein, the acts and omissions of Defendants were done with oppression, fraud, and/or malice, thereby justifying an award of punitive damages in accordance with proof at trial.

### Twelfth Claim for Relief: Strict Liability for Ultrahazardous Activities
### *Plaintiff Grey Fox against All Defendants*

259.   Plaintiff Grey Fox incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

260.   At all times herein, Defendants owned and operated the Pipeline.

261.   At all times relevant to this action, Defendants had supervision, custody, and control of the Pipeline.

262.   At all times herein, Defendants were under a continuing duty to protect Plaintiff Grey Fox from the harm caused by the Pipeline.

263.   Defendants were engaged in ultrahazardous activities by transporting flammable, hazardous, and toxic oil through the Pipeline.

264.   Plaintiff Grey Fox has suffered harm from the discharge of toxic oil and other hazardous materials from the Pipeline.

265.   The injuries sustained by Plaintiff Grey Fox as a result of the oil spill were the direct and proximate result of Defendants' activities and/or inactions.

266.   The harm to Plaintiff Grey Fox was and is the kind of harm that would be reasonably anticipated as a result of the risks created by transporting flammable,

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

hazardous, and toxic oil and other hazardous materials in the Pipeline and not properly maintaining the Pipeline.

267.    Defendants' operation of the Pipeline and its failure was a substantial factor in causing the harms suffered by Plaintiff Grey Fox.

268.    Due to Defendants' strict liability, Plaintiff Grey Fox is entitled to recover actual damages.

269.    As described herein, the acts and omissions of Defendants were done with oppression, fraud, and/or malice, thereby justifying an award of punitive damages in accordance with proof at trial.

### Thirteenth Claim for Relief: Negligence

### *Plaintiffs Grey Fox and Bean Blossom, against All Defendants*

270.    Plaintiffs Grey Fox and Bean Blossom incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

271.    Lot X, owned by Plaintiff Grey Fox has been listed for sale and actively marketed for more than one year. Lot H, owned by Bean Blossom has been listed for sale and actively marketed since the oil spill occurred. Both remain unsold as the result of stigma associated with the oil spill.

272.    Defendants owed a duty to Plaintiffs Grey Fox and Bean Blossom to exercise reasonable and ordinary care. That duty arose under the easement contract and property law generally, as well as from, among other things, federal, state, and local laws, ordinances, and regulations that require Defendants to comply with all applicable safety standards, including without limitation, the Pipeline Safety Act ("PSA"), 49 U.S.C. §60101, *et seq.* , the Lempert-Keene Act, Government Code Section 8670, *et seq.* , the Porter-Cologne Act, Water Code Sections 13000, *et seq.* , Cal. Fish & Game Code Section 5650, *et seq.* , the Federal Clean Water Act, 33 U.S.C. §1251 *et seq.* , Santa Barbara County Code, Chapter 25, §§25-7(g) and 25-37, and state and federal spill response and notification laws.

273.   A special relationship exists between Defendants and Plaintiffs Grey Fox and Bean Blossom as a result of the failure of Defendants' Pipeline in the immediate vicinity of their properties. Defendants had a duty to operate the Pipeline in a manner that would have avoided unnecessary injury to Plaintiff's property values from the spill of oil and other toxic chemicals on and near their properties, as well as the resulting noise, vibration, dust and the release of noxious and malodorous gases, fumes, and other contaminants that further polluted the land and air in the vicinity of, under and over Plaintiff's properties following the spill. Failure to maintain, repair and/or restore the Pipeline was a clearly foreseeable harm to these Plaintiffs' properties. Plaintiffs have suffered physical injury to and interference with their properties, as well as economic harm as a result of Defendants' failure to maintain the Pipeline and prevent the spill. Defendants' conduct is a direct and proximate cause of the injury suffered. Given the toxic nature of the substances in the Pipeline, Defendants' track record of repeated violations of pipeline safety regulation, and the clear warning signs that the Pipeline required repair and/or restoration, there is a sound policy and moral reasons for holding Defendants accountable for their failure to maintain, repair and/or restore the Pipeline.

274.   As set forth herein, Defendants breached their duty to Plaintiffs Grey Fox and Bean Blossom by, among other things, failing to detect and repair the corrosion, anomalies, leaks, and potential rupture points, by failing to install, operate, monitor, maintain, repair and/or restore the Pipeline in a reasonable manner consistent with all applicable safety standards, and by failing to respond adequately and promptly to the spill.

275.   Defendants, in the exercise of reasonable care, should have known that the Pipeline could corrode and degrade and that it could leak, fail, rupture, and spill significant amounts of hazardous materials. Defendants have acknowledged that spills have occurred on their pipelines in the past and will occur, and have in fact occurred, again. Yet, Defendants have a history of failing to take reasonable, commonsense steps to monitor, detect and repair the corrosion and other anomalies known to exist in its

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

Pipeline facilities. Defendants' conduct, or lack thereof, increases the risk of ruptures and catastrophic spills and unnecessarily threatens lives and property.

276.   In addition, Defendants' violations of the statutes, ordinances, and regulations cited herein resulted in precisely the harm to Plaintiffs that the laws were designed to prevent, and Plaintiff is among those for whom the laws were adopted to protect.

277.   At all times herein mentioned, Defendants negligently, wantonly, carelessly and/or recklessly maintained and operated the Pipeline.

278.   As a direct and proximate result of Defendants' negligence, Plaintiffs Grey Fox and Bean Blossom suffered and will continue to suffer physical injury to and interference with their properties, economic harm and other damages, including but not limited to the loss of use and enjoyment of Plaintiffs' properties; the loss of profits due to failed real property marketing and sales to buyers who, but for the Pipeline, would have purchased Plaintiffs' properties; and the diminished value of Plaintiffs' properties and future lost profits due to the taboo associated with the Pipeline and the May, 2015 rupture, which has and will continue to drive down the value and desirability of Plaintiffs' properties.

279.   As described herein, the acts and omissions of Defendants were committed with oppression, fraud, and/or malice, thereby justifying an award of punitive damages in accordance with proof at trial.

**Fourteenth Claim for Relief: Breach of Contract**

***Plaintiff Grey Fox against Defendant Plains Pipeline, LP***

280.   Plaintiff Grey Fox incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

281.   Plaintiff Grey Fox and Defendant Plains Pipeline, LP are parties to a contract entered into after the spill, the Temporary Property Access and Remediation Agreement, which obligates Plains to pay a Use Fee in the amount of $5,500 per day for use of the

Grey Fox property, and separately to protect Grey Fox against, among other things any and all damages, losses, costs or expenses whatsoever, including attorneys' fees and experts' fees arising out of any physical or property damage.

282.   Plaintiff Grey Fox has performed all conditions, covenants, and promises required by it on its part to be performed in accordance with the terms and conditions of the contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

283.   Defendant Plains materially breached the contract by refusing to pay for Use Fees owed and refusing to pay fees and costs owed arising out of damage to the property.

284.   As a result of Defendant's breach, Plaintiff Grey Fox has incurred damages in the amount of $137,500 in unpaid Use Fees, and $221,666. 74 in fees and costs incurred as a result of damage to the property. Plaintiff Grey Fox believes there are and will be additional fees and expenses owed in an amount to be proved at trial.

## VIII.  REQUEST FOR RELIEF

Plaintiffs, individually and on behalf of all others similarly situated, request judgment against Defendants, and each of them, as follows:

A.    For an order certifying the Class, appointing Plaintiffs as representatives of the Class, and appointing the lawyers and law firms representing Plaintiffs as counsel for the Class;

B.    For declaratory and injunctive relief;

C.    For compensatory damages sustained by Plaintiffs and the Class;

D.    For treble damages insofar as they are allowed by applicable laws;

E.    For appropriate individual relief;

F.    For costs and expenses;

G.    For both pre-judgment and post-judgment interest on any amounts awarded;

H.    For payment of attorney fees and expert fees as may be allowable under applicable law;

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

I.    For exemplary and punitive damages;

J.    For such other and further relief, including declaratory relief, as the Court may deem just and proper.

## IX.    DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  December 17, 2018          Respectfully submitted,

KELLER ROHRBACK L.L.P.

By: */s/Juli E. Farris*
     Juli E. Farris
Juli Farris (CSB No. 141716)
Matthew J. Preusch (CSB No. 298144)
KELLER ROHRBACK L.L.P.
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Telephone:  (805) 456-1496
Facsimile:  (805) 456-1497

Lynn Lincoln Sarko
*(Pro Hac Vice)*
KELLER ROHRBACK L. L. P.
1201 Third Ave, Suite 3200
Seattle, WA 98101
Telephone:  (206) 623-1900
Facsimile:   (206) 623-3384

A. Barry Cappello (CSB No. 037835)
Leila J. Noël (CSB No. 114307)
Lawrence J. Conlan (CSB No. 221350)
David L. Cousineau (CSB No. 298801)
CAPPELLO & NOËL LLP
831 State Street
Santa Barbara, CA 93101-3227
Telephone:  (805)564-2444
Facsimile:   (805)965-5950

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

Robert L. Lieff (CSB No. 037568)
Elizabeth J. Cabraser (CSB No. 083151)
Robert J. Nelson (CSB No. 132797)
Wilson M. Dunlavey (CSB No. 307719)
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415. 956. 1000
Facsimile:  415. 956. 1008

*Attorneys for Individual and
Representative Plaintiffs*

PLAINTIFFS' AMENDED CLASS ACTION AND INDIVIDUAL
COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

## CERTIFICATE OF SERVICE

I, Juli Farris, hereby certifies that on December 17, 2018, I electronically filed the foregoing document with the Clerk of the United States District Court for the Central District of California using the CM/ECF system, which shall send electronic notification to all counsel of record.

<em>/s/Juli E Farris</em><br>Juli E. Farris

65