1  HENRY WEISSMANN (State Bar No. 132418)
   henry.weissmann@mto.com
2  DANIEL B. LEVIN (State Bar No. 226044)
   daniel.levin@mto.com
3  JORDAN D. SEGALL (State Bar No. 281102)
   jordan.segall@mto.com
4  MAGGIE THOMPSON (State Bar No. 313898)
   maggie.thompson@mto.com
5  MUNGER, TOLLES & OLSON LLP
   350 South Grand Avenue, 50th Floor
6  Los Angeles, California 90071-1560
   Telephone:  (213) 683-9100
7  Facsimile:  (213) 687-3702
8
9  Attorneys for Defendants
   PLAINS ALL AMERICAN PIPELINE, L.P.
10 and PLAINS PIPELINE, L.P.

11              UNITED STATES DISTRICT COURT

12              CENTRAL DISTRICT OF CALIFORNIA

13

| | |
|---|---|
| 14  GREY FOX, LLC a California limited<br>15  liability company; MAZ PROPERTIES,<br>     INC., a California Corporation; BEAN<br>16  BLOSSOM, LLC, a California limited<br>     liability company; WINTER HAWK,<br>17  LLC, a California limited liability<br>     company, and MARK W. TAUTRIM,<br>18  individually and o/b/o the MARK W.<br>     TAUTRIM REVOCABLE TRUST,<br>19<br>20              Plaintiffs,<br>21       vs.<br>22  PLAINS ALL AMERICAN PIPELINE,<br>23  L.P., a Delaware limited partnership,<br>     PLAINS PIPELINE L.P., a Texas<br>24  limited partnership,<br>25              Defendants | Case No. 2:16-cv-03157-PSG-JEM_<br><br>**MEMORANDUM IN SUPPORT OF<br>PLAINS' DEFENDANTS' MOTION<br>FOR PARTIAL SUMMARY<br>JUDGMENT**<br><br>Date:   December 1, 2023<br>Time:   1:30 p.m.<br>Ctrm.:  6A<br>Judge:  Hon. Philip S. Gutierrez<br><br>*Filed concurrently with Notice of<br>Motion and Motion, Separate Statement<br>of Uncontroverted Facts, Declaration of<br>Jordan D. Segall, Declaration of<br>William Dean Gore, Jr., and<br>[Proposed] Order* |

26

27

28

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ..................................................................................1

II.   BACKGROUND ..................................................................................1

    A.    Plains Spilled Oil On A Tract Of Land Owned By Grey Fox, But Plains Promptly Restored That Tract And The Oil Did Not Reach Any Other Plaintiff's Property. .........................................................1

    B.    Plaintiffs Blame The "Stigma" Lingering After The Spill For Their Inability To Sell Luxury Villas On Lots H And X (Which They Listed At Twice Their Respective Market Values, According To Plaintiffs' Listing Agent And Their Appraisal Expert)......................................................................................3

    C.    Plains Sells The Pipelines To ExxonMobil Corporation........................5

    D.    Plaintiffs' Lawsuit Seeks To Recover For Impairment Of Marketability And Market Value. .........................................................6

III.  LEGAL STANDARD............................................................................8

IV.   ARGUMENT........................................................................................9

    A.    Summary Judgment Must Be Granted As To The Properties That Were Not Oiled.......................................................................................9

        1.    Bean Blossom seeks only unrecoverable stigma damages...........9

        2.    The economic loss rule also bars Bean Blossom's tort claims. ..................................................................................12

    B.    Summary Judgment Must Be Granted As To Grey Fox. ....................15

        1.    Grey Fox cannot recover in negligence (Claims 6 and 13).......15

        2.    Grey Fox cannot recover in trespass (Claim 11)......................18

        3.    Grey Fox cannot recover stigma damages on a theory of strict liability for ultrahazardous activities (Claim 12). .............18

    C.    Plaintiffs' Remaining Claims Fail. ....................................................19

        1.    The claims for breach of written easement contract and breach of the implied covenant fail (Claims 4 and 8). ..............19

        2.    Lack of evidence supporting a restitutionary award bars Plaintiffs' UCL claim (Claim 7)...........................................20

V.    CONCLUSION ..................................................................................21

MEMORANDUM IN SUPPORT OF PLAINS' MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Andrews v. Plains All Am. Pipeline, L.P.,*
    2017 WL 10543401 (C.D. Cal. Aug. 25, 2017).................................................14

*Barber Lines A/S v. M/V Donau Maru,*
    764 F.2d 50 (1st Cir. 1985) ............................................................................12

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986).........................................................................................8

*D'Artiste v. Am. Int'l Grp., Inc.,*
    2021 WL 4707000 (C.D. Cal. May 12, 2021) .................................................20

*Grey Fox, LLC v. Plains All Am. Pipeline, L.P.,*
    2019 WL 4196066 (C.D. Cal. Apr. 8, 2019) ...................................................13

*Johnson v. Rai Rocklin Invs., LLC,*
    2017 WL 3421848 (E.D. Cal. Aug. 9, 2017)...................................................20

*Magnetar Techs. Corp. v. Intamin, Ltd.,*
    801 F.3d 1150 (9th Cir. 2015).......................................................................8, 9

*McGlinchy v. Shell Chem.,*
    845 F.2d 802 (9th Cir. 1988)............................................................................8

*In re Oracle Corp. Sec. Litig.,*
    627 F.3d 376 (9th Cir. 2010)............................................................................8

*Pulaski & Middleman, LLC v. Google, Inc.,*
    802 F.3d 979 (9th Cir. 2015)..........................................................................20

*State of Louisiana v. M/V TESTBANK,*
    752 F.2d 1019 (5th Cir. 1985)........................................................................12

*Venoco, Inc. v. Plains Pipeline, L.P.,*
    2016 WL 10646303 (C.D. Cal. Sept. 26, 2016).............................................19

**STATE CASES**

*Biakanja v. Irving,*
    49 Cal. 2d 647 (1958) ....................................................................................14

*Cortez v. Purolator Air Filtration Prods. Co.*,
    23 Cal. 4th 163 (2000) ....................................................................20

*Dep't of Fish & Game v. Super. Ct.*,
    197 Cal. App. 4th 1323 (2011).........................................................19

*Edwards v. Post Transp. Co.*,
    228 Cal. App. 3d 980 (1991).............................................................18

*Erlich v. Menezes*,
    21 Cal. 4th 543 (1999) ...............................................................14, 16

*Fresno City Lines v. Herman*,
    97 Cal. App. 2d 366 (1950)...............................................................10

*Gehr v. Baker Hughes Oil Field Operations, Inc.*,
    165 Cal. App. 4th 660 (2008)............................................................11

*Goodwin v. Reilley*,
    176 Cal. App. 3d 86 (1985)................................................................18

*Kelly v. CB&I Constructors, Inc.*,
    179 Cal. App. 4th 442 (2009)............................................................16

*Kincaid v. Dunn*,
    26 Cal. App. 686 (1915).............................................................15, 16

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003) ....................................................................20

*Linforth v. San Francisco Gas & Elec. Co.*,
    156 Cal. 58 (1909) .............................................................................16

*Luthringer v. Moore*,
    31 Cal. 2d 489 (1948) .......................................................................18

*Reynolds v. Bank of Am. Nat'l T. & S. Ass'n*,
    53 Cal. 2d 49 (1959) ..................................................................10, 18

*Rhodes v. San Mateo Inv. Co.*,
    130 Cal. App. 2d 116 (1955)..............................................................17

*S. Cal. Gas Leak Cases*,
    7 Cal. 5th 391, 398 (2019) ........................................................12, 14

*Santa Fe P'ship v. ARCO Prods. Co.*,
  46 Cal. App. 4th 967 (1996)......................................................................9, *passim*

*Sheen v. Wells Fargo Bank, N.A.*,
  12 Cal. 5th 905 (2022) .................................................................. 13, 14, 15

*Spaulding v. Cameron*,
  38 Cal. 2d 265 (1952) ............................................................................ 17, 18

**STATE STATUTES**

California Civil Code § 3333 .....................................................................16

**FEDERAL RULES**

Fed. R. Civ. P. 56(c) ..................................................................................8

**TREATISES AND OTHER SOURCES**

6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts § 1462...................16

CACI No. 3903F.........................................................................................15, 17

# I.      INTRODUCTION

Plains spilled oil on property owned by one of the Plaintiffs, Grey Fox, LLC. Plains cleaned up Grey Fox's property within 36 days of the spill, leaving no remaining contamination, then backfilled the affected area with clean soil and removed all of its construction equipment from Grey Fox's property within 106 days.  All of this is undisputed.  Nevertheless, Plaintiffs claim that negative perceptions allegedly caused by the oil spill lingered for years after the remediation was completed, impairing the marketability and market value of their properties— even though most of those properties never were touched by any oil.  Because California law does not allow Plaintiffs to recover for alleged diminution in the value of property that has been fully remediated and repaired, sometimes referred to as "stigma damages," Plains seeks summary judgment dismissing all but one of Plaintiffs' claims.

# II.     BACKGROUND

### A.     Plains Spilled Oil On A Tract Of Land Owned By Grey Fox, But Plains Promptly Restored That Tract And The Oil Did Not Reach Any Other Plaintiff's Property.

MAZ Properties purchased the 3,500-acre El Rancho Tajiguas property in 1981, which was subdivided into 23 separate lots.  Second Amended Complaint, Dkt. 108-1 ("SAC") ¶¶ 40–41.  Plaintiffs are four companies that separately own 15 of those lots.  Plaintiff Grey Fox, LLC owns "Lot X" (colored in red on the map below), and Plaintiff Bean Blossom, LLC owns "Lot H" (colored orange). Statement of Uncontroverted Facts ("SUF") No. 2.  Plaintiff MAZ Properties, Inc. owns the parcels colored green, and Winter Hawk, LLC owns the parcels colored pink.  *Id.*

MEMORANDUM IN SUPPORT OF PLAINS' MOTION FOR PARTIAL SUMMARY JUDGMENT



The oil spill at issue in this lawsuit occurred on Lot X.  SUF Nos. 3, 4.  It contaminated 0.54 acres of the 287.36-acre Lot X tract, near the southernmost edge of the property, marked on the map with a star.  The oil did not reach any other tract.[1]  SUF No. 5.

Remediation activities on Lot X began on the day of the spill.  Declaration of William Dean Gore, Jr. ("Gore Declaration") Ex. 1 at CGR000000023.  Plains conducted three rounds of soil excavation, which were completed on June 24, 2015.

---

[1] Plains leased 12 acres on Lot X to use as a work and equipment storage area during remediation operations, pursuant to a Temporary Property Access and Remediation Agreement.  SAC Ex. 9.  Plains paid Grey Fox a $5,500 daily fee to use that acreage through September 2, 2015, the date on which it removed all of its personnel and equipment from Lot X.  *Id.* Ex. 9 at 3; Segall Decl. Ex. 12 at 55-57.  Grey Fox's fourteenth cause of action claims that Plains is liable for an additional $137,500 of use fees through October 2, 2015, the date on which Lot X was hydromulched.  That contract claim is not addressed in this summary motion.

SUF No. 9.  Oil was therefore entirely removed from Lot X 36 days after the release.  *Id.*  Plains then backfilled the area using soils similar to those present on the property and that were acceptable to Grey Fox, Declaration of Jordan D. Segall ("Segall Decl.") Ex. 3 at 74:6–76:1, completing the backfill work by August 29, 2015.  Gore Decl. Ex. 1 at CGR00000109.  Plains removed all of its equipment and personnel from the property by September 2, 2015, 106 days after the spill.  SUF No. 10.  Plains replanted the affected area with a seed mix selected by Plaintiffs, and conducted a second round of seeding and mulching in late September 2015.  Segall Decl. Ex. 3 at 126:15–129:20; Gore Decl. Ex. 1 at CGR00000112–13.  In April 2016, the Unified Command conducted an inspection and, based on significant revegetation, declared the restoration of Lot X complete.  SUF No. 12.  As Grey Fox's representative who oversaw the cleanup efforts, Mark Lloyd, testified, Grey Fox also agreed that the post-cleanup reseeding and revegetation work was completed satisfactorily.  Segall Decl. Ex. 3 at 126:24–127:2.

The cleanup exceeded the governing regulatory standards.  The Regional Water Quality Control Board and Santa Barbara County Environmental Health Services required Plains to remediate the oil-impacted areas to "background concentrations"—*i.e.*, to the levels that existed prior to the oil spill, Gore Decl. Ex. 1 at CGR00000024—but Grey Fox requested that Plains meet more stringent requirements, and Plains agreed.  *Id.*  Lloyd testified that when Plains vacated the cleanup site in September 2015, Plains had "achieved th[e] goal" of cleaning the property to Grey Fox's specifications.  SUF No. 11.

**B.     Plaintiffs Blame The "Stigma" Lingering After The Spill For Their Inability To Sell Luxury Villas On Lots H And X (Which They Listed At Twice Their Respective Market Values, According To Plaintiffs' Listing Agent And Their Appraisal Expert).**

In the 1990s, Plaintiffs began to explore opportunities to exploit their properties for real estate speculation, hoping to either develop eight luxury ranchettes or sell lots to developers to do the same.  Segall Decl. Ex. 2 ¶ 7; *id.* Ex. 3

1   at 145:9–146:19.  Around 2007, they submitted a new proposed parcel map to Santa

2   Barbara County planning authorities that would create building sites for eight

3   single-family homes.  *Id.* Ex. 3 at 143:8–144:3.  To date, however, Santa Barbara

4   County has not approved the plan.  *Id.* at 159:3–160:16.  Nevertheless, Bean

5   Blossom and Grey Fox obtained the necessary permits to build single-family

6   residences on Lots H and X, respectively.  *Id.* Ex. 2 ¶¶ 13–14.

7        Construction of a luxury residence on Lot H began in April 2010 and was

8   completed in December 2012.  SUF No. 6.  Bean Blossom's parent company

9   ultimately spent more than $26 million on its speculative investment.  Segall Decl.

10   Ex. 5 at 89:22–91:5.  Bean Blossom initially offered the property for sale at $38.5

11   million, then reduced the listing price in October 2014 to $35 million.  *Id.* Ex. 8 at

12   29:6–25, 31:17–32:9.  But, according to Plaintiffs' own expert, the value of Lot H

13   was less than $18.1 million at the time.  *Id.* Ex. 6 at 30.

14        In 2016, Bean Blossom commissioned an appraisal of Lot H, which

15   concluded that the property's unimpaired market value (*i.e.*, disregarding any

16   potential effects of the oil spill) was just $21 million, $14 million less than Bean

17   Blossom's $35 million listing price.  Segall Decl. Ex. 9 at 157:3–158:8.  As of the

18   date of the oil spill on May 19, 2015, nobody had made an offer on Lot H.  *Id.* Ex. 8

19   at 35:18–36:16.  Nor was Lot H being used for any purpose at the time of the spill.

20   *Id.* at 55:5–19.

21        Grey Fox began construction of a luxury residence on Lot X in September

22   2011.  SUF No. 7.  Grey Fox intentionally slowed the construction process out of

23   concern about having two luxury homes on the market at the same time.  Segall

24   Decl. Ex. 5 at 77:17–79:2.  The home on Lot X was still under construction in May

25   2015, and nobody was living in it.  SUF No. 14.  The oil spill occurred

26   approximately half a mile away from the home site, in an area that was not visible

27   from the home site.  Segall Decl. Ex. 8 at 69:14–19.  Construction resumed within a

28   few days of the spill.  *Id.* Ex. 1 at 118:19–21.

1    Grey Fox completed construction of the home in December 2015, at a total
2  cost of more than $31 million.  Segall Decl. Ex. 2 ¶ 23; *id.* Ex. 5 at 90:6-91:5.  As
3  with Lot H, the property owner commissioned an appraisal of the property in 2016
4  and, without including any discount for any impacts from the spill, the appraiser
5  concluded that Lot X's unimpaired market value was $23 million.  *Id.* Ex. 9 at
6  37:20–25.  Nevertheless, Grey Fox first listed Lot X for sale in April 2017 at an
7  asking price of $38.5 million.  SUF No. 8; Segall Decl. Ex. 2 ¶ 23.  (Plaintiffs'
8  damages expert calculates that Lot X's value in 2017 was $20.8 million, or 45%
9  below the listing price.  Segall Decl. Ex. 6 at 30.)  Grey Fox's decision to list Lot X
10  for $38.5 million contravened the advice of its real estate broker, Randy Solakian,
11  who warned Grey Fox's representative John Vallance in December 2016 that the
12  high-end real estate market had "eroded significantly over the past couple years";
13  that in the past 12 months there had been only one sale in Santa Barbara County
14  above $28 million (and that sale, he explained, was not even an "open market"
15  transaction); and that buyers at the top end of the market were being "highly
16  selective."  *Id.* Ex. 1 at 126:3–128:21.
17    As of 2022, a buyer was in escrow to purchase all of the lots in El Rancho
18  Tajiguas except for Lot H for $60 million.  Segall Decl. Ex. 6 at 16.  This
19  prospective sale was recently canceled for undisclosed reasons.  *Id.* Ex. 11.  Both
20  Lot H and Lot X therefore remain unsold today.
21    **C.    Plains Sells The Pipelines To ExxonMobil Corporation.**
22    On October 13, 2022, a subsidiary of ExxonMobil Corporation, Mobil Pacific
23  Pipeline Company, purchased the Line 901 and Line 903 pipelines at issue in this
24  litigation from Plains, and then transferred them to the Pacific Pipeline Company
25  ("PPC").  SUF No. 25.  As a result of this sale, Plains no longer has any ownership
26  interest in the pipelines, nor any authority to decide whether Exxon will replace the
27  existing pipelines or resume oil transportation on them.  *Id.*
28

### D.   Plaintiffs' Lawsuit Seeks To Recover For Impairment Of Marketability And Market Value.

Plaintiffs assert the following claims against Plains:

| | |
|---|---|
| Grey Fox, MAZ Properties, Bean Blossom, and Winter Hawk together | Claim 4 (breach of written easement contract) Claim 6 (negligence) Claim 7 (violation of the California UCL) Claim 8 (breach of the implied covenant of good faith & fair dealing) |
| Grey Fox alone | Claim 11 (trespass) Claim 12 (strict liability, ultrahazardous activities) Claim 14 (breach of contract related to the Temporary Property Access and Remediation Agreement) |
| Grey Fox and Bean Blossom together | Claim 13 (negligence caused harm to the villas' sales prospects from stigma)[2] |

As damages for their tort causes of action, Plaintiffs seek to recover the diminution in value they attribute to the stigma of the oil spill, and compensation for the period of years in which they claim the stigma from the spill impaired buyers' interest in purchasing the property for the value Plaintiffs ascribe to it.  Plaintiffs' only evidence of damages is an expert report by submitted by a real estate appraiser, Dr. Randall Bell.  SUF No. 15.  Bell opines that Grey Fox and Bean Blossom were damaged by the impairment in the value of Lot X and Lot H, respectively, as a result of the 2015 spill.  SUF No. 16.  He calculates a total impairment of $22,184,673 for Grey Fox and $20,776,123 for Bean Blossom.  Segall Decl. Ex. 6 at 6.  Dr. Bell does not opine that the value of any parcel owned by MAZ Properties or Winter

---

[2] Plaintiffs originally asserted additional causes of action, including class claims, against Plains related to the interpretation of the easement agreements.  After Plains sold the Lines 901 and 903 pipelines to PPC, PPC joined this case as a defendant and assumed liability on those causes of action.  *See* Dkt. 222 at 1.  Plaintiffs and Plains have filed a stipulation for dismissal of those claims with prejudice as to Plains.  Dkt. 249.  Additionally, Plaintiffs originally asserted causes of action for negligent misrepresentation (Claim 5) and permanent nuisance (Claim 9), which Plains successfully moved to dismiss.  *See* Dkt. 80 at 16, 23.  Plaintiffs did not re-plead them, although they did not remove the claims from the Second Amended Complaint.  *See* Dkt. 137 at 2.

1  Hawk has been impaired—meaning he proffers no evidence of any damages for
2  those Plaintiffs.  SUF No. 17.

3      Bell's damages analysis proceeds in three steps.  First, he conducts a property
4  appraisal to estimate the **unimpaired values** of Lot X and Lot H as of June 22,
5  2022, assuming that the 2015 oil spill had never occurred.  Segall Decl. Ex. 6 at 10,
6  19, 30.  Bell opines that as of July 2022 the unimpaired market value of Lot X was
7  $31,500,000 and the unimpaired market value of Lot H was $29,500,000.  *Id.*

8      Next, Bell considers what he calls **risk effects**: the alleged diminution in te
9  value of the property caused by the public's "negative perceptions" of the
10  environmental incident.  Segall Decl. Ex. 6 at 5.  As Bell explained at his deposition,
11  "risk effects" are synonymous with "stigma."  SUF No. 19.  Bell opines that the
12  stigma from the 2015 spill continues to depress the values of Lot X and Lot H by
13  25%.  Segall Decl. Ex. 6 at 5.

14      Third, Bell considers what he calls **use effects**: damages Grey Fox and Bean
15  Blossom have suffered as a result of what he calls the "loss of use" of their property
16  caused by the spill.  *Id.* at 4.  But Bell does not calculate any damages from the loss
17  of use of Lot X or Lot H *as residences* during the time the cleanup was underway—
18  not surprising, because nobody was living on or otherwise using Lot X or Lot H at
19  the time of the spill.  SUF Nos. 14–16.  Nor does Bell contend that the spill deprived
20  Grey Fox or Bean Blossom of the opportunity to market or sell the properties.  SUF
21  No. 19 ("Q: Did the oil spill somehow prevent the owner of Lot H, Bean Blossom,
22  from either marketing or selling the property? A: I don't think that there is anything
23  that absolutely prevented them from selling it …  Q: Nothing about the oil spill
24  prevented them from selling the property, from listing the property, from marketing
25  the property, from changing the price of the property, is that right?  A: On a strict
26  technical basis, I don't think they were prevented from doing anything.").

27      Instead, Bell's "loss of use" damages refer to the delay in the owners' ability
28  *to sell* Lot X and Lot H at their preferred price, allegedly because of the spill's

stigmatic effects.  Segall Decl. Ex. 6 at 29; *id.* Ex. 7 at 184:18–23 ("Q: So, for purposes of your opinion in this case, loss of use damages are equivalent to damages from delays in selling the two properties, is that right? A: That's one way of putting it.").  Bell opines that while "spec homes" are built to sell quickly, Lot X and H have sat on the market for years because the oil spill has discouraged prospective buyers from paying what the sellers are asking.  *Id.* Ex. 6 at 29.  In other words, Bell assumes that, but for the oil spill, Lot X and Lot H both would have sold in 2015. *Id.* Ex. 7 at 188:7–14.

## III.   LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)); *see also* Fed. R. Civ. P. 56(c)(1)(B).  Summary judgment should be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 323.  A plaintiff that fails to "submit[] 'expert witnesses or designated documents providing competent evidence from which a jury could fairly estimate'" damages necessarily loses.  *Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1159 (9th Cir. 2015) (quoting *McGlinchy v. Shell Chem.*, 845 F.2d 802, 808 (9th Cir. 1988)).

## IV.   ARGUMENT

### A.   Summary Judgment Must Be Granted As To The Properties That Were Not Oiled.

Winter Hawk and MAZ Properties own a total of 13 lots in El Rancho Tajiguas, none of which was oiled.  SUF No. 5.  Bell does not opine that Winter Hawk or MAZ Properties were damaged.  SUF No. 18.  Plains is therefore entitled to summary judgment on all their claims (Claims 4, 6, 7, and 8).  *Magnetar*, 801 F.3d at 1159.

Bean Blossom owns Lot H.  SUF No. 5.  It was not oiled in the spill either, and Plains did not physically damage its property in any way.  *Id.*  But Bell opines that Bean Blossom is entitled to recover economic damages for the alleged delay in the sale of the property, which he attributes to the spill.  SUF No. 17.  This theory of damages fails for two independent reasons.  First, Bell's calculations of "use effects" and "risk effects" for an un-oiled property are both forms of stigma damages, which are not recoverable under California law.  Second, Bean Blossom's claims are barred by the economic loss rule, which does not permit recovery in tort for purely economic losses.

#### 1.   Bean Blossom seeks only unrecoverable stigma damages.

Bean Blossom's negligence claims (Claims 6 and 13) fail because its only claimed injury is an alleged diminution in the value of the Lot H villa and the delay in selling the villa due to the stigma resulting from the lot's proximity to the spill site on the neighboring tract and the existence of the pipeline right-of-way on the lot. California courts reject this theory of damages: "No case of which we are aware permits a plaintiff to recover diminution in market value damages caused by the stigma of contaminated land."  *Santa Fe P'ship v. ARCO Prods. Co.*, 46 Cal. App. 4th 967, 984 (1996).  The only potential exception to this rule is when a defendant creates a *permanent*, unabatable nuisance, but this Court has already dismissed Plaintiffs' permanent nuisance claim.  Dkt. 80 at 22–23.

In *Santa Fe*, the defendant oil company's storage tank leaked gasoline into the soil and ground water, contaminating the plaintiffs' adjacent property. *Santa Fe P'ship*, 46 Cal. App. 4th at 969–72. Remediation efforts were expected to "successfully remove all contamination from the property in due course." *Id.* at 972. The plaintiffs had not incurred any costs because the defendant was remediating the contamination on the property at its own expense, as Plains did here. Nor had they suffered any loss of use of their property, because the contamination did not interfere with their ongoing motel operations. *Id.* Instead, the plaintiffs sought post-cleanup stigma damages for the diminution in value their property had allegedly suffered. *Id.* The court concluded that "diminution in market value damages caused by the stigma of contaminated land" are not recoverable. *Id.* at 984.

Both components of Bell's calculation of damages to Lot H constitute unrecoverable stigma damages. There is no dispute as to "risk effects"—the 25% diminution in value allegedly caused by Lot H's proximity to an oil spill on another property. Bell conceded under oath that the phrase is synonymous with stigma. SUF No. 18. These damages are unrecoverable, full stop.

Bell's "use effects" are likewise a measure of diminution in value from stigma. In standard usage under California law, loss of use damages are intended to compensate a landowner for the loss of use of damaged property "*during the time necessarily consumed in making the proper repairs*." *Fresno City Lines v. Herman*, 97 Cal. App. 2d 366, 372 (1950) (emphasis added); *see also Reynolds v. Bank of Am. Nat'l T. & S. Ass'n*, 53 Cal. 2d 49, 50 (1959) (explaining that loss of use damages are intended to measure "the loss sustained by being deprived" of the use of damaged property "during the time reasonably required for the making of repairs"). Bell's own report explains that characteristic examples of loss of use damages include the cost of a rental car while auto repairs are being performed or the rental cost of a nearby home during home repairs. Segall Decl. Ex. 6 at 5. But Lot H was never oiled and no remediation work ever occurred on the property, SUF

No. 5; plainly, then, the spill did not prevent Bean Blossom from selling the home or using it as a residence. SUF Nos. 20-21; Segall Decl. Ex. 7 at 162:10–17 ("Q: What use could somebody make of Lot H when it was listed for sale in 2014 that they could not make use of the property in 2016, say, after the oil spill? A: Well, the physical house is the same."). Bean Blossom therefore suffered no "loss of use" damages as the phrase is used in California law.

Bell tries to get around this rule by opining that Bean Blossom lost "use" of the money it would have received if it had sold the property in May 2015, thereby avoiding the delay he assumes was caused by the stigma. Segall Decl. Ex. 6 at 29. But lost income from the inability to monetize property as a result of an earlier accident affecting the property does not constitute loss of use damages recoverable in tort. *See Gehr v. Baker Hughes Oil Field Operations, Inc.*, 165 Cal. App. 4th 660, 662 (2008). In *Gehr*, the owner of land that the previous owner had polluted with chemical solvents brought an action under a continuing nuisance theory against the previous owner, claiming that, as a result of the contamination, the owner had been unable to refinance the property. The court rejected the claim, reasoning that the plaintiff "did not seek to abate the nuisance or claim any physical loss of use of their property." *Id.* at 669. Instead, the court held that the plaintiff was seeking "stigma" damages "resulting from the inability to refinance," which were "indistinguishable from a diminution in value claim" and therefore not recoverable. *Id.* at 670–71; *see also Santa Fe P'ship*, 46 Cal. App. 4th at 977 (rejecting economic losses resulting from plaintiff's inability "to sell or secure a loan against the land due to the stigma which attaches to previously contaminated property").

As *Gehr* illustrates, what Bell characterizes here as "loss of use" is in fact an unrecoverable claim for a temporary diminution in value from the stigmatic consequences of an oil spill. Indeed, Bell conceded in deposition that the properties *would have sold* notwithstanding the spill *if* the owners had been willing to reduce the listing prices to what the market would bear in the spill's aftermath:

Q.    [L]et's assume, in 2017, Grey Fox decided, we want to hold a fire sale, we want to get this property off our hands as soon as possible, and so they put Lot X on the market for $500,000.  You'd agree that Lot X would be very likely to sell at the price, wouldn't you?

A.    If Lot X was put on the market for $500,000, I don't know if I'd buy it, but my guess is that—or my expectation is that it would sell.

Segall Decl. Ex. 7 at 247:3–11.  Bean Blossom's alleged inability to sell the property after the oil spill is not "loss of use"—Bell concedes the property *could* have and *would* have sold at some price—but rather at most is "diminution in market value damages caused by the stigma of contaminated land," which is not recoverable as a matter of law.  *Santa Fe P'ship*, 46 Cal. App. 4th at 984 (rejecting recovery where landowners "concede they have not suffered any costs of remediation or loss of use or enjoyment of their property" yet seek "diminution in market value damages caused by the stigma of contaminated land").

**2.    The economic loss rule also bars Bean Blossom's tort claims.**

Bean Blossom's negligence claims also are barred by the economic loss rule.  The California Supreme Court recently reaffirmed that there is no duty in tort to guard against purely economic losses—those that "do[] not arise from actionable physical, emotional or reputational injury to persons or physical injury to property." *S. Cal. Gas Leak Cases*, 7 Cal. 5th 391, 398 (2019).  Courts should not "impos[e] a duty of care to avoid causing purely economic losses" where they flow "from an industrial accident caused by the defendant (and which happens to occur near the plaintiff)."  *Id.* at 403; *see also id.* at 404–07 (citing *State of Louisiana v. M/V TESTBANK*, 752 F.2d 1019 (5th Cir. 1985) (no recovery for economic losses resulting from closure of waterway due to chemical spill), and *Barber Lines A/S v. M/V Donau Maru*, 764 F.2d 50 (1st Cir. 1985) (no recovery for economic losses resulting from closure of berth due to oil spill).  Such claims "are best not treated as compensable in negligence," the Court explained, because "claims for purely economic losses suffered from mere proximity to an industrial accident create

1    intractable line-drawing problems for courts" and entail "massive and

2    indeterminate" liability. *Id.* at 394–95, 405.

3         *Southern California Gas* bars Bean Blossom's negligence claims. The

4    undisputed facts show that Lot H was not physically damaged in any respect by the

5    oil spill. Instead, Bell opines that the value of Lot H has been impaired by the

6    stigma of the oil spill. These are economic losses for which recovery in negligence

7    is barred.

8         Bean Blossom cannot avoid the economic loss rule by invoking the "special

9    relationship" exception, for two reasons. First, Bean Blossom and Plains were in

10   contractual privity, and the special relationship exception does not apply when the

11   parties have a contract. *Sheen v. Wells Fargo Bank, N.A.*, 12 Cal. 5th 905, 922

12   (2022); *see also, e.g.*, *Grey Fox, LLC v. Plains All Am. Pipeline, L.P.*, 2019 WL

13   4196066, at *7 n.5 (C.D. Cal. Apr. 8, 2019) ("[C]ourts in this District have found

14   that contractual privity *is* a bar to a special relationship under *J'Aire*.") (Gutierrez,

15   J.). This Court denied Plains' motion to dismiss on the theory that Plaintiffs had

16   alleged that Plains owed them a duty outside of the easement contract, *Grey Fox*,

17   2019 WL 4196066, at *8, but the California Supreme Court's subsequent decision in

18   *Sheen* confirms that the existence of contract precludes a special relationship, even

19   when a plaintiff alleges the defendant owed duties outside of the contract

20   requirements. In *Sheen*, a plaintiff sued Wells Fargo for negligence for allegedly

21   mishandling the plaintiff's application for a mortgage modification, claiming Wells

22   Fargo had breached a tort duty to "to process, review and respond carefully and

23   completely to [his] loan modification applications." 12 Cal. 5th at 919. The

24   California Supreme Court held that the economic loss rule barred the negligence

25   claim because "Plaintiff and Wells Fargo had a contract," and that mortgage

26   contract did not provide that Wells Fargo would "process, review and respond

27   carefully and completely" to any loan modification application the plaintiff filed.

28   *Id.* at 924–25. The Court could only "give deference to the parties' agreement" by

1   rejecting a tort claim seeking to impose substantive duties in excess of those created
2   by the contract. *Id.* at 925.

3       So too here. Plains and Bean Blossom had a contract—the easement
4   agreement pursuant to which the pipeline traversed Lot H. Bean Blossom alleges
5   that the contract required Plains to operate and maintain the pipeline in particular
6   ways, and has asserted a breach of contract claim on that basis. *See* SAC ¶¶ 181–93.
7   Bean Blossom's negligence claim therefore is not "completely independent of" the
8   original easement contract. *Erlich v. Menezes*, 21 Cal. 4th 543, 552 (1999).

9       Bean Blossom does not allege any conduct by Plains separate and apart from
10  its operation of the pipeline pursuant to the parties' easement. This Court held at the
11  motion to dismiss stage that Plaintiffs had "adequately pleaded duties arising from
12  conduct independent of the easement contracts in several of their claims." Dkt. 80
13  at 11. But as to Lot H, where no oil was spilled, the only duty between Plains and
14  Bean Blossom was that arising from the easement. No other duty exists between a
15  pipeline operator and the owner of a property near the site of a spill. Indeed, the
16  injury Bean Blossom claims is classic economic loss, no different from the claims of
17  those in the vicinity of the gas leak in *Southern California Gas*, 7 Cal. 5th at 398.

18      Second, even if the contractual economic loss rule did not bar its claim, Bean
19  Blossom did not have any other special relationship with Plains that exempts it from
20  the economic loss rule. The *Southern California Gas* Court emphasized that under
21  California law, a "special relationship" means that the plaintiff "was *an intended*
22  *beneficiary of a particular transaction* but was harmed by the defendant's
23  negligence in carrying [that transaction] out." 7 Cal. 5th at 400 (emphasis added).
24  In those situations, the Court explained, a "special relationship" between the
25  plaintiff and the defendant can justify recovery "because the 'end and aim' of the
26  transaction" is to benefit the economically harmed third-party plaintiff. *Id.* (quoting
27  *Biakanja v. Irving*, 49 Cal. 2d 647, 650 (1958)). Absent that showing, the special
28  relationship exception does not apply. *Cf. Andrews v. Plains All Am. Pipeline, L.P.*,

1  2017 WL 10543401, at \*10 (C.D. Cal. Aug. 25, 2017) (where evidence showed

2  nothing to "indicate anything more than that Plaintiffs were in the chain of oil

3  production," no showing that "end and aim" of transaction was to benefit plaintiffs).

4        Bean Blossom was not the intended beneficiary of any relevant transaction.

5  Plains transported oil through the pipeline pursuant to a federally regulated tariff.

6  SUF No. 23.  Bean Blossom did not receive any payment based on whether oil was

7  transported through the pipeline.  SUF No. 25.  Rather, Bean Blossom's predecessor

8  received a one-time payment for the easement on the date of purchase.  SUF No. 24.

9  Bean Blossom had no interest at all in the transactions between Plains and the

10 shipper for the transportation of oil, and certainly its interests were not the "end and

11 aim" of that transaction.  Bean Blossom was the beneficiary of the easement

12 agreement, but that contract cannot establish a special relationship for the reason

13 just mentioned: *Sheen* precludes a special relationship when the parties are in

14 contractual privity.

15      **B.**    **Summary Judgment Must Be Granted As To Grey Fox.**

16        **1.**    **Grey Fox cannot recover in negligence (Claims 6 and 13).**

17       Summary judgment is required as to the negligence claims asserted by Grey

18 Fox, the owner of Lot X, the only parcel where oil was spilled.  SUF Nos. 4–5.

19 Plains fully repaired the damage from the oil spill at its own cost.  SUF Nos. 9–13.

20 While the remediation work was ongoing, Grey Fox did not lose the use of the

21 property as a home construction site (or for any other purpose), except for the area

22 that Plains occupied pursuant to contract during cleanup (the alleged breach of

23 which is excluded from this motion).  SUF Nos. 14, 19.

24       Under California law, the measure of damages for harm to property is the

25 ***lesser of*** (1) the costs incurred by the property owner to repair the property

26 (including loss of use while the repairs are being made); ***or*** (2) the reduced value of

27 the property caused by its damaged condition.  *See* CACI No. 3903F (Damage to

28 Real Property (Economic Damage)); *Kincaid v. Dunn*, 26 Cal. App. 686, 687–88

1  (1915).  California cases uniformly apply this "lesser-of" rule, subject only to

2  narrow and well-defined exceptions inapplicable here.

3      The lesser-of rule implements California Civil Code section 3333, the general

4  tort-damages statute, which allows plaintiffs to recover tort damages only for "the

5  detriment" that is "proximately caused" by "the breach of an obligation."  Cal. Civil

6  Code § 3333.  Applying section 3333, California cases hold that damages are

7  measured by "the difference in the value of the property immediately before and

8  after the injury," but if "the injury [is] capable of repair at an expense less than the

9  diminution in value of the property as injured," then damages are instead "limited to

10  the cost of making such repair."  *Kincaid*, 26 Cal. App. at 687; *see also Linforth v.*

11  *San Francisco Gas & Elec. Co.*, 156 Cal. 58, 62–63 (1909) ("This rule allowing

12  compensation for the cost of restoration to the original condition when this can be

13  done at a reasonable expense, together with compensation for the loss of the use of

14  the property is in precise accord with section 3333 of the Civil Code."); *Erlich*, 21

15  Cal. 4th at 555 ("general measure of damages" for injury to property "is the

16  reasonable cost of repair together with the value of lost use during the period of

17  injury").

18      Here, Grey Fox's property was fully remediated at Plains' expense.  SUF

19  Nos. 9–13.  As detailed above, oil was removed from the Grey Fox property in 36

20  days, and remediation activities (aside from grass seeding and weekly watering)

21  were completed within 106 days.  SUF Nos. 9-10.  The Unified Command certified

22  the restoration of the Grey Fox property complete in April 2016.  SUF No. 12.

23  Plaintiffs' property manager Mark Lloyd confirmed under oath that the cleanup was

24  conducted to his client's specifications and on Plains' dime.  SUF No. 11.

25      Because Plains fully remediated the physical damage to Lot X, the only

26  economic losses recoverable under section 3333 are those arising from the loss of

27  Grey Fox's ability to use Lot X while the spill was being remediated.  *See, e.g.*,

28  *Kelly v. CB&I Constructors, Inc.*, 179 Cal. App. 4th 442, 450 (2009) (for tortious

1   injury to real property, damages are measured by either diminution in value or "the

2   cost to repair the damage and restore the property … plus the value of any lost

3   use").  As with Lot H, there was no "loss of use" of Lot X during the remediation

4   period.  During that period, Grey Fox was using the property as a construction site

5   for the villa it was building, and that work was not impeded by the cleanup efforts.

6   SUF No. 14; Segall Decl. Ex. 1 at 118:19–21.  To the extent Bell opines that Grey

7   Fox suffered "loss of use" damages from delays in selling the property caused by the

8   oil spill, that claim fails for the reason stated above regarding Bell's analysis of Lot

9   H: the harm from sellers being unwilling to buy at list price is not "loss of use"

10  damages, but rather, at best, unrecoverable damages for diminution in value caused

11  by stigma. *See supra* at 10–11.  Because Plains already remediated all the property

12  damage caused by the spill, this diminution in value is unrecoverable in tort. *See*

13  CACI No. 3903F.

14       California courts are particularly skeptical of awarding stigma damages to a

15  plaintiff who has already received a full abatement of the physical injury and is

16  simply speculating that its property will increase in value.  Awarding damages for a

17  decrease in the property's value caused by a temporary condition allows such a

18  plaintiff to "obtain a double recovery"—that is, to recover *both* for "depreciation in

19  value" while also "hav[ing] the cause of that depreciation removed." *Rhodes v. San*

20  *Mateo Inv. Co.*, 130 Cal. App. 2d 116, 118 (1955) (quoting *Spaulding v. Cameron*,

21  38 Cal. 2d 265, 269 (1952)).  Grey Fox decided to continue holding Lot X for years

22  following the oil spill in hopes of selling it for a higher price.  That is market

23  speculation, and Grey Fox is responsible for the consequences of its speculation.

24       Grey Fox's claims fail for a second, independent reason: the property was

25  never even on the market during the remediation period.  Plains removed all of the

26  oil on Lot X, completed quality-control testing, and vacated the property by

27  September 2, 2015.  SUF Nos. 9–11.  Lot X was not put up for sale until *April 2017*,

28  a year and a half later.  SUF Nos. 8, 19.  Grey Fox therefore did not suffer any

1   losses at all from sales delays "during the time reasonably required for the making

2   of repairs." *Reynolds*, 53 Cal. 2d at 50.

3              **2.      Grey Fox cannot recover in trespass (Claim 11).**

4              For the same reasons that its negligence claims fail, Grey Fox's trespass claim

5   likewise fails.  California law limits damages for trespass to two categories:

6   "abatement and loss of use."  *Santa Fe P'ship*, 46 Cal. App. 4th at 980.  Plains

7   already abated the oil on Lot X.  SUF No. 9.  Dr. Bell's calculation of "trespass"

8   damages is identical to his calculation of "loss of use" damages, and it suffers from

9   the same flaws: (a) economic losses during the period Lot X was on the market are

10  not "loss of use" damages at all, and (b) even if they were, Grey Fox could not

11  recover them in this case because it was not prevented from continuing construction

12  on Lot X while the remediation work was performed, and it did not complete

13  construction and offer Lot X for sale until after the remediation work was

14  completed.  *See Spaulding v. Cameron*, 38 Cal. 2d 265, 270 (1952) (purpose of loss-

15  of-use damages in trespass cases is to compensate property owners for the

16  "temporary decrease in the value of the use of the property" until the trespass is

17  abated).

18              **3.      Grey Fox cannot recover stigma damages on a theory of**
19                     **strict liability for ultrahazardous activities (Claim 12).**

20             Grey Fox's claim for strict liability for ultrahazarous activities fails for the

21  same reasons as its other tort claims: its claimed damages are barred by the "lesser

22  of" rule and by the prohibition on recovery of stigma damages.  Moreover, the

23  damages sought are outside the scope of the harm contemplated by strict liability.

24  Damages for strict liability extend only to "consequences which lie within the

25  extraordinary risk posed by the abnormally dangerous activity."  *Goodwin v. Reilley*,

26  176 Cal. App. 3d 86, 92 (1985).  The "extraordinary risk" that renders an activity

27  ultrahazardous is the "risk of serious harm to the person, land or chattels of others."

28  *Edwards v. Post Transp. Co.*, 228 Cal. App. 3d 980, 983 (1991) (citing *Luthringer*

1   *v. Moore*, 31 Cal. 2d 489, 498 (1948)); *accord Venoco, Inc. v. Plains Pipeline, L.P.*,

2   2016 WL 10646303, at *11 (C.D. Cal. Sept. 26, 2016) ("To the extent that the Court

3   would deem the transportation of oil ultrahazardous, it would be because of the

4   potential harm to persons or property from an oil spill.") (Gutierrez, J.).  Plains fully

5   remediated the physical harm to Lot X.  SUF Nos. 9–13.  Grey Fox's claim is not

6   for physical harm, but for economic losses allegedly resulting from potential buyers'

7   unfavorable mental impressions of the property because it previously had been

8   contaminated with oil and because future plans for the pipeline remained uncertain.

9   Those kinds of economic harms are not the type of physical harm that flows from

10  ultrahazardous activities.  *Dep't of Fish & Game v. Super. Ct.*, 197 Cal. App. 4th

11  1323, 1361 (2011) ("reduced property values and economic decline" are not "the

12  type of harm" that follows from ultrahazardous activity).

### C.    Plaintiffs' Remaining Claims Fail.

#### 1.    The claims for breach of written easement contract and breach of the implied covenant fail (Claims 4 and 8).

16      Plaintiffs' contract-based claims allege that their easement agreements require

17  Plains to "install, repair, monitor, maintain, operate, remove, or replace" the

18  pipeline, SAC ¶ 184, and that Plains breached those duties.  In ruling on Plains'

19  motion to dismiss these claims, this Court agreed with Plains that the plain language

20  of the easements creates no affirmative obligations on Plains to maintain the

21  pipeline.  *See* Dkt. 80 at 13–14, 21–22.  This Court held "[t]he easement grants

22  Defendants the right to operate and maintain the Pipeline" but "does not place an

23  affirmative obligation on them to do so."  *Id.* at 14.  The Court nevertheless denied

24  Plains' motion to dismiss because Plaintiffs might have been able to identify

25  extrinsic evidence in discovery rendering the easements ambiguous.  *Id.*  Plaintiffs

26  failed to discover any such evidence.  Accordingly, the Court's prior construction of

27  the easements must stand and summary judgment should be entered for Plains.

28

**2.    Lack of evidence supporting a restitutionary award bars Plaintiffs' UCL claim (Claim 7).**

Plains is entitled to summary judgment on Plaintiffs' UCL claim because no evidence supports a restitutionary award. *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003) (prevailing UCL plaintiffs are limited to injunctive relief and restitution).  Restitution under the UCL is "'the return of the excess of what the plaintiff gave the defendant over the value of what the plaintiff received.'" *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015) (quoting *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 174 (2000)).  A plaintiff must prove "a measurable amount" of restitution "supported by evidence." *Id.*

Plaintiffs allege that they are entitled to restitution for a "loss of property" they suffered "when they granted Defendants the Easements."  SAC ¶ 225.  But the property owners were paid for the easements when they entered into them, and Plaintiffs have no evidence that Plains' predecessor obtained easements from Plaintiffs (which happened more than two decades before the spill) as the result of a fraudulent, unfair, or illegal practice.  SUF No. 24.  Nor does Bell does attempt to quantify or otherwise opine as to this theory of injury, as he does not opine that Plaintiffs were underpaid for the easements.  *See D'Artiste v. Am. Int'l Grp., Inc.*, 2021 WL 4707000, at *2 (C.D. Cal. May 12, 2021) ("[A] district court may enter summary judgment in favor of Defendants on a UCL claim where no evidence supports a recovery consistent with the limits of restitution under the UCL.").

Any claim for injunctive relief would be moot because of Plains' sale of the pipeline to PPC.  *See* SAC ¶ 222–23 (seeking injunctive relief to require Plains to operate, repair, or replace the pipeline consistent with governing safety standards and the easements); *Johnson v. Rai Rocklin Invs., LLC*, 2017 WL 3421848, at *2 (E.D. Cal. Aug. 9, 2017) (holding that claim for injunctive relief was moot where defendants no longer owned or controlled the property at issue).

1

## V.    CONCLUSION

2    Plains' motion for partial summary judgment should be granted.

3

DATED:  October 6, 2023                Respectfully submitted,

4

5                                      MUNGER, TOLLES & OLSON LLP
                                           HENRY WEISSMANN
6                                          DANIEL B. LEVIN
                                           JORDAN D. SEGALL
7                                          MAGGIE THOMPSON

8

9    By: */s/ Henry Weissmann*
                                           HENRY WEISSMANN
10                                     *Attorneys for Plains All American Pipeline,*
                                       *L.P. and Plains Pipeline, L.P.*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Certificate of Compliance

The undersigned counsel of record for Defendants Plains All American Pipeline L.P. and Plains Pipeline, L.P. certifies that this brief contains 6,997 words, which complies with the word limit of L.R. 11-6.1.

DATED:  October 6, 2023

MUNGER, TOLLES & OLSON LLP


By: */s/ Henry Weissmann*
HENRY WEISSMANN
*Attorneys for Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

MEMORANDUM IN SUPPORT OF PLAINS' MOTION FOR PARTIAL SUMMARY JUDGMENT