1
2
3
4
5
6

Robert J. Nelson (CSB No. 132797)
Nimish Desai (CSB No. 244953)
Wilson M. Dunlavey (CSB No. 307719)
Amelia A. Haselkorn (CSB No. 339633)
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone: (415) 956.1000

7
8
9
10
11

A. Barry Cappello (CSB No. 037835)
Leila J. Noël (CSB No. 114307)
Lawrence J. Conlan (CSB No. 221350)
**CAPPELLO & NOËL LLP**
831 State Street
Santa Barbara, CA 93101-3227
Telephone: (805)564-2444

12
13
14

Lynn Lincoln Sarko (*Pro Hac Vice*)
**KELLER ROHRBACK L.L.P.**
1201 Third Ave., Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900

Juli E. Farris (CSB No. 141716)
Matthew J. Preusch (CSB No. 298144)
**KELLER ROHRBACK L.L.P.**
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Telephone: (805) 456-1496

15

*Attorneys for Plaintiff*

16
17
18

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

19

20
21
22
23
24
25

GREY FOX, LLC, et al.,

                         Plaintiffs,

v.

PLAINS ALL AMERICAN
PIPELINE, L.P. et al.,

                         Defendants.

Case No.  2:16-cv-03157-PSG-JEM

**PLAINTIFF'S MEMORANDUM IN
OPPOSITION TO PLAINS'
SECOND MOTION FOR PARTIAL
SUMMARY JUDGMENT**

Hearing Date:  May 17, 2024
Time:              1:30 p.m.
Judge:             Hon. Philip S. Gutierrez
Courtroom:      6A

26
27
28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

    I.    Plains' Failure to Maintain its Pipeline Caused a Massive Oil Spill on Plaintiff's Property. ...................................................... 3

    II.   Plaintiff's Property Incurred Prolonged Impacts from the Spill........... 5

LEGAL STANDARD ......................................................................................... 5

ARGUMENT ...................................................................................................... 6

    I.    Summary Judgment Must Be Denied as to the Tort Claims. ............... 6

        A.    The facts establishing trespass have been conceded, so summary judgment must be denied. ........................................ 6

        B.    Summary judgment must be denied as to Grey Fox's negligence claims.................................................................... 9

        C.    Grey Fox's strict liability claim survives. ............................... 10

        D.    Plains' motion engages in improper misdirection. ................... 10

            1.    The Temporary Access Agreement is irrelevant to Grey Fox's tort claims.................................................... 10

            2.    Plains' conjecture that damages are not in dispute does not pass muster........................................................ 13

    II.   Summary Judgment Must Be Denied as to Plains' Liability for Punitive Damages. ............................................................................. 16

CONCLUSION................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. McMillion*,
  82 Cal. App. 3d 211 (1978) ........................................................................... 7

*Am. Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton*,
  96 Cal. App. 4th 1017 (2002) ....................................................................... 19

*Andrews v. Plains All Am. Pipeline, L.P.*,
  No. 15-4113, 2020 WL 1650031 (C.D. Cal. Mar. 17, 2020) ............................. 6

*Behr v. Redmond*,
  193 Cal. App. 4th 517 (2011) ....................................................................... 18

*Butte Fire Cases*,
  24 Cal. App. 5th 1150 (2018) ................................................................. 16, 19

*Carter v. Nat'l R.R. Passenger Corp.*,
  No. 18-9652, 2020 WL 2475085 (C.D. Cal. Jan. 24, 2020) ............................ 20

*Cassinos v. Union Oil Co.*,
  14 Cal. App. 4th 1770 (1993) ..................................................................... 6, 7

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ...................................................................................... 5

*Costerisan v. Tejon Ranch Co.*,
  255 Cal. App. 2d 57 (1967) ............................................................................ 7

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*,
  No. 13-5693, 2016 WL 6916826 (C.D. Cal. Sept. 8, 2016) ............................. 5

*Fraser v. Goodale*,
  342 F.3d 1032 (9th Cir. 2003) ........................................................................ 5

*Martin Marietta Corp. v. Ins. Co. of N. Am.*,
  40 Cal. App. 4th 1113 (1995) ......................................................................... 6

*Masayesva for & on Behalf of Hopi Indian Tribe v. Hale*,
  118 F.3d 1371 (9th Cir. 1997) ........................................................................ 8

*Miles v. Deutsche Bank Nat'l Tr. Co.*,
  236 Cal. App. 4th 394 (2015) ................................................................... 9, 14

1
2

# TABLE OF AUTHORITIES
## (continued)

Page

3
4

*Music Grp. Macao Com. Offshore Ltd. v. Foote*,
   No. 14-03078, 2015 WL 3882448 (N.D. Cal. June 23, 2015) ........................... 12

5
6

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*,
   210 F.3d 1099 (9th Cir. 2000) ............................................................... 6

7

*Ortega v. Kmart Corp.*,
   26 Cal. 4th 1200 (2001) ...................................................................... 9

8
9

*Reynolds v. Bank of Am. Nat'l Tr. & Sav. Ass'n*,
   53 Cal. 2d 49 (1959) ........................................................................... 8

10
11
12

*Simulados Software, Ltd. v. Photon Infotech Priv., Ltd.*,
   No. 5:12-04382, 2020 WL 109391 (N.D. Cal. Jan. 9, 2020), aff'd,
   861 F. App'x 149 (9th Cir. 2021) ............................................... 14, 15

13

*Taylor v. Super. Ct.*,
   24 Cal. 3d 890 (1979) ........................................................................ 19

14

**Statutes**

15
16

Cal. Civ. Code §§ 3294(c)(1), (c)(2) ....................................................... 18

Cal. Civ. Code § 3334 ............................................................................. 8

17
18

**Court Rules**

19

Fed. R. Civ. P. 56(a) ............................................................................... 5

20
21
22
23
24
25
26
27
28

# **INTRODUCTION**

Plains moves again for summary judgment on Plaintiff Grey Fox's tort claims for negligence (claims 6 and 13), trespass (claim 11), and strict liability for ultrahazardous activities (claim 12), as well as Plaintiff's claim for punitive damages. The only claim that Plains does not move on is Grey Fox's breach of contract claim (claim 14).

Plaintiff's tort claims easily survive summary judgment. Plains concedes it caused an oil spill on Plaintiff's property, establishing a trespass. This Court has already found that Plains' oil spill was an ultrahazardous activity, so strict liability plainly attaches. As to Plaintiff's negligence claim, this Court has already found that Plains owed Plaintiff a duty of care and that the Plaintiff was injured (and therefore suffered some damage) because it lost use of its property. Whether Plains' conduct that caused a disastrous oil spill on Plaintiff's property is a breach of that duty (it plainly is) and the precise amount of damages owed to Plaintiff are quintessential questions of fact ill-suited for summary judgment.

Plains' argument that Plaintiff has no viable tort claims is pure misdirection. After Plains spilled oil on Plaintiff's property, the parties entered into a Temporary Access Agreement permitting Plains access to the property to clean up its spill in exchange for compensation. Plains implausibly asserts that it somehow did not trespass, dump ultrahazardous oil on Plaintiff's property, or commit negligence in causing a spill because the contract permitted Plains to "occupy" the property after the spill. But the fees Plains paid Grey Fox under the contract were for Plains' personnel and equipment to enter and use the property for remediation efforts. Plains made no payments to compensate Grey Fox for the spill of ultrahazardous crude oil, which preceded and led to the access agreement in the first place. In short, the access agreement did not permit Plains to trespass and dump ultrahazardous oil on Plaintiff's private property, so it cannot be used as a shield from that tortious conduct. Moreover, the contract expressly preserves legal claims

Grey Fox had against Plains, and states: "Nothing in this Agreement shall limit any right or claim, legal or otherwise, the Owner [*i.e.*, Grey Fox] may have against Plains, and Owner expressly reserves all of its rights and claims it has or will have against Plains."

Plains' argument fundamentally misconstrues the law, which only prevents a plaintiff from recovering both tort and contract damages when such a recovery would be duplicative. Here, however, Plaintiff's tort claims and breach of contract claim derive from independent matters. Simply put, Plaintiff's tort claims derive from the years of misconduct leading up to the spill as well as the prolonged damage caused by the spill. Plaintiff's contract claim derives from Plains' need to access the Grey Fox property for its remediation efforts as well as Plains' failure to pay Grey Fox what it owed pursuant to that contract.

As set forth herein, Plaintiff has a strong punitive damages case. Plains' argument that no jury could find that Plains acted with malice or oppression toward Grey Fox does not withstand scrutiny. Plains ignores its criminal felony conviction for knowingly causing an oil spill and the outrage that the trial court overseeing that criminal trial expressed toward Plains' failure to maintain and operate its oil pipeline (Line 901 or "Pipeline"), including its disregard for the environment, its woeful response to the spill (including *restarting* the pipeline after the release occurred), and its unwillingness to take responsibility for it, thereby allowing oil to gush onto Grey Fox's property for hours after Plains first learned of the spill. SGD No. 45. Plains' reliance on the *Venoco* case is wholly unpersuasive, as Venoco, unlike Grey Fox, was in a longstanding business relationship with Plains to produce and transport oil, and did not have more than a hundred thousand gallons of oil spilled on its property.

The evidence here will show that Plains engaged in a decade-long failure to maintain the Pipeline, and that Plains ignored key warning signs again and again and again. Government authorities through the Pipeline and Hazardous Materials

MEMORANDUM IN OPP TO PLAINS' SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT 2:16-CV-03157-PSG-JEM

Safety Administration (PHMSA) confirmed that the Pipeline was riddled with corrosion and cited numerous violations of industry norms. SGD No. 46. The evidence will also show that Plains improperly delayed its response to the Pipeline rupture, and sought to mislead the public about the size of the spill. SGD No. 47. Plaintiff is confident that it can present compelling evidence of Plains' despicable conduct within the seven court days allotted for trial.

## **BACKGROUND**

### I.   **Plains' Failure to Maintain its Pipeline Caused a Massive Oil Spill on Plaintiff's Property.**

The Pipeline that ruptured and spilled is a buried insulated line, highly susceptible to corrosion underneath its insulation (CUI). SGD No. 48. Plains, the owner and operator of the Pipeline, failed to identify and address CUI as a risk, contrary to industry practice and its own Integrity Management Program (IMP), which the law requires Plains follow. SGD No. 49. For example, data collected in 2007 indicated a severe CUI risk on the Pipeline, but Plains failed to act on that risk. SGD No. 50. The Pipeline continued to degrade until it ruptured in 2015, causing a catastrophic oil spill. SGD No. 51.

Plains' IMP required it to inspect its Pipeline, ensure the data from its inspections were reliable, and analyze prevention and mitigation measures in sensitive ecological areas, relevant here. SGD No. 52. Plains failed to do so. SGD No. 53.[1] Among its many failings, Plains failed to ensure the data from its inspection tool was reliable, complete the required analysis to identify preventative and mitigation measures ("P&M"), and measure the integrity of its Pipeline. SGD No. 56.

---

[1] Plains was not following its IMP in other ways as well. For example, the IMP Board *never* convened and there are virtually no written materials from meetings that Plains attempted to claim stood in for Board Meetings. SGD No 54. Likewise, Plains' employees indicated a general lack of familiarity with or reliance on the IMP. SGD No. 55.

- 3 -

Plains' maintenance failures were not limited to failing to detect corrosion. Similarly, in violation of industry standards and federal regulations, Plains failed to institute an alarm management program that would detect spills. SGD No. 57. As Plaintiff's expert Dr. Kim Cameron notes, "[g]iven these failures of Plains to maintain the lines, it was unsurprising that a failure of Line 901 occurred, and that Lines 901 and 903 were ordered shutdown and out of operation pending express approval of PHMSA." SGD No. 58.

A Santa Barbara jury supported these findings. After a months-long criminal trial, it found Plains guilty of the felony of knowingly causing an oil spill. In so doing, the criminal jury found that Plains failed to maintain its Pipeline well prior to 2015. SGD No. 59; *see* Jury Instructions ("To conclude that Plains is guilty of Count 1 ('knowingly discharging oil into state waters'), you must conclude that the People have proven beyond a reasonable doubt that Plains knew or should have known that ***its maintenance, integrity management and operations policies and practices*** would cause a discharge of crude oil into the Pacific Ocean.") (emphasis added).

Indeed, the observations of the judge overseeing the trial bring into full perspective the scale and scope of Plains' gross negligence. Judge Herman determined that the spill "was not a matter of if. It was a matter of when. There were red flags all over." SGD No. 60. Red flags included failing to consider corrosion under insulation, back-dating forms in response to a federal audit by PHMSA, having "no procedures for determining general corrosion," having no procedures for validating its own data, and failing to follow its integrity management plan. SGD No. 61. The judge agreed with the prosecutors that Plains was "callous" and was "doing everything possible to avoid responsibility and pay for the damage that they've done." SGD No. 62.

The judge penalized Plains $3,347,650, what he determined was the maximum penalty permitted under the statute, but lamented that the fine was "the

- 4 -

equivalent of traffic ticket fines" for a company with billions of dollars of revenue per year. SGD No. 63. Judge Herman was concerned that the fines levied up to 2019 were not "significant enough to really discourage Plains from . . . massive oil spills." SGD No. 64. In short, the judge presiding over the criminal trial wanted to impose a much larger fine on Plains to deter future misconduct.

## II.   **Plaintiff's Property Incurred Prolonged Impacts from the Spill.**

When the Pipeline ruptured, it spilled more than 140,000 gallons of crude oil onto Lot X, owned by Plaintiff Grey Fox. SGD No. 65. The oil seeped toxic hydrocarbons into Plaintiff's soil. SGD No. 66. Aside from cleanup efforts, the aftermath of the spill also required extensive restoration as well as monitoring, testing, and oversight from governmental entities. SGD No. 67; SGD No. 68. It wasn't until April 2021 that the Regional Water Quality Control Board issued a case closure report of the spill cite. *Id.*

## LEGAL STANDARD

Summary judgment is proper only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence[;]. . . it draws all inferences in the light most favorable to the nonmoving party." *Flo & Eddie, Inc. v. Sirius XM Radio, Inc*., No. 13-5693, 2016 WL 6916826, at *2 (C.D. Cal. Sept. 8, 2016) (citation omitted). Moreover, "[a]t the summary judgment stage, [courts] do not focus on the admissibility of the evidence's form[] . . . [but] instead focus on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003) (citations omitted). "If a moving party [for summary judgment] fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of

persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000) (citations omitted).

## ARGUMENT

### I.   Summary Judgment Must Be Denied as to the Tort Claims.

All three of Grey Fox's tort claims should survive summary judgment. Plains does not even dispute that a reasonable jury could find a *prima facie* case of trespass, negligence, and ultrahazardous activity. *See* Dkt. 288-1 at 1, 2 (conceding "[t]ort liability will not be in dispute"). The evidence establishes a clear claim for trespass (again, a fact that "Plains would not dispute," *id.* at 2). Because of the uncontested oiling and clear failure to maintain the Pipeline, Plaintiff's negligence claims also survive summary judgment. Liability for ultrahazardous activities also attaches here because transporting hazardous crude oil over another's property inevitably poses a high degree of risk to that property. *See Andrews v. Plains All Am. Pipeline, L.P.*, No. 15-4113, 2020 WL 1650031, at *8 (C.D. Cal. Mar. 17, 2020) (denying summary judgment as to oiled properties' ultrahazardous liability claim).

### A.   The facts establishing trespass have been conceded, so summary judgment must be denied.

Without Plaintiff Grey Fox's authorization, Plains spilled oil onto Lot X. This fact is not in dispute. Dkt. 285 at 9, 10 ("[I]t is undisputed that the oil and the subsequent remediation efforts occupied Grey Fox's property."). Accordingly, this uncontested wrongful entry establishes liability for trespass. "The essence of the cause of action for trespass is an 'unauthorized entry' onto the land of another." *Cassinos v. Union Oil Co.*, 14 Cal. App. 4th 1770, 1778 (1993) (citations omitted) (wastewater injected from defendant's property to plaintiff's constituted trespass). A trespass "may include wrongful entry or invasion by pollutants." *Martin Marietta Corp. v. Ins. Co. of N. Am.*, 40 Cal. App. 4th 1113, 1132 (1995); *see also Andrews* Dkt. 419, 2/9/18 Order at 21 ("[I]f oil invaded these properties and easements, then

MEMORANDUM IN OPP TO PLAINS' SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT 2:16-CV-03157-PSG-JEM

subclass members would have viable trespass and Lempert-Keene-Seastrand Oil Spill Prevention and Response Act claims.").

Once a trespass has been shown, the question of damages for that trespass must go to a jury. *See Costerisan v. Tejon Ranch Co.*, 255 Cal. App. 2d 57, 59, 61 (1967) (holding a jury verdict finding trespass without awarding damages is invalid and must be retried because the court cannot assess damages). While there is "no fixed rule" to determine the proper measure of damages for wrongful occupation of property, "the usual measure of damages for a . . . trespass is the reasonable rental value of the use of the property . . . during the period of wrongful occupation of the property." *Cassinos*, 14 Cal. App. 4th at 1777, 1785 (citing Cal. Civ. Code § 3334). And at the very minimum, Plaintiff is entitled to nominal damages for Plains' trespass. *Allen v. McMillion*, 82 Cal. App. 3d 211, 219 (1978). Here, whether there was a trespass, though undisputed, remains a jury question, as does the amount of damages Plains owes to Grey Fox. Summary judgment is clearly unwarranted.

Additionally, there are material disputes of fact as to the length of Plains' trespass on the property. The impact from Plains' oil spill allegedly continued on Lot X for years after the spill, a fact that remains in dispute. *See* Dkt. 285 at 12 ("[I]t is undisputed that Grey Fox lost use of its property and there is a disputed question of fact as to how long Grey Fox lost use of its property."). Specifically, Grey Fox did not have full control over Lot X until April 30, 2021, when the Central Coast Regional Water Quality Control Board closed the site cleanup program. SGD No. 69 ("Plains continues to monitor the restoration progress and submitted an annual report (April 21, 2020) that demonstrates that the restoration has progressed and has been successful."). Until then, the property required continued government oversight, monitoring, and site inspection for many years with various possible end dates. For example, through March 2, 2017, Unified Command conducted monitoring of the restoration site, including checking hydrocarbon runoff when major storm water runoff from the spill site ran into the

culvert to ensure that the site was clear of hydrocarbons. SGD No. 70. In summary, because there is no dispute that liability for trespass has been established, summary judgment of Plaintiff's trespass claim must be denied and the question of damages for that trespass must be decided by the jury.

Plains nonetheless engages in misdirection. It does not come out and say it, but it's appearing to argue that Grey Fox could not have suffered a trespass because Grey Fox permitted Plains to enter the property to remediate the spill. This argument fails at the outset because the Remediation Agreement did not permit Plains to dump oil onto Plaintiff's property, which is the trespass. Instead, it permitted Plains to come onto the property to clean up the mess that Plains' trespass caused. Of course, cleaning up the trespass does not negate the trespass. Moreover, the proper amount of damages Plaintiff should recover for the oil spill is a quintessential jury question.

Plains nonetheless seeks to cabin its tort damages to the period required for making repairs under the Temporary Access Agreement, claiming that "California law limits loss of use damages to the period 'reasonably required for the making of repairs.'" Mot. at 9 (quoting *Reynolds v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 53 Cal. 2d 49, 50 (1959)). But *Reynolds* is a case about damages for the destruction or conversion of chattels. It does not set forth the law for real property.

As California Civil Code Section 3334 makes clear, damages to real property may be recovered for "the value of the use of the property *for the time of that wrongful occupation*," measured by "the reasonable rental value of that property . . . ." Cal. Civ. Code § 3334 (emphasis added); *see also Masayesva for & on Behalf of Hopi Indian Tribe v. Hale*, 118 F.3d 1371, 1384 (9th Cir. 1997) (Owner of invaded land is entitled to "the loss of the value of the use, at least the rental value of the . . . land during the period of deprivation.") (citation omitted)); CACI No. 3903G (Feb. 2024) (Apr. 2006 rev.) ("To recover damages for the loss of use, plaintiff must prove the reasonable cost to rent similar property for the time when it could not use

its own property.") (cleaned up). This makes sense as tort damages traditionally entitle a plaintiff to "all proximately caused damages." *Miles v. Deutsche Bank Nat'l Tr. Co.*, 236 Cal. App. 4th 394, 410 (2015).

Accordingly, Grey Fox is entitled to damages for the entire period for which it was deprived of its property, and this length of time is not beholden to the terms negotiated under the Temporary Access Agreement.

Plains also attempts to wash its hands of any damage it caused to Lot X after it allegedly completed its contractually negotiated remediation obligations. Yet, the only support that Plains offers for this argument is cherry-picked testimony of Grey Fox's land surveyor, Mark Lloyd. *See* Mot. at 9. Mr. Lloyd oversaw Plains' remediation work, and was asked to "confirm that the surface of the ground had been restored and that the revegetation as required by the remediation plan had been implemented" pursuant to the Agreement, SGD No. 71, which he did. Whether oil or other burdens remained on the property after Plains removed its personnel and equipment, however, is a disputed question of fact. *See, e.g.*, SGD No. 72.

### B.    Summary judgment must be denied as to Grey Fox's negligence claims.

Negligence requires a showing of duty, breach, causation, and damages. *Ortega v. Kmart Corp*., 26 Cal. 4th 1200, 1205 (2001) (citations omitted). Grey Fox has pled all the elements of negligence and negligence per se. Dkt. 108-1 ¶¶ 203–11.

Whether Plains owed Grey Fox a duty of care is a question of law that has already been decided in Plaintiff's favor. As this Court held when it denied Plains' motion to dismiss Plaintiff's negligence claim, Grey Fox's tort claims "rest on *independent* duties arising out of . . . property law" and other laws. Dkt. 80 at 11 (citing cases), 17. Plains does not contest that it owed Grey Fox a duty arising out of property law (or other laws).

- 9 -

Breach of that duty remains a disputed question of fact. The parties dispute whether Plains failed to adequately maintain the Pipeline despite clear warnings that the Pipeline was on the brink of failure. The parties also dispute whether Plains failed to adequately respond to the oil spill. Resolution of these questions of fact must be left to the jury.

As to injury, this Court has already held that Plains' oil spill resulted in injury to Grey Fox. Dkt. 285 at 10 (holding Grey Fox is entitled to damages for its loss of use). However, the amount of damages that Plains owes for Grey Fox's injury remains a disputed question of fact. And a jury must decide whether Plains is liable for its alleged negligence and the damages resulting from such negligence.

**C.   Grey Fox's strict liability claim survives.**

Plains concedes that it spilled oil on the property, and it does not contest that the transportation of oil is an ultrahazardous activity. Nor does it contest that the property injury Grey Fox suffered as a result of the oil spill was foreseeable as a consequence of pumping hazardous oil through a residential property. Again, Plains only argues that payment made under the parties' contract should absolve it of paying damages in tort. That argument ignores that a tort occurred, and, as explained below, mischaracterizes the parties' contract. As such, summary judgment fails, and whether Plains is strictly liable to Grey Fox must be decided by the jury.

**D.   Plains' motion engages in improper misdirection.**

**1.   The Temporary Access Agreement is irrelevant to Grey Fox's tort claims.**

Plains seeks to dodge liability and payment of damages for Plaintiff's tort claims by misconstruing its rights under the Temporary Access Agreement. The Temporary Access Agreement merely granted Plains physical access to and/or use of Plaintiff's property while Plains cleaned up its oil spill. SGD No. 73.[2] Surely this

---

[2] "It is expressly understood that this Agreement does not provide any lienholder,

2983651.7

MEMORANDUM IN OPP TO PLAINS' SECOND
MOTION FOR PARTIAL SUMMARY JUDGMENT
2:16-CV-03157-PSG-JEM

contractual agreement did not permit Plains to contaminate Lot X with oil in the first instance. In fact, and fatal to Plains' argument, the Agreement explicitly reserves Grey Fox's tort claims. SGD No. 75 ("Nothing in this Agreement shall limit any right or claim, legal or otherwise, the Owner may have against Plains, and the Owner expressly reserves all of its rights and claims it has or will have against Plains."). Thus, by its own terms the Temporary Access Agreement has no effect on Grey Fox's tort claims.

Plains wrongly asserts that its "occupation of the property cannot be tortious, given the existence of a contract permitting Plains to occupy the property in exchange for agreed compensation." Mot. at 8. But Plains' motion is no more than a play on words, seeking to merge two different manners in which it "occupied" Plaintiff's property into one. Plains uses the word "occupation" to mean the presence of its personnel and equipment on the property (permitted by the contract) interchangeably with its tortious occupation through the spill and unauthorized presence of hazardous oil on the property (not covered by the contract).

Plains argues that it cannot be held liable for its negligence, trespass, or ultrahazardous activity of spilling oil onto Plaintiff's property because it paid Grey Fox for its access to and use of the property to clean up the oil it negligently spilled in the first place. But paying for access to address tortious harm previously committed is not the same as being liable and paying for the losses associated with that harm.

Here, then, contrary to Plains' assertions, the parties' Temporary Access Agreement does not prevent Grey Fox from recovering in tort for the damages Plains caused. Previous to the spill, the relationship between Grey Fox and Plains was not one of a contractual nature. As this Court previously held, Plains owed a tort duty to Grey Fox (a duty it does not presently contest) "arising out of . . .

---

ownership interest, *or any other rights to the Property*." SGD No. 74 (emphasis added).

property law" and other laws. MTD Order at 11 (citing cases), Dkt. 80. Plains' duty to Grey Fox was independent from the Temporary Access Agreement. Certainly, no Temporary Access Agreement to remediate Plaintiff's property would have ever existed had Plains not spilled more than 140,000 gallons of crude oil onto Lot X. And of course, this Agreement was only signed after the spill occurred. *See* SGD No. 76.

The Temporary Access Agreement did not somehow retroactively undue the trespass or Grey Fox's injury from Plains' negligence, and signing the Agreement did not transform the oil Plains was transporting into a non-ultrahazardous activity. Thus, contrary to Plains' representations, the "existence of a contract" allowing Plains to remediate the property does not nullify Plaintiff's tort claims because the tort did not arise out of the parties' contract. *See, e.g.*, *Music Grp. Macao Com. Offshore Ltd. v. Foote*, No. 14-03078, 2015 WL 3882448, at *17 (N.D. Cal. June 23, 2015) (denying summary judgment on plaintiff's negligence claim despite the existence of a contract where plaintiff owed an independent tort duty).

In support of its argument, Plains selectively cites and quotes from cases where a plaintiff's tort claims arose from an *existing* contract. *See* Mot. at 11 (citing *Walker v. Signal Co., Inc.*, 84 Cal. App. 3d 982, 993–94 (1978) (declining to extend tort remedies to an employment contract because the employment relationship is fundamentally contractual); *Hine v. Dittrich*, 228 Cal. App. 3d 59, 63 (same); *Sheen v. Wells Fargo Bank, N.A.*, 12 Cal. 5th 905, 915 (2022) ("Plaintiff's [tort] claim arises from the mortgage contract he had with Wells Fargo . . . ."); *Sands v. Walnut Gardens Condo. Ass'n. Inc.*, 35 Cal. App. 5th 174, 176 (2019) (homeowners association breached its contractual responsibility to maintain condominium's common areas in "a first class condition")). These cases are inapposite. The relationship between Grey Fox and Plains arose in tort from the rupture and spill of Line 901 onto Lot X, not from the Temporary Access Agreement.

Additionally, unlike in the cases Plains cites, no policy rationale exists for barring Grey Fox's tort claims to "protect[] the bargain the parties have made," because no bargain had been made. Mot. at 11 (quoting *Sheen*, 12 Cal. 5th at 923). First, the bargain Plains purports to protect (the Temporary Access Agreement) did not even exist at the time that Plains spilled oil onto Lot X. Second, when the parties executed the Temporary Access Agreement post-spill, there were no allocations of financial risk made to compensate Grey Fox for its loss of use. SGD No. 77. Third, all tort claims were expressly reserved in the Agreement. SGD No. 78. Fourth, shielding an oil company from tort liability for criminally spilling oil onto private property would impede the public's interest and undermine the goal of promoting socially useful business practices. Thus, while the inquiry at hand does not require the Court to weigh policy rationales, policy rationales strongly cut in Plaintiff's favor.

In sum, a reasonable jury could find Plains liable for negligence, trespass, and ultrahazardous activity on the property irrespective of the existence of the Temporary Access Agreement.

### 2. Plains' conjecture that damages are not in dispute does not pass muster.

Not only does Plains erroneously attempt to use the Temporary Access Agreement to absolve itself of tort liability, Plains also asserts that this contractual fee fully compensated Grey Fox for its "loss of use of Lot X." *See* Mot. at 10, 11 ("Plains was remitting daily payments under a contract that was intended to compensate Grey Fox for that loss of use."). Plains merely asserts that it paid a fee each day from May 19, 2015 until September 2, 2015, which it argues somehow demonstrates that the negotiated fee was for Grey Fox's entire loss of use of the property arising from the spill and Plains' myriad tortious failures. However, the so-called "Use Fee" that Plains paid pursuant to the Temporary Access Agreement clearly states that it was "for [Plains'] use of the Property to complete the

[remediation] Work." SGD No. 79. Grey Fox's attorney, Chris Jacobs, who negotiated the Temporary Access Agreement (SGD No. 80), confirmed that the payment was intended to be "*a daily use fee*," (SGD No. 81), to compensate for the fact that many trucks and other equipment were needed on the property to conduct remediation efforts. There is no indication that Plains' payment was intended to serve as full compensation for literally all of the tort liability and damage Plains' oil spill caused to the property, which were expressly carved out of the contract.[3]

In fact, under the Temporary Access Agreement, Plains only agreed to clean up Lot X to a "specified standard," but its continued payments were not contingent on its full remediation and restoration of the property. *See* SGD No. 83. Rather, Plains ended its access to and remediation of the property (and thus its payments) before the property was fully remediated and restored. SGD No. 84. As such, the impacts of Plains' oil spill continued on Lot X beyond the terms of the contract, as did Grey Fox's loss of use of its property.[4] As the Court recognized in its previous summary judgment order, it was not until *January 2021*, that "the Central Coast Regional Water Quality Control Board signed off on the remediation [of the spill site] and closed the case." Dkt. 285 at 9; *see also* SGD No. 85. At a minimum, it is a jury question as to whether the contract's Use Fee was intended to or could have compensated Grey Fox for the entire loss of use of the property as Plains now purports it did. *Miles*, 236 Cal. App. 4th at 409 ("It would be strange, however, to apply a *contract* measure of damages to a *tort*.").

Plains erroneously asserts that an "award of loss of use damages on Grey Fox's tort claims would . . . constitute an impermissible double recovery." Mot. at 10 (citing *Simulados Software, Ltd. v. Photon Infotech Priv., Ltd.*, No. 12-04382,

---

[3] Moreover, "the Parties are not in agreement as to the monetary value for the use of the Property by Plains as contemplates in this Agreement." SGD 82.

[4] The presence of oil alone warrant damages for Plaintiff's loss of use. Dkt. 285 at 10 (holding that "actual use of the property is not the standard to determine whether damages are not recoverable").

2020 WL 109391, at *2 (N.D. Cal. Jan. 9, 2020), aff'd, 861 F. App'x 149, 154 (9th Cir. 2021)). Plains reliance on *Simulados Software* is misplaced. There, plaintiff could only recover in either tort or contract because plaintiff's fraudulent misrepresentation and breach of contract claims arose from the same contract. 2020 WL 109391 at *1. In contrast, here, Grey Fox's claim for Plain's breach of the Temporary Access Agreement has little to do with Grey Fox's tort claims, which involve a separate injury. As explained above, the evidence at trial will show that the Use Fee negotiated under the Agreement was compensation for Plains' use of the property, not compensation for Grey Fox's loss of use of its property caused by the oil spill.

Plains wrongly claims that Dr. Bell has not clearly articulated a measure of damages from Plaintiff's loss of use.  But Dr. Bell performed a "use effect" analysis, which required calculating the reasonable rental value of Lot X. SGD No. 86 ("Market Rent x Period of Time = Use Effect"; "[T]he damages would be equivalent to the cost of renting a comparable substitute property."). Lot X was constructed "on spec," meaning it was developed to sell in turnkey condition to a "speculative" future buyer and "constructed on the premise of a short holding period." SGD No. 87. Because speculative homes are typically "not leased," there is a "lack of local rental data for high-end estate homes" such as Lot X. SGD No. 88. Accordingly, Dr. Bell used the ground lease rate[5] as a proxy for the reasonable rental value of a substitute property. SGD No. 89.

Dr. Bell explains his loss of use calculations for Lot X on page 30 of his expert report, where he calculated Grey Fox's loss of use on an annual basis. *See* Fig. 13: Use Effect – Lot X. To determine the daily rental value of Lot X, each year that it was occupied, would simply require dividing each year's loss of use

---

[5] "Ground leases are a real estate-based investment that include both a rental rate return and appreciation," however Dr. Bell did not include an estimated rate of appreciation in his calculation, as shown by his selection of 8% as the ground lease on Lot X. SGD No. 90.

MEMORANDUM IN OPP TO PLAINS' SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT
2:16-CV-03157-PSG-JEM

1  calculation by 365. Plains does not dispute that calculating the reasonable rental

2  value is an accurate measure of loss of use damages. Nor did Plains move to

3  exclude Dr. Bell's report. At trial, Plaintiff will put forth evidence of Plaintiff's loss

4  of use of Lot X due to Plains' tortious conduct.

5      For these reasons, a reasonable jury could find that Plains has not

6  compensated Grey Fox for its loss of use caused by the oil spill on the property.

7  **II.  Summary Judgment Must Be Denied as to Plains' Liability for Punitive Damages.**

8      Plains' failure to adequately maintain its Pipeline and comply with applicable

9  safety regulations, its concealment of the spill, and its denial of responsibility for

10  the spill constitute oppressive and malicious conduct suitable for punitive damages.

11  As Plains concedes, conduct warranting liability for punitive damages includes

12  conduct that has "the character of outrage frequently associated with crime." Mot.

13  at 13 (quoting *Butte Fire Cases*, 24 Cal. App. 5th 1150, 1159 (2018)). Not only

14  does Plains' misconduct have the character of outrage frequently associated with

15  crime, but, unlike corporate defendants in almost all civil cases where punitive

16  damages are sought, Plains has already been convicted of a felony crime for its

17  misconduct. SGD No. 91.

18      In finding Plains guilty, the jury considered Plains' maintenance and

19  operation failures. The jury found beyond a reasonable doubt that Plains was guilty

20  of "knowingly discharging oil, or [that Plains] reasonably should have known that

21  its actions would cause the discharge of oil, into the waters of the state." SGD No.

22  92 (Count 1 Verdict Form). The jury was specifically instructed that in order to find

23  Plains guilty of this crime (Count 1), it must conclude "beyond a reasonable doubt

24  that Plains knew or should have known that its maintenance, integrity management

25  and operations policies and practices would cause a discharge of crude oil into the

26  Pacific Ocean." SGD No. 93. Plains did not appeal its criminal conviction.

27

28

MEMORANDUM IN OPP TO PLAINS' SECOND
MOTION FOR PARTIAL SUMMARY JUDGMENT
2:16-CV-03157-PSG-JEM

1   During Plains' sentencing hearing, Superior Court Judge James E. Herman,

2   who oversaw the criminal trial, observed that Plains knew its maintenance integrity

3   management operations, policies, and practices would cause Line 901 to rupture.

4   SGD No. 94. Judge Herman described Plains' misconduct in stark terms: "Stating

5   the case in its simplest terms, Plains knew its two-decade old buried insulated

6   Pipeline was vulnerable to external corrosion. It knew that the ILI measuring tool

7   was inaccurate with a high percentage of overcalls and under-calls in measuring the

8   depth of anomaly erosions of the pipe wall. As the People argued, given the root

9   causes of the rupture, which Plains failed to mitigate, a Pipeline failure resulting in

10  release of oil [was] foreseeable based on what Plains knew or should have known."

11  SGD No. 95. In short, this spill was no accident, but, due to Plains' long

12  malfeasance, the Pipeline was a ticking time bomb waiting to explode. As the

13  criminal trial judge summarized, "there were red flags all over." *See* Background §

14  I, *supra*.

15  Indeed, Judge Herman agreed with prosecutors that Plains' conduct was

16  "callous" and expressed frustration that he could not sentence Plains to a larger

17  penalty in order to deter it from committing future crimes. In other words, the judge

18  overseeing a months-long trial and presented with a mountain of evidence thought

19  that Plains misconduct warranted substantial punishment.

20  There is voluminous evidence indicating that before the rupture Plains had

21  actual knowledge that the Pipeline was on the brink of failure. *See* Background § I,

22  *supra*. In summary, Plaintiff's expert, Dr. Kim Cameron, who specializes in

23  metallurgy and failure analysis on Pipeline systems, confirmed that Plains was

24  well-aware of corrosion in Line 901 yet failed to impose required maintenance or

25  an alarm management plan. SGD No. 96. Plains had multiple warnings and chances

26  to correct its maintenance failures that led to the Pipeline corrosion and ultimate

27  rupture, yet chose not to "until after the release of crude oil." SGD No. 97;

28  Background § I, *supra*. As Dr. Cameron concluded, given Plains' long list of

1  maintenance failures, "it was unsurprising that a failure of Line 901 occurred."

2  SGD No. 98.

3  In advancing its argument that there is no triable issue as to whether Plains'

4  misconduct warrants punitive damages, Plains wholly ignores the compelling

5  evidence that it engaged in precisely the kind of "despicable conduct" that

6  subjected Grey Fox "to cruel and unjust hardship in conscious disregard of [its]

7  rights," Cal. Civ. Code § 3294(c)(2), or which Plains carried on "with a willful and

8  conscious disregard of the rights or safety of others," Cal. Civ. Code § 3294(c)(1).

9  *See* Mot. at 13 (referring to its failures to maintain and operation its Pipeline as "a

10  series of alleged deficiencies"). Plains seeks to ignore its criminal conviction as

11  "irrelevant" because the jury could have found it guilty based on a lesser "should

12  have known" mental state rather than finding that Plains had actual knowledge. *See*

13  Mot. at 13–14 n.5. However, the pertinent inquiry is not why the jury found Plains

14  guilty of knowingly spilling oil, but what a reasonable jury could find here. The

15  extent to which Judge Herman was outraged by Plains' misconduct is certainly

16  relevant to that inquiry, as is the fine he imposed in the millions of dollars, and the

17  fact that he lamented that he could not impose a much higher fine to punish Plains

18  for its misconduct and to deter improper conduct in the future.

19  Instead, Plains urges this Court to consider the decision of a civil judge

20  overseeing the *Venoco* case. Mot. at 17–18. Plains assumes that the record in that

21  case, which is outside the record here, was "an identical factual record" to this one.

22  *Id.* at 17. However, unlike in *Venoco*, this is not a case where the plaintiff willingly

23  entered into a symbiotic business relationship with Plains, a contractual relationship

24  that lasted many years. Rather, while Grey Fox acquired Lot X knowing the

25  Pipeline traversed through it, Grey Fox did not reap any benefits from the presence

26  of the Pipeline on its property or have any leverage over Plains to ensure it

27  maintained the Pipeline. Simply, Grey Fox was forced to trust that Plains would

28  appropriately maintain and operate Line 901. *See Behr v. Redmond*, 193 Cal. App.

4th 517, 527 (2011) (The nature of the relationship between the parties is relevant to punitive damages.). Here, Grey Fox was an innocent victim, whereas Venoco had a longstanding business relationship with Plains that allowed Venoco to reap substantial profits for many years from its oil platform.

Plains argues that punitive damages are unwarranted, repeating the refrain that "there [was] no evidence that Plains was on notice of *a specific risk at the failure location* and then consciously disregarded the risk." Mot. at 16 (emphasis added); Mot. at 17 ("[H]ad the 2012 ILI accurately reported the anomaly's depth, Plains would have repaired it."). Plains is wrong, but in any event, this certainly is a disputed question of fact. SGD No. 99. However, even if Plains were not on notice, it was only due to its own deficient maintenance of Line 901, including useless ILI runs from 2007, 2009, and on until the rupture in 2015. SGD No. 100. The evidence will demonstrate that Plains understood that its failed maintenance created an environment where a rupture along the Pipeline was inevitable. Plains also was aware of the probable harm to landowners along the Pipeline should such a rupture occur. Plains' criminal disregard of the landowner's rights is sufficient for a jury to award punitive damages against Plains. *See Taylor v. Super. Ct.*, 24 Cal. 3d 890, 897 (1979) (holding that operating a motor vehicle while intoxicated may "exhibit a conscious disregard of the safety of others").

Plains wastes pages comparing its misconduct here to the PG&E's power line fires in *Butte Fire Cases*, 24 Cal. App. 5th 1150. Yet, unlike in *Butte Fire Cases*, Plains' misconduct has already been found to have been "in blatant violation of law or policy." *Am. Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton*, 96 Cal. App. 4th 1017, 1051 (2002). Plains' criminal convictions demonstrate this. Additionally, in *Butte Fire Cases*, the key issue involved an external factor, the power line's susceptibility to nearby trees that could fall onto the power line and ignite a fire. *Butte Fire Cases*, 24 Cal. App. 5th at 1155. In contrast, Plains' failure was the integrity of its own Pipeline due to years and years of neglect and

mismanagement. There was no external event that harmed the underground Pipeline. Finally, *Butte Fire Cases* does not hold that the existence of a risk-management plan is sufficient to dodge punitive damages. Here, the evidence shows that Plains' integrity mismanagement, control room procedure failures, and alarm management plans defied federal regulations and industry standards. SGD Nos. 46, 57, 94. PHMSA provided multiple warnings that Plains' inspection and repair plans were in violation of its regulations, but Plains did not bring them into compliance. SGD No. 97. Moreover, Plains did not even follow its own safety plans. SGD Nos. 98, 101. *Cf. Carter v. Nat'l R.R. Passenger Corp.*, No. 18-9652, 2020 WL 2475085, at *9 (C.D. Cal. Jan. 24, 2020) (J. Gutierrez) (denying summary judgment on punitive damages because "[a]lthough Defendant argues that it implemented a non-discrimination and non-harassment policy in good faith, the Court holds that Defendant has not proven this as a matter of law, given how it reacted to Plaintiff's complaints about Porter.").

At this stage, the only issue is whether there is a triable issue of fact as to whether Plains could be liable for punitive damages. The extensive evidentiary record demonstrates that there is.

## CONCLUSION

Plains has failed to carry its burden to show an absence of evidence to support the challenged elements of Plaintiff's case. The Court should deny Plains' second motion for partial summary judgment.

Dated: April 26, 2024                    Respectfully submitted,

                                         LIEFF CABRASER HEIMANN &
                                         BERNSTEIN, LLP

                                         By:  */s/ Robert J. Nelson*

                                         Robert J. Nelson (CSB No. 132797)
                                         Nimish Desai (CSB No. 244953)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Wilson M. Dunlavey (CSB No. 307719)
Amelia A. Haselkorn (CSB No. 339633)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339

Juli Farris (CSB No. 141716)
Matthew J. Preusch (CSB No. 298144)
KELLER ROHRBACK L.L.P.
801 Garden Street, Suite 301
Santa Barbara, CA 93101

Lynn Lincoln Sarko, (Pro Hac Vice)
KELLER ROHRBACK L.L.P.
1201 Third Ave, Suite 3200
Seattle, WA 98101

A. Barry Cappello (CSB No. 037835)
Leila J. Noël (CSB No. 114307)
Lawrence J. Conlan (CSB No. 221350)
CAPPELLO & NOËL LLP
831 State Street
Santa Barbara, CA 93101-3227

***Attorneys for Plaintiff***

1

## CERTIFICATE OF COMPLIANCE

2

3       The undersigned, counsel of record for Plaintiffs and the Class, certifies that

4   this brief contains 6,808 words, which complies with the word limit of L.R. 11-6.1.

5

6

7                           */s/ Robert J. Nelson*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2983651.7