1  Robert J. Nelson (CSB No. 132797)
2  Nimish Desai (CSB No. 244953)
   Wilson M. Dunlavey (CSB No. 307719)
3  Amelia A. Haselkorn (CSB No. 339633)
   **LIEFF CABRASER HEIMANN &**
4  **BERNSTEIN, LLP**
   275 Battery Street, 29th Floor
5  San Francisco, CA 94111-3339
   Telephone: (415) 956.1000
6
7  A. Barry Cappello (CSB No. 037835)
   Leila J. Noël (CSB No. 114307)
8  Lawrence J. Conlan (CSB No. 221350)
   **CAPPELLO & NOËL LLP**
9  831 State Street
   Santa Barbara, CA 93101-3227
10 Telephone: (805)564-2444
11
   Lynn Lincoln Sarko (*Pro Hac Vice*)        Juli E. Farris (CSB No. 141716)
12 **KELLER ROHRBACK L.L.P**.               Matthew J. Preusch (CSB No. 298144)
   1201 Third Ave., Suite 3200              **KELLER ROHRBACK L.L.P.**
13 Seattle, WA 98101                        801 Garden Street, Suite 301
   Telephone: (206) 623-1900               Santa Barbara, CA 93101
14                                          Telephone: (805) 456-1496
15 *Attorneys for Plaintiff*
16
                    **UNITED STATES DISTRICT COURT**
17
                    **CENTRAL DISTRICT OF CALIFORNIA**
18
19
20 GREY FOX, LLC, et al.,                   Case No.  2:16-cv-03157-PSG-JEM
21                        Plaintiffs,        **STATEMENT OF GENUINE**
                                            **DISPUTES IN SUPPORT OF**
   v.                                       **PLAINTIFF'S OPPOSITION TO**
22                                          **PLAINS' SECOND MOTION FOR**
   PLAINS ALL AMERICAN                      **PARTIAL SUMMARY**
23 PIPELINE, L.P. et al.,                   **JUDGMENT**
24
                                            Hearing Date:   May 17, 2024
25                       Defendants.         Time:           1:30 p.m.
                                            Judge:          Hon. Philip S. Gutierrez
26                                          Courtroom:      6A
27
28

2983654.2

| | Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|---|
| 1. | Plains Pipeline, L.P. ("Plains") owned and operated a pipeline known as Line 901.<br><br>*Evidence*: Plaintiffs' Second Amended Complaint, Dkt. 108-1 ("SAC") ¶¶ 2, 6. | Disputed.  Incomplete.  Vague as to "operated."<br><br>While Plains owned and operated Line 901 prior to the May 19, 2015 oil spill, the pipeline has not been operated since then.<br><br><br>Plaintiffs' Second Amended Complaint, Dkt. 108-1 ("SAC") ¶¶ 1, 10, 12, 14, 17, 18, 22, 27, 93-105, 163-164, 289, 292. |
| 2. | On May 19, 2015, Line 901 spilled crude oil.<br><br>*Evidence*: SAC ¶ 11. | Undisputed. |
| 3. | The Line 901 spill occurred on Lot X, a property owned by Grey Fox, LLC ("Grey Fox").<br><br>*Evidence*: SAC ¶ 11. | Undisputed. |
| 4. | Immediately following the spill, Grey Fox and Plains negotiated and entered into a Temporary Property Access and Remediation Agreement (the "Remediation Agreement").<br><br>*Evidence*: SAC Ex. 9 (Remediation Agreement). | Disputed.  Vague as to "immediately."  The evidence Plains cites does not contain the date that the Temporary Property Access and Remediation Agreement was executed. |
| 5. | Under the Remediation Agreement, Grey Fox granted Plains the "right to enter upon" portions of Lot X to "conduct sampling and remediation, | Undisputed. |

| | | |
|---|---|---|
| | including related field activities to collect soil, water, building material or other samples, to perform excavation, backfill, removal, and restoration before and after demobilization, to stage and operate equipment, as necessary to achieve compliance with the terms of this Agreement and to fully remediate damage to the Property resulting from the Event (collectively, the **"Work"**)."<br><br>*Evidence*: SAC Ex. 9 ¶ 1. | |
| 6. | Under the Remediation Agreement, Grey Fox granted Plains the right to access Lot X "after completion of the Work and demobilization to conduct limited post work activities, as necessary ("Post Work Activities")" and provided that "the rights and obligations applicable to the Work under this Agreement shall be applicable to Post Work Activities."<br><br>*Evidence*: SAC Ex. 9 ¶ 1. | Undisputed. |
| 7. | The Remediation Agreement designated Mark Lloyd as Grey Fox's representative to "monitor the Work" and required Plains to provide daily reports to Lloyd on the progress.<br><br>*Evidence*: SAC Ex. 9 ¶ 14. | Disputed.  The Agreement directs Plains to provide Mark Lloyd "a copy of the daily report provided to the Unified Command," as well as any relevant responses from Unified Command, "to allow Owner to properly monitor the Work."  SAC Ex. 9 ¶ 14.  The Owner, Grey Fox, consulted with other experts to |

2983654.2

2

STATEMENT OF GENUINE DISPUTES ISO PLS' OPP TO PLAINS' MOTION FOR PARTIAL SUMMARY JUDGMENT - CASE NO. 2:16-CV-03157-PSG-JEM

| | | | |
|---|---|---|---|
| | | | monitor the work.  Declaration of Robert J. Nelson ("Nelson Decl.") Ex. 13 (Mark Lloyd Dep.) at 131:9–24. |
| 8. | | Plains agreed to pay Grey Fox $5,500 "per day for use of the Property to complete the Work commencing from the Effective Date until completion of the Work, demobilization (removal of equipment from the Property) and physical vacation of the Property by Plains."<br><br>*Evidence*: SAC Ex. 9 ¶ 10. | Undisputed. |
| 9. | | Plains agreed to pay Grey Fox $5,500 per day "for each day that Post Work Activities are conducted on the Property."<br><br>*Evidence*: SAC Ex. 9 ¶ 10. | Undisputed. |
| 10. | | Under the Remediation Agreement Plains and Grey Fox "reserv[ed] all of their rights on the question of the reasonable value of the use of the Property by Plains to complete the Work for the period of time that the Work and Post Work Activities" occurred.<br><br>*Evidence*: SAC Ex. 9 ¶ 10. | Undisputed. |
| 11. | | The Remediation Agreement was effective as of the date of the spill and continued "in effect until completion of the Work … and including obtaining final approvals from | Undisputed. |

3

| | | |
|---|---|---|
| | all applicable governmental agencies." *Evidence*: SAC Ex. 9 ¶ 3. | |
| 12. | The Remediation Agreement constituted "the entire agreement of the Parties and as such is intended as a complete and exclusive statement of the promises, representations, negotiations, discussions, and other agreements that may have been made in connection with the subject matter hereof." *Evidence*: SAC Ex. 9 ¶ 23. | Undisputed. |
| 13. | Plains began removing the oil on Lot X on the day of the spill. *Evidence*: Declaration of Maggie Thompson ("Thompson Decl.") Ex. 26 (Declaration of Dean Gore in Support of Motion for Summary Judgment), Dkt. 251-16, Ex. 1 at CGR000000023. | Undisputed but incomplete.  Plains began recovery of free "pooled oil" on May 19, 2015, which continued until May 21, 2015.  Remedial "excavation of oil impacted soil" did not begin until May 21, 2015. *Evidence*: Thompson Decl. Ex. 26 (Declaration of Dean Gore in Support of Motion for Summary Judgment), Dkt. 251-16, Ex. 1 at CGR00000109. |
| 14. | Plains completed soil excavations to remove all oil from the spill on Lot X by June 24, 2015. *Evidence*: Thompson Decl. Ex. 26 (Gore Decl.), Ex. 1 at CGR00000109. | Disputed.  There is no evidence that "all oil" from the spill on Lot X was removed by June 24, 2015.  The evidence shows that hydrocarbons likely remained on the property.  For example, the government continued monitoring, inspecting, and testing stormwater runoff from Lot X to ensure that hydrocarbons were not entering sensitive habitats.  Nelson Decl. Ex. 13 (Ex. 112 to Mark Lloyd |

2983654.2

4

STATEMENT OF GENUINE DISPUTES ISO PLS' OPP TO PLAINS' MOTION FOR PARTIAL SUMMARY JUDGMENT - CASE NO. 2:16-CV-03157-PSG-JEM

| | | | |
|---|---|---|---|
| 1 | | | Dep.). Nelson Decl. Ex. 6 (Kristin Robrock Dep.) at 141:21–142:3. |
| 2 | | | |
| 3 | 15. | Plains completed backfill of the excavated area on Lot X by August 29, 2015. | Undisputed. |
| 4 | | | |
| 5 | | | |
| 6 | | *Evidence*: Thompson Decl. Ex. 26 (Gore Decl.), Ex. 1 at CGR00000109. | |
| 7 | | | |
| 8 | | | |
| 9 | 16. | Plains demobilized cleanup equipment and vacated Lot X on September 2, 2015. | Disputed.  Plains continued to conduct "Post Work Activities" at the spill site.  Nelson Decl. Ex. 13 (Mark Lloyd Dep.) at 120:18–122:18 Nelson Decl. Ex. 7 (Chris Jacobs Dep.) at 68:15–70:13. |
| 10 | | | |
| 11 | | | |
| 12 | | *Evidence*: Thompson Decl. Ex. 1 (Deposition of Mark Lloyd) at 119–123; *id.* Ex. 2 (Lloyd Dep. Ex. 110). | |
| 13 | | | |
| 14 | | | |
| 15 | 17. | Mark Lloyd testified that when Plains vacated Lot X in September 2015, Plains had "achieved th[e] goal" of performing the cleanup "to the requirements that [Grey Fox] had." | Disputed.  The ongoing impacts of Plains' oil spill continued beyond September 2015, and it was not until the Central Coast Regional Water Quality Control Board signed off on the remediation and closed the case in approximately on January 2021. Nelson Decl. Ex. 13 (Mark Lloyd Dep.) at 129:21-131:24; Nelson Decl. Ex. 4 (Case Closure Summary); Nelson Decl. Ex. 7 (Chris Jacobs Dep.) at 63:8–64:18. |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | *Evidence*: Thompson Decl. Ex. 1 (Lloyd Dep.) at 122:24–123:11. | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | 18. | Pursuant to the terms of the Remediation Agreement, Plains paid Grey Fox $5,500 per day each day from the date of the spill until Plains demobilized cleanup equipment and vacated Lot X on September 2, 2015. | Undisputed. |
| 25 | | | |
| 26 | | | |
| 27 | | | |
| 28 | | | |

2983654.2

5

STATEMENT OF GENUINE DISPUTES ISO PLS' OPP TO PLAINS' MOTION FOR PARTIAL SUMMARY JUDGMENT - CASE NO. 2:16-CV-03157-PSG-JEM

| | | | |
|---|---|---|---|
| | | *Evidence*: SAC Ex. 9 at 3; Thompson Decl. Ex. 3 (Deposition of Christopher Jacobs) at 55:4-57:5, 66:19-25. | |
| | 19. | Plains conducted an additional round of seeding on Lot X at Grey Fox's request in late September 2015.<br><br>*Evidence*: Thompson Decl. Ex. 1 at 126:15–129:20; Gore Decl. Ex. 1 at CGR00000112–13. | Undisputed. |
| | 20. | Plains performed watering of the reseeding areas on Lot X until April 2016, at which point the site had been successfully reseeded.<br><br>*Evidence*: Thompson Decl. Ex. 1 at 126:15-129:16; *id.* Ex. 23. | Undisputed. |
| | 21. | Pursuant to the terms of the Remediation Agreement, Plains paid Grey Fox $5,500 for each day that it entered upon Lot X to conduct the Post-Work Activities.<br><br>*Evidence*: Thompson Decl. Ex. 3 (Jacobs Dep.) at 72:19-73:7; *id.* Ex. 27. | Disputed as to "Post-Work Activities" and mischaracterizes the testimony.  The parties dispute when "Work" under the Temporary Access Agreement ended and Post-Work Activities began.  Nelson Decl. Ex. 7 (Chris Jacobs Dep.) at 68:19–69:24. |
| | 22. | At the time of the spill, Grey Fox was constructing a home on Lot X, and construction work on that project resumed within 3–4 days after the spill. | Undisputed. |

| | | | |
|---|---|---|---|
| | | *Evidence*: Thompson Decl. Ex. 4 (Deposition of John Vallance) at 118:19-24. | |
| 23. | | Construction work on the home on Lot X was completed in December 2015.<br><br>*Evidence*: Thompson Decl. Ex. 5 (Vallance Dep. Ex. 58.) | Undisputed. |
| 24. | | Plaintiffs' damages expert Randall Bell prepared an expert report calculating Plaintiffs' damages as a result of the 2015 spill.<br><br>*Evidence*: Thompson Decl. Ex. 6 (Expert Report of Randall Bell). | Undisputed. |
| 25. | | Before the spill occurred, Plains maintained a pipeline integrity management program intended to mitigate the risk of external corrosion on its pipelines.<br><br>*Evidence*: Thompson Decl. Ex. 7 (Deposition of Katherine Buckingham) at 219:20-221:12, 225:19-21; id. Ex. 8 (Deposition of Michael Stackhouse) at 224:18-226:7. | Disputed. Plains' integrity management program was not intended to mitigate the risk of external corrosion on its pipelines. Nelson Decl. Ex. 12 (Kim Cameron 07/22/2022 *Grey Fox* Rep.) at 3–6. Plains did not "maintain" a pipeline integrity management program as it "did not properly document or implement an inline inspection into their IMP." Dkt. 269-8, Kaplan Decl. Ex. 26, Appendix C (Kim Cameron 03/29/2029 *Andrews* Rep.) at 17. |
| 26. | | Plains had 50–80 integrity management employees in the years prior to the spill.<br><br>*Evidence*: Thompson Decl. Ex. 14 (Exhibit 1342 to the Deposition of Harry Pefanis) at PLAINS-CL00429051. | Disputed. Vague as to "Plains." The entire Plains company had 50-80 employees on its integrity management staff for pipelines that carried 4 million barrels (168 million US liquid gallons) of crude oil a day. Thompson Decl. Ex. 14 (Exhibit |

| | | | |
|---|---|---|---|
| | | | 1342 to the Deposition of Harry Pefanis) at PLAINS-CL00429048. |
| 27. | | Plains inspected 3,000 to 5,000 miles of pipeline annually in the years before the spill.<br><br>*Evidence*: Thompson Decl. Ex. 15 (Exhibit 1357 to the Deposition of Harry Pefanis) at PLAINS-CL00889188. | Disputed.  Vague as to "inspected." Plaintiff disputes that Plains' inspections were sufficient to identify anomalies at risk.  Nelson Ex. 12 (Kim Cameron 07/22/2022 *Grey Fox* Rep.) at 5.  Additionally, the slide cited by Plains is illegible. |
| 28. | | Plains spent $39–$107 million each year prior to the spill on the inspection, testing, and correction of identified anomalies.<br><br>*Evidence*: Thompson Decl. Ex. 16 (Plains Form 10-K) at 35. | Disputed.  Document does not stand for proposition asserted.  The document Plains cites demonstrate its costs rapidly decreasing each year, from $107 million in 2014, to $57 million in 2013, to $39 million in 2012, to an estimated $27 million in 2015. Thompson Decl. Ex. 16 (Plains Form 10-K) at 35. |
| 29. | | Plains spent $150–$300 million annually prior to the spill on pipeline maintenance.<br><br>*Evidence*: Thompson Decl. Ex. 14 (Exhibit 1342 to the Deposition of Harry Pefanis) at PLAINS-CL00429049. | Disputed.  Document does not stand for proposition asserted.  The document, a marketing powerpoint drafted by Plains, indicated that Plains spent $60 million in 2005, $70 million in 2006, and approximately $100 million in 2007, 2008, 2009, and 2010, the years in which the documentation from Dr. Kim Cameron demonstrates the Pipeline was corroded. *See generally* Nelson Decl. Ex. 12 (Kim Cameron 07/22/2022 *Grey Fox* Rep.). Moreover, the document indicates that Plains never spent $300 million on maintenance in any year based on the graphs. |
| 30. | | Plains' integrity management program consisted of, among | Disputed.  Vague as to "regular" and as to "inspections."  The evidence |

8

| | | | |
|---|---|---|---|
| | | other measures, regular in-line inspections ("ILI") of its pipelines.<br><br>*Evidence*: Thompson Decl. Ex. 7 (Buckingham Dep.) at 221:14-223:11; id. Ex. 9 (Deposition of Christian Caramo) at 36:12-39:3; 47:10-49:3; 56:5-57:11. | indicates that Plains did not perform proper ILI because it did not validate the results of its so-called ILI. *See* Nelson Decl. Ex. 12 (Kim Cameron 07/22/2022 *Grey Fox* Rep.) at 4–6. |
| | 31. | An ILI contractor sent a magnetic tool through the pipeline to detect areas of metal loss caused by external corrosion, interpreted the data gathered by the tool, and provided measurements of the depth of external corrosion anomalies.<br><br>*Evidence*: Thompson Decl. Ex. 9 (Carcamo Dep.) at 20:4-26:1. | Disputed. Vague as to "to detect." |
| | 32. | A company called Rosen, hired by Plains, inspected Line 901 in 2007, 2012, and 2015 using an ILI tool.<br><br>*Evidence*: Thompson Decl. Ex. 9 (Carcamo Dep.) at 36:12-39:3; 47:10-49:3; 56:5-57:11; id. Ex. 8 (Stackhouse Dep.) at 208:22-25, 212:7-213:8. | Undisputed that Rosen performed some kind inspection in 2007, 2012, and 2015. |
| | 33. | Plains made repairs to the pipeline following the 2007 and 2012 inspections.<br><br>*Evidence*: Thompson Decl. Ex. 10 (Deposition of Joshua Bremner) at 159:17-162:18; id. Ex. 8 (Stackhouse Dep.) at | Disputed.  Joshua Bremner's cited testimony shows that a single area to be repaired was discovered on Line 901 following a government-mandated inspection, and that repair was for a "dent" not corrosion. |

9

| | | | |
|---|---|---|---|
| | | 214:10-215:2; id. Ex. 17 (2007 ILI DOT Compliance Report); id. Ex. 18 (2012 ILI DOT Compliance Report) | |
| 34. | | The 2015 inspection happened too close in time to the spill for repairs to have begun.<br><br>*Evidence*: Thompson Decl. Ex. 9 (Carcamo Dep.) at 56:5-57:11; id. Ex. 8 (Stackhouse Dep.) at 212:7-213:8. | Disputed.  Vague and misleading as to "too close in time."  The testimony does not stand for the proposition asserted.  Plains was not entitled to continue running the Line 901 despite it being at risk of rupture. |
| 35. | | The inspection tool that Rosen ran through Line 901 in 2012 measured the depth of metal loss at the eventual failure site of Line 901 at 45%.<br><br>*Evidence*: Thompson Decl. Ex. 9 (Carcamo Dep.) at 54:12-55:25; id. Ex. 7 (Buckingham Dep.) at 229:12-230:19; id. Ex. 8 (Stackhouse Dep.) at 224:10-13. | Disputed.  Had Plains worked with Rosen to "to obtain a valid ILI tool run, the depth of the anomaly that led to the rupture would have been repaired prior to the rupture."  Dkt. 269-8, Kaplan Decl. Ex. 26, Appendix C (Kim Cameron 03/29/2029 *Andrews* Rep.) at 21. "Once the raw data from the ILI tool is collected, the operator must make choices on how the vendor (Rosen) should process the data for reporting."  Dkt. 269-8, Kaplan Decl. Ex. 26, Appendix C (Kim Cameron 03/29/2029 *Andrews* Rep.) at 37. However, "Plains did not properly validate the ILI run and discuss the under-calling issues with Rosen." Dkt. 269-8, Kaplan Decl. Ex. 26, Appendix C (Kim Cameron 03/29/2029 *Andrews* Rep.) at 28. |
| 36. | | The inspection tool that Rosen ran through Line 901 on May 6, 2015, measured the depth of metal loss at the eventual failure site of Line 901 at 47%. | Disputed.  Testimony does not stand for the proposed asserted.  The Buckingham cite refers to a "feature" not the "failure site."  The Carcamo transcript also does not refer to the |

10

| | | | |
|---|---|---|---|
| | | *Evidence*: Thompson Decl. Ex. 7 (Buckingham Dep.) at 229:24-230:1; id. Ex. 9 (Carcamo Dep.) at 56:5-14. | "failure site." Further disputed that the tool run was valid. |
| | 37. | After the spill, the metal loss at the failure site of Line 901 was measured at 89% wall loss.<br><br>*Evidence*: Thompson Decl. Ex. 9 (Carcamo Dep.) at 54:2-6; id. Ex. 7 (Buckingham Dep.) at 237:9-15. | Disputed.  Vague as to "measured." The citation does not stand for the proposition asserted.  The Carcamo citation asks if the deponent "came to learn," not that it was measured. Furthermore, citation is unclear if "measured" means that it was a valid tool run, which is disputed.  *See generally* Dkt. 269-8, Kaplan Decl. Ex. 26, Appendix C (Kim Cameron 03/29/2029 *Andrews* Rep.) at 39 (ILI Validation). |
| | 38. | None of the inspections of Line 901 detected the failure anomaly at a depth that would have required Plains to dig or repair the failure anomaly.<br><br>*Evidence*: Thompson Decl. Ex. 7 (Buckingham Dep.) at 229:12-230:19, 249:12-251:21; id. Ex. 8 (Stackhouse Dep.) at 214:10-215:2; 224:10-17; id. Ex. 10 (Bremner Dep.) at 159:9-161:25; 177:14-179:15; id. Ex. 9 (Carcamo Dep.) at 111:22-112:13. | Disputed. *See* Dkt. 269-8, Kaplan Decl. Ex. 26, Appendix C (Kim Cameron 03/29/2029 *Andrews* Rep.) at 39 ("Once the ILI run is complete, the results must still be validated before they can be used in the risk assessment and long-term integrity plan.  Plains' use of the Rosen ILI run in their integrity management program without a proper validation substantially contributed to the rupture in 2015.").  Validation, which properly part of any inspection, would have demonstrated the failure anomaly. |
| | 39. | In 2013, the Pipeline and Hazardous Materials Safety Administration ("PHMSA")—the federal agency with oversight of crude oil pipelines—conducted an integrated audit of Plains' application of its integrity | Undisputed. |

11

| | | | |
|---|---|---|---|
| 1<br>2<br>3<br>4<br>5 | | management program to Plains' Line 901 and Line 903.<br><br>*Evidence*: Thompson Decl. Ex. 11 (Deposition of Ngiabi Gicuhi) at 22:3-23. | |
| 6<br>7<br>8<br>9<br>10<br>11<br>12<br>13 | 40. | During the 2013 audit, PHMSA reviewed Plains' Integrity Management Plan, the 2012 ILI results, the repairs Plains performed based on those results, and the data Plains collected from its repairs.<br><br>*Evidence:* Thompson Decl. Ex. 11 (Gicuhi Dep.) at 40:6-42:9; id. Ex. 21. | Undisputed that PHMSA reviewed the falsified documents and forms that Plains gave them. *See* Nelson Decl., Ex. 3 at 73-74. |
| 14<br>15<br>16<br>17<br>18<br>19<br>20<br>21 | 41. | In the Notice of Probable Violation PHMSA issued after the spill, they did not identify any deficiencies with respect to the inspections of Line 901 in 2007, 2012, or 2015.<br><br>*Evidence*: Thompson Decl. Ex. 19 (PHMSA Notice of Probable Violation); id. Ex. 20 (PHMSA Final Order). | Disputed.  Vague as to "deficiencies."  PHMSA faulted Plains for the spill. |
| 22<br>23<br>24<br>25<br>26<br>27 | 42. | After the spill, PHMSA ordered Plains to obtain a "root-cause analysis" of the spill from an independent third party.<br><br>*Evidence*: Thompson Decl. Ex. 7 (Buckingham Dep.) at 188:10-190:3. | Undisputed. |
| 28 | 43. | The independent investigator who conducted the root-cause | Disputed that the investigator was independent.  Vague as to |

12

| | | | |
|---|---|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>10 | | analysis of the spill testified that she did not see anything in her review of Plains' integrity management program or the events before the spill that suggested Plains intentionally ignored or consciously disregarded the risk of corrosion on Line 901.<br><br>*Evidence*: Thompson Decl. Ex. 12 (June 29, 2023 Deposition of Katherine Buckingham) at 284:23-285:16. | "intentionally ignored" or "consciously disregarded." |
| 11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23 | 44. | At Grey Fox's request, Plains' remediation of Lot X exceeded the governing regulatory standards set by the Regional Water Quality Control Board and Santa Barbara County Environmental Health Services.<br><br>*Evidence*: Thompson Decl. Ex. 26 (Gore Decl.) Ex. 1 at CGR00000024. | Disputed.  Reference to "governing regulatory standards" and "remediation" is ambiguous.  The evidence cited does not establish that hydrocarbons were removed from Lot X at the time Plain demobilized cleanup equipment and vacated the property, and it was believed that hydrocarbons were still present in the soil.  Nelson Decl. Ex. 4 (Central Coast Regional Water Quality Control Board Case Closure Summary); Nelson Decl. Ex. 13 (Mark Lloyd Dep.) at 41:20–44:2; Nelson Decl. Ex. 7 (Chris Jacobs Dep.) at 62:21–25. Nelson Decl., Ex. 6 (Kristin Robrock Dep.) at 141:3–142:3. |
| 24 | | **Plaintiffs' Additional Facts** | **Plaintiffs' Evidence** |
| 25<br>26<br>27<br>28 | 45. | The trial court overseeing Plains' criminal trial expressed outrage toward Plains' failure to maintain and operate Line 901 and its unwillingness to take responsibility for its spill. | Nelson Decl., Ex. 1 at ¶ 3, 3-4, 6-9, 14-17, app. B (PHMSA Failure Investigation Report). |

| | | |
|---|---|---|
| 46. | Government authorities through the Pipeline and Hazardous Materials Safety Administration (PHMSA) confirmed that the Pipeline was riddled with corrosion and cited numerous violations of industry norms. | Nelson Decl., Ex. 1 at 3, 12-17 (PHMSA Failure Investigation Report). |
| 47. | Plains improperly delayed its response to the Pipeline rupture, and sought to mislead the public about the size of the spill. | Nelson Decl., Ex. 1 at 7 (PHMSA Failure Investigation Report). |
| 48. | The Pipeline that ruptured and spilled is a buried insulated line, highly susceptible to corrosion underneath its insulation (CUI). | Dkt. 269-8 at 3 (Kim Cameron 07/22/2022 *Grey Fox* Rep.).<br><br>Nelson Decl., Ex. 1 at 14 (PHMSA Failure Investigation Report). |
| 49. | Plains, the owner and operator of the Pipeline, failed to identify and address CUI as a risk, contrary to industry practice and its own Integrity Management Program (IMP), which the law requires Plains follow. | Dkt. 269-8 at 3 (Kim Cameron 07/22/2022 *Grey Fox* Rep.).<br><br>Nelson Decl., Ex. 1 at 14-15 (PHMSA Failure Investigation Report). |
| 50. | Data collected in 2007 indicated a severe CUI risk on the Pipeline, but Plains failed to act on that risk. | Dkt. 269-8 at 3 (Kim Cameron 07/22/2022 *Grey Fox* Rep.).<br><br>Nelson Decl., Ex. 1 at 15 (PHMSA Failure Investigation Report). |
| 51. | The Pipeline continued to degrade until it ruptured in 2015, causing a catastrophic oil spill. | Dkt. 269-8 at 4 (Kim Cameron 07/22/2022 *Grey Fox* Rep.).<br><br>Nelson Decl., Ex. 1 at 15 (PHMSA Failure Investigation Report). |

14

| | | |
|---|---|---|
| 52. | Plains' IMP required it to inspect its Pipeline, ensure the data from its inspections were reliable, and analyze prevention and mitigation measures in sensitive ecological areas, relevant here. | Dkt. 269-8 at 4 (Kim Cameron 07/22/2022 *Grey Fox* Rep.). Nelson Decl., Ex. 1 at 15-17 (PHMSA Failure Investigation Report). |
| 53. | Plains' IMP failed to ensure the data from its inspections were reliable, and analyze prevention and mitigation measures in sensitive ecological areas | Dkt. 269-8 at 4 (Kim Cameron 07/22/2022 *Grey Fox* Rep.). |
| 54. | Plains IMP Board never convened and there are virtually no written materials from meetings that Plains tried to claim stood in for Board Meetings. | Dkt. 269-8 at 4 (Kim Cameron 07/22/2022 *Grey Fox* Rep.). |
| 55. | Plains' employees indicated a general lack of familiarity with or reliance on the IMP. | Dkt. 269-8 at 4 (Kim Cameron 07/22/2022 *Grey Fox* Rep.). Nelson Decl., Ex. 1 at 17 (PHMSA Failure Investigation Report). |
| 56. | Plains failed to ensure the data from its inspection tool was reliable, complete the required analysis to identify preventative and mitigation measures ("P&M"), and measure the effectiveness of the integrity of its Pipeline. | Dkt. 269-8 at 4 (Kim Cameron 07/22/2022 *Grey Fox* Rep.). |
| 57. | Plains violated industry standards and federal regulations and failed to institute an alarm management program that would detect spills. | Dkt. 269-8 at 7-8 (Kim Cameron 07/22/2022 *Grey Fox* Rep.). Nelson Decl., Ex. 1 at 16-17 (PHMSA Failure Investigation Report). |

15

| | | |
|---|---|---|
| 58. | Plaintiff's expert Dr. Kim Cameron concluded that, "[g]iven these failures of Plains to maintain the lines, it was unsurprising that a failure of Line 901 occurred, and that Lines 901 and 903 were ordered shutdown and out of operation pending express approval of PHMSA." | Dkt. 269-8 at 6 (Kim Cameron 07/22/2022 *Grey Fox* Rep.). |
| 59. | After a months-long criminal trial, a Santa Barbara jury found Plains guilty of the felony of knowingly causing an oil spill. In so doing, the criminal jury found that Plains failed to maintain its Pipeline well prior to 2015. | *See generally* Nelson Decl., Ex. 2 (Jury Instructions). |
| 60. | Judge Herman determined that the spill "was not a matter of if. It was a matter of when. There were red flags all over." | Nelson Decl., Ex. 3 at 165:10-12 (*People v. Plains* April 25, 2019 Hearing Transcript). |
| 61. | Plains' red flags included failing to consider corrosion under insulation, back-dating forms in response to a federal audit by PHMSA, having "no procedures for determining general corrosion," having no procedures for validating its own data, and failing to follow its integrity management plan. | Nelson Decl., Ex. 3 at 73-74 (*People v. Plains* April 25, 2019 Hearing Transcript). |
| 62. | Judge Herman agreed with the prosecutors that Plains was "callous" and was "doing everything possible to avoid | Nelson Decl., Ex. 3 at 71-72 (*People v. Plains* April 25, 2019 Hearing Transcript). |

| | | | |
|---|---|---|---|
| | | responsibility and pay for the damage that they've done." | |
| 63. | | Judge Herman penalized Plains $3,347,650, what he determined was the maximum penalty permitted under the statute, but lamented that the fine was "the equivalent of traffic ticket fines" for a company with billions of dollars of revenue per year. | Nelson Decl., Ex. 3 at 167:8-9; 171:12-23 (*People v. Plains* April 25, 2019 Hearing Transcript). |
| 64. | | Judge Herman was concerned that the fines levied up to 2019 were not "significant enough to really discourage Plains from . . . massive oil spills." | Nelson Decl., Ex. 3 at 166:27-167:10 (*People v. Plains* April 25, 2019 Hearing Transcript). |
| 65. | | When the Pipeline ruptured, it spilled more than 140,000 gallons of crude oil onto Lot X, owned by Plaintiff Grey Fox. | Dkt. 107 SAC, ¶ 11 (SAC).<br><br>Nelson Decl., Ex. 4 at 2-3 (Ex. 112 to Lloyd Dep., Case Closure Summary). |
| 66. | | The oil from Plains' ruptured Pipeline seeped toxic hydrocarbons into Plaintiff's soil. | *See generally* Nelson Decl., Ex. 5 (*Andrews* Dkt. 606-9 (excerpt of water sample results, PLAINS CLEX-AM-00013521)). |
| 67. | | Aside from cleanup efforts, the aftermath of the spill also required extensive monitoring, testing, and oversight from governmental entities. | Nelson Decl., Ex. 6 at 140:19–142:3 (*Grey Fox* Kristin Sept. 19, 2023 Robrock Dep. Transcript). |
| 68. | | Aside from cleanup efforts, the aftermath of the spill also required extensive monitoring, testing, and oversight from governmental entities. | *See generally* Nelson Decl., Ex. 4 at 2-3 (Ex. 112 to Lloyd Dep., Case Closure Summary). |

| | | |
|---|---|---|
| 69. | Grey Fox did not have full control over Lot X until April 30, 2021, when the Central Coast Regional Water Quality Control Board closed the site cleanup program. | Nelson Decl., Ex. 4 at 2 (Ex. 112 to Lloyd Dep., Case Closure Summary) ("Plains continues to monitor the restoration progress and submitted an annual report (April 21, 2020) that demonstrates that the restoration has progressed and has been successful.").<br><br>Nelson Decl., Ex. 6 at 141:21–142:3 (*Grey Fox* Kristin Sept. 19, 2023 Robrock Dep. Transcript). |
| 70. | Through March 2, 2017, Unified Command conducted monitoring of the restoration site, including checking hydrocarbon runoff when major storm water runoff from the spill site ran into the culvert to ensure that the site was clear of hydrocarbons. | Nelson Decl., Ex. 4 at 2 (Ex. 112 to Lloyd Dep., Case Closure Summary). |
| 71. | Mark Lloyd oversaw Plains' remediation work on Lot X, and was asked to "confirm that the surface of the ground had been restored and that the revegetation as required by the remediation plan had been implemented" pursuant to the Agreement…which he did. | Nelson Decl., Ex. 7 at 62:6-9 (*Grey Fox* May 31, 2022 Chris Jacobs Dep. Transcript). |
| 72. | Oil remained on Lot X after Plains removed its personnel and equipment. | Nelson Decl., Ex. 7 at 62:21–25 (*Grey Fox* May 31, 2022 Chris Jacobs Dep. Transcript). |
| 73. | The Temporary Access Agreement merely granted Plains physical access to and/or use of Plaintiff's property while Plains cleaned up its oil spill. | Nelson Decl., Ex. 8 ¶ 1 (Temporary Access Agreement) (granting Plains "a temporary, nonexclusive, right to enter upon such portion of Owner's |

| | | | |
|---|---|---|---|
| | | | Property . . . to conduct sampling and remediation."). |
| 74. | | The Temporary Access Agreement states, "It is expressly understood that this Agreement does not provide any lienholder, ownership interest, or any other rights to the Property." | Nelson Decl., Ex. 8 ¶ 13 (Temporary Access Agreement). |
| 75. | | The Temporary Access Agreement explicitly reserves Grey Fox's tort claims. | Nelson Decl., Ex. 8 ¶ 12 (Temporary Access Agreement) ("Nothing in this Agreement shall limit any right or claim, legal or otherwise, the Owner may have against Plains, and the Owner expressly reserves all of its rights and claims it has or will have against Plains."). |
| 76. | | The Temporary Access Agreement was signed after the spill occurred. | Nelson Decl., Ex. 7 at 17:5-8 (*Grey Fox* May 31, 2022 Chris Jacobs Dep. Transcript) (Following the spill, Chris Jacobs, a lawyer for Grey Fox, negotiated the Temporary Access Agreement with Plains). |
| 77. | | When the parties executed the Temporary Access Agreements there were no allocations of financial risk made to compensate Grey Fox for its loss of use. | *See generally* Nelson Decl., Ex. 8 (Temporary Access Agreement) (the Temporary Access Agreement only compensated Grey Fox for Plains' access to and use of its property). |
| 78. | | All tort claims were expressly reserved in the Agreement. | Nelson Decl., Ex. 8 ¶ 12 (Temporary Access Agreement) (explicitly reserved "all of [Grey Fox's] rights and claims it has or will have against Plains."). |

19

| | | |
|---|---|---|
| 79. | The "Use Fee" that Plains paid pursuant to the Temporary Access Agreement was "for [Plains'] use of the Property to complete the [remediation] Work." | Nelson Decl., Ex. 8 ¶ 10 (Temporary Access Agreement). |
| 80. | Grey Fox's attorney, Chris Jacobs, negotiated the Temporary Access Agreement. | Nelson Decl., Ex. 7 at 17:2-6 (*Grey Fox* May 31, 2022 Chris Jacobs Dep. Transcript). |
| 81. | The Use Fee was intended to be "a daily use fee" for Plains' staging of its personnel and equipment on the property. | Nelson Decl., Ex. 7 at 40:7-13 (*Grey Fox* May 31, 2022 Chris Jacobs Dep. Transcript). |
| 82. | The Agreement states that "the Parties are not in agreement as to the monetary value for the use of the Property by Plains as contemplates in this Agreement." | Nelson Decl., Ex. 8 ¶ 10 (Temporary Access Agreement). |
| 83. | Under the Temporary Access Agreement, Plains only agreed to clean up Lot X to a "specified standard," but its continued payments were not contingent on its full remediation and restoration of the property. | Nelson Decl., Ex. 7 at 41:12-15 (*Grey Fox* May 31, 2022 Chris Jacobs Dep. Transcript).<br><br>Nelson Decl., Ex. 8 ¶ 7 (Temporary Access Agreement) (defining "Stipulated Remediation Level"). |
| 84. | Plains ended its access to and remediation of the property (and thus its payments) before the property was fully remediated and restored. | Nelson Decl., Ex. 6 at 141:21–142:3 (*Grey Fox* Kristin Sept. 19, 2023 Robrock Dep. Transcript).<br><br>*See generally* Nelson Decl., Ex. 4 (Ex. 112 to Lloyd Dep., Case Closure Summary). |

| | | |
|---|---|---|
| 85. | It was not until January 2021, that "the Central Coast Regional Water Quality Control Board signed off on the remediation [of the spill site] and closed the case." | *See generally* Nelson Decl., Ex. 4 (Ex. 112 to Lloyd Dep., Case Closure Summary). Nelson Decl., Ex. 6 at 141:21–142:3 (*Grey Fox* Kristin Sept. 19, 2023 Robrock Dep. Transcript). |
| 86. | Dr. Bell performed a "use effect" analysis, which required calculating the reasonable rental value of Lot X. | Nelson Decl., Ex. 9 at 27-30 (July 22, 2022 Randall Bell Expert Report) ("Market Rent x Period of Time = Use Effect"; "[T]he damages would be equivalent to the cost of renting a comparable substitute property."). |
| 87. | Lot X was constructed "on spec," meaning it developed to sell in turnkey condition to a "speculative" future buyer and "constructed on the premise of a short holding period." | Nelson Decl., Ex. 9 at 29 (July 22, 2022 Randall Bell Expert Report). |
| 88. | Because speculative homes are typically "not leased," there is a "lack of local rental data for high-end estate homes" such as Lot X. | Nelson Decl., Ex. 9 at 29 (July 22, 2022 Randall Bell Expert Report). |
| 89. | Dr. Bell used the ground lease rate as a proxy for the reasonable rental value of a substitute property. | Nelson Decl., Ex. 9 at 29 (July 22, 2022 Randall Bell Expert Report). |
| 90. | "Ground leases are a real estate-based investment that include both a rental rate return and appreciation," however Dr. Bell did not include an estimated rate of appreciation in his calculation, as shown by his selection of 8% as the ground lease on Lot X. | Nelson Decl., Ex. 9 at 29 (July 22, 2022 Randall Bell Expert Report). |

21

| | | |
|---|---|---|
| 91. | Plains has been convicted of a felony crime for its misconduct. | *See generally* Nelson Decl., Ex. 10 (*People v. Plains* Verdict Form). |
| 92. | The jury found beyond a reasonable doubt that Plains was guilty of "knowingly discharging oil, or [that Plains] reasonably should have known that its actions would cause the discharge of oil, into the waters of the state." | Nelson Decl., Ex. 10 at Count 1 (*People v. Plains* Verdict Form). |
| 93. | The jury was specifically instructed that in order to find Plains guilty of this crime (Count 1), it must conclude "*beyond a reasonable doubt that Plains knew or should have known that its maintenance, integrity management and operations policies and practices would cause a discharge of crude oil into the Pacific Ocean.*" | Nelson Decl., Ex. 2 at 5 (Jury Instructions). |
| 94. | During Plains' sentencing hearing, Superior Court Judge James E. Herman, who oversaw the criminal trial, observed that Plains knew its maintenance integrity management operations, policies, and practices would cause Line 901 to rupture. | Nelson Decl., Ex. 3 at 165:10-12 (*People v. Plains* Apr. 25, 2019 Hearing Transcript). |
| 95. | Judge Herman described Plains' misconduct as: "Stating the case in its simplest terms, Plains knew its two-decade old buried insulated Pipeline was | Nelson Decl., Ex. 11 at AOE000122:15-19 (*People v. Plains* Feb. 29, 2019 Order Denying Plains Motion for Reconsideration of Acquittal, at AOE000122). |

22

| | | | |
|---|---|---|---|
| | | vulnerable to external corrosion. It knew that the ILI measuring tool was inaccurate with a high percentage of overcalls and under-calls in measuring the depth of anomaly erosions of the pipe wall. As the People argued, given the root causes of the rupture, which Plains failed to mitigate, a Pipeline failure resulting in release of oil [was] foreseeable based on what Plains knew or should have known." | |
| | 96. | Plaintiff's expert, Dr. Kim Cameron, who specializes in metallurgy and failure analysis on Pipeline systems, confirmed that Plains was well-aware of corrosion in Line 901 yet failed to impose required maintenance or an alarm management plan. | Nelson Decl., Ex. 12 at 2-5 (*Grey Fox* July 22, 2022 Kim Cameron Expert Rep.) ("Plains was not maintaining lines 901 and 903 according to industry standards or as required by federal regulations, based on their failure to follow an integrity management plan or alarm management plan."). |
| | 97. | Plains had multiple warnings and chances to correct its maintenance failures that led to the Pipeline corrosion and ultimate rupture, yet chose not to "until after the release of crude oil." | Nelson Decl., Ex. 12 at 6 (Kim Cameron 07/22/2022 *Grey Fox* Rep.) ("[T]he very analysis on forms F11 that Plains was cited for in 2012 for the 2007 assessment, was again not done for the 2012 assessment until after the release of crude oil."). <br><br> Nelson Decl., Ex. 12 at 4-5 (Kim Cameron 07/22/2022 *Grey Fox* Rep.) (PHMSA warnings as to Plains' inadequate documentation of its justification for not undertaking preventative and mitigation measures to protect high consequence areas and unclear procedures and documentation of its decision-making process for addressing when in line |

2983654.2

23

STATEMENT OF GENUINE DISPUTES ISO PLS' OPP TO PLAINS' MOTION FOR PARTIAL SUMMARY JUDGMENT - CASE NO. 2:16-CV-03157-PSG-JEM

| | | | inspection tool run data indicates anomalous conditions). |
|---|---|---|---|
| 98. | Dr. Cameron concluded that given Plains' long list of maintenance failures, "it was unsurprising that a failure of Line 901 occurred." | | Nelson Decl., Ex. 12 at 5 (Kim Cameron 07/22/2022 *Grey Fox* Rep.). |
| 99. | Plains was on notice of a specific risk at the failure location and then consciously disregarded the risk. | | *See generally* Nelson Decl., Ex. 12 (Kim Cameron 07/22/2022 *Grey Fox* Rep.). |
| 100. | Even if Plains were not on notice, it was only due to its own deficient maintenance of Line 901, including useless ILI runs from 2007, 2009, and on until the rupture in 2015. | | Nelson Decl., Ex. 12 (Kim Cameron 07/22/2022 *Grey Fox* Rep.). |
| 101. | Moreover, Plains did not follow its own safety plans. | | Nelson Decl., Ex. 12 (Kim Cameron 07/22/2022 *Grey Fox* Rep.). |

Dated: April 26, 2024

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

By:   */s/ Robert J. Nelson*

Robert J. Nelson (CSB No. 132797)
Nimish Desai (CSB No. 244953)
Wilson M. Dunlavey (CSB No. 307719)
Amelia A. Haselkorn (CSB No. 339633)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339

Juli Farris (CSB No. 141716)
Matthew J. Preusch (CSB No. 298144)

2983654.2

24

STATEMENT OF GENUINE DISPUTES ISO PLS' OPP TO PLAINS' MOTION FOR PARTIAL SUMMARY JUDGMENT - CASE NO. 2:16-CV-03157-PSG-JEM

1         KELLER ROHRBACK L.L.P.
           801 Garden Street, Suite 301

2         Santa Barbara, CA 93101

3

         Lynn Lincoln Sarko, (Pro Hac Vice)

4         KELLER ROHRBACK L.L.P.

5         1201 Third Ave, Suite 3200
           Seattle, WA 98101

6

7         A. Barry Cappello (CSB No. 037835)
           Leila J. Noël (CSB No. 114307)

8         Lawrence J. Conlan (CSB No. 221350)
           CAPPELLO & NOËL LLP

9         831 State Street

10        Santa Barbara, CA 93101-3227

11

12        ***Attorneys for Plaintiff***

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28